UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.:

ANGELA MARIA HENAO MONTES; AURA
MARIA OCAMPO OCAMPO;  BEATRIZ HELENA
ARCILA RINCON; GLORIA ELENA BOTERO
OCAMPO; MARIA ROSMIRA VELEZ DE HENAO;
MARTHA ELENA VALENCIA CORREA;
MONICA MARIA BEDOYA GAVIRIA; ADA LUZ
TEHERAN HERRERA; ALBA ROCIO SOTO
ACEVEDO;  ANA ELIZABETH SANCHEZ DE
VASQUEZ; ANA EMILCEN DIAZ ESCOBAR;
ANA WAITOTO GAMBOA; DIANA MARIA
VARGAS HERNANDEZ; EMILIA BLANDON;
FANNY DE JESUS GRACIANO TORRES; FLOR
ELENA LOPEZ GUERRA; GUSTAVO MIGUEL
VILLADIEGO MARTINEZ; JHON JAIRO TORRES
VARELAS; JOSE SATURNINO MURILLO
MORENO; LUZ ELENA PARRA MORALES; LUZ
EVERLY MORENO OBREGON; LUZ MARINA
CORDONA PEREZ; MAGNOLIA TRUJILLO;
MARIA DE JESUS MONSALVE DE AVENDAÑO;
MARIA DEL CARMEN GONZALEZ CORDOBA;
MARIA EUSEBIA LOPEZ VALENCIA; MARIA
JULIANA POVEDA DE MURILLO; MARIA
LEONOR CHAVERRA DE RENDON; MARTHA
ALICIA MURILLO MOSQUERA; MARTHA
ISABEL ALVAREZ GRISALES; NELSA ROSA
ORTIZ PADILLA; NUR ERNEDIS GOMEZ
GUERRERO; RAFAEL ANGEL MANCO GUISAO;
SANDRA BIBIANA MORENO FERNANDEZ;
AMANDA OSPINA DE RUIZ; GABRIEL DE
JESUS CANO; LUZ MARGARITA ARANGO
RESTREPO; AIDA MOSQUERA CAÑIZALEZ;
ASTERIO MENDOZA MOSQUERO; DORA
NELLY ESCOBAR METAUTE; LUZ MARINA
TUBERQUIA OSORIO; MARIA OMAIRA
FRANCO VASQUEZ; AMPARO DE JESUS
MORALES OLIVARES; ENADIS MARTINEZ
BRAVO; JUANA DE DIOS BEDOYA; MARIA
ELENA GONZALEZ MORENO; ORLANDO DE
JESUS GARCIA BETANCUR; TERESA TABARES;
URSULA DEL CARMEN CABADIA MARQUEZ;

**COMPLAINT**

**Jury Trial Demanded**

1

XIOMARA PIEDRAHITA VALENCIA; YANETH AMIN BELLO; ALEIDA IRENE RUIZ DE ARREDONDO; ALICIA DE JESUS ALVAREZ; ALICIA DE JESUS ALVAREZ; ALIDA DEL SOCORRO SANTANA AMARILES; ANA MARINA GARCIA SERNA; ANGEL EMIRO ARBOLEDA ORTIZ; BERTALINA MESA DE AGUDELO; BLANCA ASENTH RESTREPO; CRISTOBAL DE JESUS RESTREPO BERRIO; CRUZ ELENA TORO GARCIA; ELVIA JULIA DEL CARMEN CORREA DE DIOSA; FERLEY DE JESUS MARTINEZ RIOS; FLOR ANGELA ZAPATA BEDOYA; GLORIA ELENA BALZAN BENJUMEA; GLORIA ELENA PIEDRAHITA; GLORIA EMILSEN ZAPATA ARDILA; JOSE GENARO FLOREZ DIOSA; LORENA ALCIRA VELEZ ACEVEDO; LUCIA MARGARITA ARDILA DE BEDOYA; LUZ AMANDA MONTOYA GARCIA; LUZ MARINA RESTREPO; LUZ MIRIAM GUTIERREZ OBANDO; LUZ NELLY BLANDON HOYOS; LUZ OFELIA JARAMILLO PARRA; MARIA CATALINA JIMENEZ; MARIA CONSUELO MORALES CASTAÑO; MARIA DEL ROCIO CALLE GONZALEZ; MARIA DEL ROSARIO PULGARIN GARCES; MARIA GRACIELA CARO ALVAREZ; MARIA LETICIA CORREA; MARIA LILIAN QUINTERO RAMIREZ; MARIA LUCELLY AGUDELO; MARIA MARLENY URREGO; MARIA NINFA RESTREPO DE CARDENAS; MARLENY DE JESUS ALVAREZ; MARTHA CECILIA PALACIO PALACIO; NELSYN CATALINA MESA; ORLINDE PALACIO LOPEZ; ROSA MARINA AMARILES PALACIO; ROSALBA ORTEGA RESTREPO; ROSALBA RUIZ RESTREPO; ROSMIRA PINO HIGUITA; RUTH NELLY ESTRADA MUÑOZ; VIRGINIA DE JESUS SANCHEZ; YHIRLEY VANESA OCHOA VELEZ; MARIA CRISTINA CHAVERRA HIGUITA; GLORIA NELLY TUBERQUIA OSORIO; EMILCE DEL SOCORRO CASTRO DE PATINO; MARIA NUBIA GONZALEZ PATIÑO; TERESA DE JESUS MUNOZ ZAPATA; ANA FABIOLA MONSALVE PULGARIN; CARLOS ALBERTO FLOREZ VALENCIA; CARMEN DOLORES CARMONA ROMAN; CARMEN JULIA CHICA DE SUAZA; MARIA ISABEL OCAMPO DE OCAMPO; MARIA

NUBIA JIMENEZ DE RAMIREZ; MARIA OLIVIA
CASTRO RIOS; MARIA SOELY FLOREZ
OROZON; OLGA DEL SOCORRO RODAS
VILLADA; AMPARO HENAO ARIAS; ADRIANA
PATRICIA VILLADA GRISALES; ANA MARIA
GAVIRIA TABARES; ANA MARIS CARDONA DE
PAVAS; BERNARDA OSORIO MARULANDA;
BETSABE MEJIA DE LOPEZ; BLANCA LUZ
VILLADA ALZATE; BLANCA OLIVIA TORO
RIOS;  BLANCA RUTH OSORIO; CARMEN
EMILIA VILLA; CECILIA RIOS DE RINCON;
CELIA MARGARITA TOBON TOBON; CELINA
DE JESUS OTALVARO OSORIO; CLARA ROSA
CARDENAS DE GUTIERREZ; CLAUDIA DEL
SOCORRO RIOS CASTRO; DIANA PATRICIA
VELASQUEZ; ELVIA TOBON DE JURADO; FLOR
MARIA ARIAS GALEANO; GLORIA DEL
CARMEN CARMONA PEREZ; GLORIA
PATRICIA VALENCIA LOPEZ; HERIBERTO DE
JESUS PATINO OCAMPO; JAIME DE JESUS
GAVIRIA BOTERO; JESUS MARIA VILLADA
VALENCIA; JOHN JULIO CASTEÑEDA TORO;
JORGE IVAN OCAMPO ARENAS; LILIANA
PATRICIA ALVAREZ MAZO; LUCIA MOLINA
RIOS; LUIS ALFONSO BOTERO BOTERO; LUIS
EDUARDO MORALES; LUZ DARY BEDOYA
GAVIRIA; LUZ MARINA RODRIGUEZ
VALENCIA; LUZ MERY GARCIA HENAO; LUZ
MERY MUÑOZ MUÑOZ; MAGDALENA INES
OCAMPO DE PEREZ; MARGARITA DE JESUS
CORREA DE BEDOYA; MARIA CECILIA
FLOREZ VALENCIA; MARIA CIELO VILLADA;
MARIA CONSUELO MARULANDA MARTINEZ;
MARIA CONSUELO MONTOYA RAMIREZ;
MARIA ELENA RIOS GAVIRIA; MARIA ELVIA
OROZCO DE ARIAS; MARIA LUZ BEDOYA
ECHAVARRIA; MARIA OLGA RIOS MOLINA;
MARIA OLIVIA FLOREZ PAVAS; MARIA
OMAIRA GAVIRIA DE MOLINA; MARIA
ROMELIA RIOS; MARIA TERESA BURITICA;
MARLENI VILLADA BUITRAGO; MARLENY
MAZO; MARLENY RESTREPO MARULANDA;
MARTA LINA OTALVARO OTALVARO;
MARTHA CECILIA OCAMPO DE OTALVARO;
MARTHA LIA ARENAS; MERDADO ARGOTE;
MIGUEL ANGEL VALENCIA VALENCIA;
NANCY RODAS GALLEGO; OFELIA VALENCIA

DE RIOS; OLIVA ARANGO ANDRADE;
POLICARPA DE LOS DOLORES LOPEZ MARIN;
RODOLFO DE JESUS CARDONA; ROSA EDILMA
LOPEZ GAVIRIA; ROSALBA BEDOYA
ECHAVARRIA; SANDRA MILENA MEDINA
QUINTERO; TERESA DE JESUS GAVIRIA DE
GOMEZ; MARTA LIGIA PAVAS DE ROJAS;
ROSANA TABARES DE GAVIRIA; SONIA
ELIZABETH PATINO BEDOYA; FANNY DE
JESUS MALDONADO DE BOLIVAR; JUAN
FERNANDO MARIN LONDOÑO; LILIANA
MARIA GARCIA GARCIA; MARIA GABRIELA
RESTREPO VELEZ; ZULIA CUESTA BLANDON;
LUZ NERIZ MARTINEZ PEDROZA; GUSTAVO
ALONSO CONEO MACIAS; LUIS ANTONIO
GUISAO; LUZ MILA BUENAÑO RIOS; ALICIA
GARCIA DE GAVIRIA; FLOR ANGELA MEDINA;
FRANCISCO JAVIER VILLADA LLANO; MARIA
ELENA CARMONA DE CARDONA; MARIA
MARLENY CASTRO DE OCAMPO; MARIA
GABRIELA BENITEZ; LUCY ANDREA USME
VALENCIA; BLANCA MARGARITA RAIGOZA
DE ECHAVARRIA; LUZ MERY SANCHEZ DE
ALVAREZ; ANA LUCIA MOLLA MORENO;
ASTRID DEL SOCORRO NEGRETE DE AMAYA;
CARLOS ENRIQUE ARENA DURANGO; CECILIA
ROSA ESPITIA; ELENA BELLO ESPITIA; FLOR
MARIA GASPAR CAUSIL; GLADYS MARIA
MONTES URANGO; GLADYS NUNEZ BENITEZ;
GREGORIA TAPIA MARIMON; INES PAUTT
MORALES; LEDYS NAUDITH YANES LEON;
MARGARITA SOFIA CASTILLO LAMBERTINEZ;
MARIA DEL CARMEN USUGA MOLINA; MARIA
LUISA MESA MESTRA; MARTHA CECILIA
CARDONA HENAO; MARTIN ELIECER DE LAS
AGUAS BELLO; MARTINA CORDOBA DE
BERRIO; NATACHA PIEDRAHITA VALENCIA;
ROSMIRA SUAREZ METRIO; BLANCA CECILIA
CAÑAVERAL; CLAUDIA YANET SERNA
ARANGO; TERESA LOPEZ JULIO; MARLENE
MARIA MARMOL PEREZ; LUCILA MANCILLA
DE GAVIRIA; ENI JHOANNA DELGADO
CORDOBA; CILA MARIA CORREA SEA; LUIS
ALBEIRO MONCADA TREJOS; ARGEMIRO
MANUEL ESPRIELLA CASARRUBIA; ELVIRA
DEL CARMEN LOZANO LOZANO; LUZ DARY
CARVAJAL GRACIANO; ALEXANDRA MUÑOZ

ARIAS; GLORIA ISABEL AGUIRRE; SILVIA
AMPARO GIRALDO DE OBANDO; MARIA DE
LA PAZ BLANDON PULGARIN; DAMARIS
VERGARA TRESPALACIOS,

                  Plaintiffs,

      v.

CHIQUITA BRANDS INTERNATIONAL, INC., a
New Jersey corporation,

                  Defendant.
_____/

## COMPLAINT

Plaintiffs, by their attorneys Boies, Schiller & Flexner LLP, for their Complaint, allege as follows:

## INTRODUCTION

1.      For a period of more than six years, Defendant Chiquita Brands International, Inc. ("Chiquita") knowingly and intentionally made over one hundred payments totaling more than $1.7 million to the United Self-Defense Groups of Colombia (*Autodefensorias Unidas de Colombia* or "AUC"), a violent terrorist organization.   Chiquita's payments were used by the AUC to finance a widespread and systematic campaign of massacres, extra-judicial killings, torture, murders, forced disappearances, forced displacements, and other violent acts against civilians in the regions of Colombia where Plaintiffs or their deceased family members lived and worked.

2.      In 2001, the United States government designated the AUC as both a Foreign Terrorist Organization and a Specifically-Designated Global Terrorist.  Consequently, it is a crime for any person or entity to provide material support or engage in unauthorized transactions with the AUC.  By making payments to the AUC, Chiquita regularly, repeatedly and knowingly

5

engaged in criminal conduct that violated federal law and provided practical assistance and material support to a terrorist organization.

3.      In 2007, the United States Department of Justice ("DOJ") charged Chiquita with Engaging in Transactions with a Specially-Designated Global Terrorist, in violation of 50 U.S.C. § 1705(b) and 31 C.F.R 594.204.  After being charged, Chiquita admitted that its payments to the AUC were unlawful and pled guilty to the offense.  In conformity with its plea agreement, Chiquita was convicted of a felony, agreed to a criminal fine of $25 million, and was placed on corporate probation for a period of five years.

4.      The Plaintiffs are family members of individuals who were killed by the AUC or are individuals who were themselves seriously injured by the AUC as a result of Chiquita's support for the AUC and its operations.  The Plaintiffs now seek compensatory and punitive damages arising from Chiquita's unlawful financing of terrorism and its violations of international law under the Alien Tort Claims Act, 28 U.S.C. § 1350, the Torture Victims Protection Act, 28 U.S.C. § 1350 note, and Ohio law.

## JURISDICTION AND VENUE

5.      The Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction); 28 U.S.C. § 1350 (Alien Tort Claims Act); and 28 U.S.C. § 1350, note § 2(a) (Torture Victim Protection Act).

6.      The Court also has diversity subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(2) because (i) all Plaintiffs are citizens of, and permanently domiciled in, the Republic of Colombia; (ii) Defendant Chiquita is a citizen of the State of New Jersey with its corporate headquarters in the State of Ohio; and (iii) the amount in controversy for each Plaintiff exceeds $75,000.

7.      In addition, the Court has supplemental jurisdiction over any claims based on the laws of the State of Ohio or other applicable jurisdictions pursuant to 28 U.S.C. § 1367(d).

8.      Pursuant to 28 U.S.C. § 1391, venue is proper and convenient in this district.

## PARTIES

**A.      Plaintiffs.**

9.      Plaintiff Angela Maria Henao Montes is the representative and widow of Jose Claudio Gomez Gomez.  Decedent Jose Claudio Gomez Gomez was forcibly disappeared by the AUC on December 29, 2001 in the municipality of Abejorral located in Antioquia, Colombia. On December 5, 2005, Jose Claudio Gomez Gomez was declared legally dead as of December 29, 2001.

10.      Plaintiff Aura Maria Ocampo Ocampo is the representative and legal heir of Luis Angel Botero Alvarez.  Decedent Luis Angel Botero Alvarez was killed by the AUC on September 6, 2000 in the municipality of Abejorral located in Antioquia, Colombia.

11.      Plaintiff Beatriz Helena Arcila Rincon is the representative and legal heir of Juan Carlos Florez Castro.  Decedent Juan Carlos Florez Castro was killed by the AUC on May 29, 2002 in the municipality of Abejorral located in Antioquia, Colombia.

12.      Plaintiff Gloria Elena Botero Ocampo is the representative and legal heir of Aldemar Grisales Garzon.  Decedent Aldemar Grisales Garzon was killed by the AUC on July 9, 2003 in the municipality of Abejorral located in Antioquia, Colombia.

13.      Plaintiff Maria Rosmira Velez de Henao is the representative and legal heir of Ivan de Jesus Henao Velez.  Decedent Ivan de Jesus Henao Velez was killed by the AUC on March 30, 2002 in the municipality of Abejorral located in Antioquia, Colombia.

14.      Plaintiff Martha Elena Valencia Correa is the representative and legal heir of Hernando de Jesus Valencia Correa.  Decedent Hernando de Jesus Valencia Correa was killed by

the AUC on or about November 11, 2000 in the municipality of Abejorral located in Antioquia, Colombia.

15.     Plaintiff Monica Maria Bedoya Gaviria is the representative and legal heir of Jose Indalecio Garcia Castano.  Decedent Jose Indalecio Garcia Castano was killed by the AUC on October 19, 2002 in the municipality of Abejorral located in Antioquia, Colombia.

16.     Plaintiff Ada Luz Teheran Herrera is the representative and legal heir of Yesi de Jesus Hoyos Martinez.  Decedent Yesi de Jesus Hoyos Martinez was killed by the AUC on April 15, 2004 in the municipality of Apartadó located in Antioquia, Colombia.

17.     Plaintiff Alba Rocio Soto Acevedo is the representative and legal heir of Dubey Antonio Hernandez Soto.  Decedent Dubey Antonio Hernandez Soto was killed by the AUC on March 19, 2000 in the municipality of Apartadó located in Antioquia, Colombia.

18.     Plaintiff Ana Elizabeth Sanchez de Vasquez is the representative and legal heir of Bladimir Vasquez Sanchez.  Decedent Bladimir Vasquez Sanchez was killed by the AUC on June 2, 1999 in the municipality of Apartadó located in Antioquia, Colombia.

19.     Plaintiff Ana Emilcen Diaz Escobar is the representative and legal heir of Rosney de Jesus Diaz.  Decedent Rosney de Jesus Diaz was killed by the AUC on September 14, 1999 in the municipality of Apartadó located in Antioquia, Colombia.

20.     Plaintiff Ana Waitoto Gamboa is the representative and legal heir of Casildo Alido Gamboa Mosquera.  Decedent Casildo Alido Gamboa Mosquera was killed by the AUC on January 16, 1997 in the municipality of Apartadó located in Antioquia, Colombia.

21.     Plaintiff Diana Maria Vargas Hernandez is the representative and legal heir of Javier Antonio Lopez.  Decedent Javier Antonio Lopez was killed by the AUC on June 20, 2004 in the municipality of Apartadó located in Antioquia, Colombia.

22.     Plaintiff Emilia Blandon is the representative and legal heir of Bertilio Blandon. Decedent Bertilio Blandon was killed by the AUC on July 25, 1997 in the municipality of Apartadó located in Antioquia, Colombia.

23.     Plaintiff Fanny de Jesus Graciano Torres is the representative and legal heir of Mariela Graciano Torres.  Decedent Mariela Graciano Torres was killed by the AUC on July 17, 1999 in the municipality of Apartadó located in Antioquia, Colombia.

24.     Plaintiff Flor Elena Lopez Guerra is the representative and legal heir of Jose Albeiro Lopez Guerra.  Decedent Jose Albeiro Lopez Guerra was killed by the AUC on June 5, 1997 in the municipality of Apartadó located in Antioquia, Colombia.

25.     Plaintiff Gustavo Miguel Villadiego Martinez is the representative and legal heir of Miguel Antonio Villadiego Martinez.  Decedent Miguel Antonio Villadiego Martinez was killed by the AUC on November 4, 2000 in the municipality of Apartadó located in Antioquia, Colombia.

26.     Plaintiff Jhon Jairo Torres Varelas is the representative and legal heir of Octavio de Jesus Graciano Torres.  Decedent Octavio de Jesus Graciano Torres was killed by the AUC on November 14, 2001 in the municipality of Apartadó located in Antioquia, Colombia.

27.     Plaintiff Jose Saturnino Murillo Moreno is the representative and brother of Jose Rubersindo Murillo Moreno.  Decedent Jose Rubersindo Murillo Moreno was forcibly disappeared by the AUC on August 7, 1998 in the municipality of Apartadó located in Antioquia, Colombia.  On August 9, 2004, Jose Rubersindo Murillo Moreno was declared legally dead as of August 7, 2000.

28.     Plaintiff Luz Elena Parra Morales is the representative and legal heir of Manuel Esteban Cotuaz Orozco.  Decedent Manuel Esteban Cotuaz Orozco was killed by the AUC on May 4, 2004 in the municipality of Apartadó located in Antioquia, Colombia.

9

29.     Plaintiff Luz Everly Moreno Obregon is the representative and legal heir of Moises Fonseca Perea.  Decedent Moises Fonseca Perea was killed by the AUC on December 13, 2000 in the municipality of Apartadó located in Antioquia, Colombia.

30.     Plaintiff Luz Marina Cordona Perez is the representative and legal heir of Ana Rita Perez Tabarez.  Decedent Ana Rita Perez Tabarez was killed by the AUC on May 13, 1998 in the municipality of Apartadó located in Antioquia, Colombia.

31.     Plaintiff Magnolia Trujillo is the representative and legal heir of Oscar William Agudelo Trujillo.  Decedent Oscar William Agudelo Trujillo was killed by the AUC on January 16, 2001 in the municipality of Apartadó located in Antioquia, Colombia.

32.     Plaintiff Maria de Jesus Monsalve de Avendaño is the representative and legal heir of Julio Cesar Avendaño Monsalve.  Decedent Julio Cesar Avendaño Monsalve was killed by the AUC on or about December 7, 1999 in the municipality of Apartadó located in Antioquia, Colombia.

33.     Plaintiff Maria del Carmen Gonzalez Cordoba is the representative and legal heir of Carlos Enrique Vivas Gonzalez.  Decedent Carlos Enrique Vivas Gonzalez was killed by the AUC on March 9, 1999 in the municipality of Apartadó located in Antioquia, Colombia.

34.     Plaintiff Maria Eusebia Lopez Valencia is the representative and legal heir of Jeiler Lopez Valencia.  Decedent Jeiler Lopez Valencia was killed by the AUC on July 7, 2004 in the municipality of Apartadó located in Antioquia, Colombia.

35.     Plaintiff Maria Juliana Poveda de Murillo is the representative and legal heir of Jose Luis Murillo Poveda.  Decedent Jose Luis Murillo Poveda was killed by the AUC on January 9, 2000 in the municipality of Apartadó located in Antioquia, Colombia.

36.     Plaintiff Maria Leonor Chaverra de Rendon is the representative and mother of Arturo de Jesus Rendon Chaverra.  Arturo de Jesus Rendon Chaverra was forcibly disappeared

by the AUC on November 11, 1998 in the municipality of Apartadó located in Antioquia, Colombia.

37.     Plaintiff Maria Leonor Chaverra de Rendon is the representative and mother of Hernando de Jesus Rendon Chaverra.  Hernando de Jesus Rendon Chaverra was forcibly disappeared by the AUC on November 11, 1998 in the municipality of Apartadó located in Antioquia, Colombia.

38.     Plaintiff Martha Alicia Murillo Mosquera is the representative and sister of Mario Mosquera Robledo.  Mario Mosquera Robledo was forcibly disappeared by the AUC on November 29, 2000 in the municipality of Apartadó located in Antioquia, Colombia.

39.     Plaintiff Martha Isabel Alvarez Grisales is the representative and legal heir of Libia Maria Alvarez Grisales.  Decedent Libia Maria Alvarez Grisales was killed by the AUC on September 10, 2003 in the municipality of Apartadó located in Antioquia, Colombia.

40.     Plaintiff Nelsa Rosa Ortiz Padilla is the representative and legal heir of Federmin Ortega Ortiz.  Decedent Federmin Ortega Ortiz was killed by the AUC on or about December 20, 1999 in the municipality of Apartadó located in Antioquia, Colombia.

41.     Plaintiff Nur Ernedis Gomez Guerrero is the representative and legal heir of Felix de Jesus Henrique Fernandez.  Decedent Felix de Jesus Henrique Fernandez was killed by the AUC on October 6, 2003 in the municipality of Apartadó located in Antioquia, Colombia.

42.     Plaintiff Rafael Angel Manco Guisao is the representative and legal heir of Jesus Emilio Manco Guisao.  Decedent Jesus Emilio Manco Guisao was killed by the AUC on November 24, 1998 in the municipality of Apartadó located in Antioquia, Colombia.

43.     Plaintiff Sandra Bibiana Moreno Fernandez is the representative and legal heir of Amparo de Jesus Fernandez Montaño.  Decedent Amparo de Jesus Fernandez Montaño was

killed by the AUC on April 26, 1997 in the municipality of Apartadó located in Antioquia, Colombia.

44.     Plaintiff Amanda Ospina de Ruiz is the representative and mother of Marco Tulio Ruiz Ospina.  Marco Tulio Ruiz Ospina was forcibly disappeared by the AUC on June 12, 1999 in the municipality of Bolívar located in Antioquia, Colombia.

45.     Plaintiff Gabriel de Jesus Cano is the representative and legal heir of Luis Enrique Munoz Cano.  Decedent Luis Enrique Munoz Cano was killed by the AUC on June 21, 1997 in the municipality of Bolívar located in Antioquia, Colombia.

46.     Plaintiff Luz Margarita Arango Restrepo is the representative and legal heir of Luis Fernando Velez Rodriguez.  Decedent Luis Fernando Velez Rodriguez was killed by the AUC on November 9, 2000 in the municipality of Caldas located in Antioquia, Colombia.

47.     Plaintiff Aida Mosquera Cañizalez is the representative and legal heir of Juan Horacio Moreno Lemos.  Decedent Juan Horacio Moreno Lemos was killed by the AUC on or about July 19, 2000 in the municipality of Carepa located in Antioquia, Colombia.

48.     Plaintiff Asterio Mendoza Mosquero is the representative and legal heir of Carlos Alberto Mendoza.  Decedent Carlos Alberto Mendoza was killed by the AUC on December 17, 2000 in the municipality of Carepa located in Antioquia, Colombia.

49.     Plaintiff Dora Nelly Escobar Metaute is the representative and surviving partner of Erasmo Antonio Velasquez Duarte.  Erasmo Antonio Velasquez Duarte was forcibly disappeared by the AUC on February 6, 2000 in the municipality of Carepa located in Antioquia, Colombia.

50.     Plaintiff Luz Marina Tuberquia Osorio is the representative and legal heir of Lisandro Antonio Gomez Tuberquia.  Decedent Lisandro Antonio Gomez Tuberquia was killed by the AUC on June 11, 2004 in the municipality of Carepa located in Antioquia, Colombia.

51.     Plaintiff Maria Omaira Franco Vasquez is the representative and legal heir of Hernando Usuga Usuga.  Decedent Hernando Usuga Usuga was killed by the AUC on April 7, 1997 in the municipality of Carepa located in Antioquia, Colombia.

52.     Plaintiff Amparo de Jesus Morales Olivares is the representative and mother of Hector Enrique Mestro Morales.  Hector Enrique Mestro Morales was forcibly disappeared by the AUC on January 26, 1997 in the municipality of Chigorodó located in Antioquia, Colombia.

53.     Plaintiff Enadis Martinez Bravo is the representative and legal heir of Ana Faustina Bravo.  Decedent Ana Faustina Bravo was killed by the AUC on November 26, 1999 in the municipality of Chigorodó located in Antioquia, Colombia.

54.     Plaintiff Juana de Dios Bedoya is the representative and legal heir of Jose Eriberto Higuita Bedoya.  Decedent Jose Eriberto Higuita Bedoya was killed by the AUC on January 13, 2002 in the municipality of Chigorodó located in Antioquia, Colombia.

55.     Plaintiff Maria Elena Gonzalez Moreno is the representative and legal heir of Manuel Espitia Herrero.  Decedent Manuel Espitia Herrero was killed by the AUC on July 5, 1997 in the municipality of Chigorodó located in Antioquia, Colombia.

56.     Plaintiff Orlando de Jesus Garcia Betancur is the representative and legal heir of Ronald Orlando Garcia Marulanda.  Decedent Ronald Orlando Garcia Marulanda was killed by the AUC on June 19, 2002 while traveling from the municipality of Carepa to the municipality of Chigorodó in Antioquia, Colombia.

57.     Plaintiff Teresa Tabares is the representative and legal heir of Juan Guillermo Cortes Tabares.  Decedent Juan Guillermo Cortes Tabares was killed by the AUC on October 3, 2003 in the municipality of Chigorodó located in Antioquia, Colombia.

58.     Plaintiff Ursula del Carmen Cabadia Marquez is the representative and legal heir of Santander Cabadia.  Decedent Santander Cabadia was killed by the AUC on July 10, 1997 in the municipality of Chigorodó located in Antioquia, Colombia.

59.     Plaintiff Xiomara Piedrahita Valencia is the representative and legal heir of Manuel Maria Correa Gomez.  Decedent Manuel Maria Correa Gomez was killed by the AUC on August 21, 1997 in the municipality of Chigorodó located in Antioquia, Colombia.

60.     Plaintiff Yaneth Amin Bello is the representative and legal heir of Jose Edgar Ibarguen Panesso.  Decedent Jose Edgar Ibarguen Panesso was killed by the AUC on October 3, 2003 in the municipality of Chigorodó located in Antioquia, Colombia.

61.     Plaintiff Aleida Irene Ruiz de Arredondo is the representative and legal heir of Jorge Eliecer Arredondo Ruiz.  Decedent Jorge Eliecer Arredondo Ruiz was killed by the AUC on September 27, 1999 in the municipality of Concordia located in Antioquia, Colombia.

62.     Plaintiff Alicia De Jesus Alvarez is the representative and legal heir of Carlos Alonso Ramirez Ortiz Alvarez.  Decedent Carlos Alonso Ramirez Ortiz Alvarez was killed by the AUC on July 15, 1998 in the municipality of Concordia located in Antioquia, Colombia.

63.     Plaintiff Alicia De Jesus Alvarez is the representative and legal heir of Luz Faneltira Ortiz Alvarez.  Decedent Luz Faneltira Ortiz Alvarez was killed by the AUC on July 14, 1998 in the municipality of Concordia located in Antioquia, Colombia.

64.     Plaintiff Alida Del Socorro Santana Amariles is the representative and legal heir of Sergio Augusto Santana.  Decedent Sergio Augusto Santana was killed by the AUC on January 8, 2004 in the municipality of Concordia located in Antioquia, Colombia.

65.     Plaintiff Ana Marina Garcia Serna is the representative and mother of Jose Dorlay Sanchez Garcia.  Jose Dorlay Sanchez Garcia was forcibly disappeared by the AUC on May 29, 1999 in the municipality of Concordia located in Antioquia, Colombia.

14

66.     Plaintiff Angel Emiro Arboleda Ortiz is the representative and legal heir of Hector Fabio Arboleda Ortiz.  Decedent Hector Fabio Arboleda Ortiz was killed by the AUC on or about November 15, 2001 in the municipality of Concordia located in Antioquia, Colombia.  At the time he was killed by the AUC, Hector Fabio Arboleda was in the custody of Colombia prison officers.  While being transported, the prison officers delivered Hector Fabio Arboleda to the AUC, who killed him.

67.     Plaintiff Bertalina Mesa de Agudelo is the representative and mother of Aristobulo Agudelo Mesa.  Aristobulo Agudelo Mesa was forcibly disappeared by the AUC on September 20, 2002 in the municipality of Concordia located in Antioquia, Colombia.

68.     Plaintiff Blanca Asenth Restrepo is the representative and legal heir of Jose Ancizar Restrepo Rivera.  Decedent Jose Ancizar Restrepo Rivera was killed by the AUC on February 21, 1998 in the municipality of Concordia located in Antioquia, Colombia.

69.     Plaintiff Cristobal de Jesus Restrepo Berrio is the representative and legal heir of Guillermo Hernando Restrepo Ortega.  Decedent Guillermo Hernando Restrepo Ortega was killed by the AUC on December 13, 1998 in the municipality of Concordia located in Antioquia, Colombia.

70.     Plaintiff Cruz Elena Toro Garcia is the representative and legal heir of Jesus Maria Rojas Toro.  Decedent Jesus Maria Rojas Toro was killed by the AUC on March 30, 1997 in the municipality of Concordia located in Antioquia, Colombia.

71.     Plaintiff Cruz Elena Toro Garcia is the representative and legal heir of Luis Emilio Rojas Toro.  Decedent Luis Emilio Rojas Toro was killed by the AUC on November 22, 1997 in the municipality of Concordia located in Antioquia, Colombia.

72.     Plaintiff Elvia Julia del Carmen Correa de Diosa is the representative and legal heir of Luis Angel Valencia Sanchez.  Decedent Luis Angel Valencia Sanchez was killed by the AUC on January 08, 2000 in the municipality of Concordia located in Antioquia, Colombia.

73.     Plaintiff Ferley de Jesus Martinez Rios was attacked and severely injured by the AUC on April 13, 1997 in the municipality of Concordia located in Antioquia, Colombia.

74.     Plaintiff Flor Angela Zapata Bedoya is the representative and sister of Luis Enrique Zapata Bedoya.  Luis Enrique Zapata Bedoya was forcibly disappeared by the AUC on February 15, 2001 in the municipality of Concordia located in Antioquia, Colombia. Plaintiff Gloria Elena Balzan Benjumea is the representative and surviving partner of Carlos Mario Rivera Munoz.  Carlos Mario Rivera Munoz was forcibly disappeared by the AUC on November 21, 1999 in the municipality of Concordia located in Antioquia, Colombia.

75.     Plaintiff Gloria Elena Piedrahita is the representative and sister of Carlos Alberto Guzman Piedrahita.  Carlos Alberto Guzman Piedrahita was forcibly disappeared by the AUC on September 23, 2000 in the municipality of Concordia located in Antioquia, Colombia.

76.     Plaintiff Gloria Emilsen Zapata Ardila is the representative and legal heir of Miguel Angel Toro Arredondo.  Decedent Miguel Angel Toro Arredondo was killed by the AUC on August 3, 1997 in the municipality of Concordia located in Antioquia, Colombia.

77.     Plaintiff Jose Genaro Florez Diosa is the representative and legal heir of Dario Angel Florez Diosa.  Decedent Dario Angel Florez Diosa was killed by the AUC on March 30, 1998 in the municipality of Concordia located in Antioquia, Colombia.

78.     Plaintiff Lorena Alcira Velez Acevedo is the representative and wife of Argiro de Jesus Serna Higuita.  Argiro de Jesus Serna Higuita was forcibly disappeared by the AUC on January 18, 2000 in the municipality of Concordia located in Antioquia, Colombia.

79.     Plaintiff Lucia Margarita Ardila de Bedoya is the representative and mother of Javier de Jesus Bedoya Ardila.  Decedent Javier de Jesus Bedoya Ardila was forcibly disappeared by the AUC on December 28, 2000 in the municipality of Concordia located in Antioquia, Colombia.  Plaintiff was subsequently advised of Mr. Bedoya Ardila's death.

80.     Plaintiff Luz Amanda Montoya Garcia is the representative and legal heir of Jhon Ramiro Montoya.  Decedent Jhon Ramiro Montoya was killed by the AUC on October 11, 1997 in the municipality of Concordia located in Antioquia, Colombia.

81.     Plaintiff Luz Marina Restrepo is the representative and legal heir of Jose Javier Arreondo Restrepo.  Decedent Jose Javier Arreondo Restrepo was killed by the AUC on August 31, 1997 in the municipality of Concordia located in Antioquia, Colombia.

82.     Plaintiff Luz Miriam Gutierrez Obando is the representative and legal heir of Jhon Jairo Marin.  Decedent Jhon Jairo Marin was killed by the AUC on June 6, 1998 in the municipality of Concordia located in Antioquia, Colombia.

83.     Plaintiff Luz Nelly Blandon Hoyos is the representative and mother of Javier Dario Zapata Blandon.  Javier Dario Zapata Blandon was forcibly disappeared by the AUC on July 20, 2000 in the municipality of Concordia located in Antioquia, Colombia.

84.     Plaintiff Luz Ofelia Jaramillo Parra is the representative and aunt of Jhon Fredy Jaramillo.  Jhon Fredy Jaramillo was forcibly disappeared by the AUC on October 13, 2000 in the municipality of Concordia located in Antioquia, Colombia.

85.     Plaintiff Maria Catalina Jimenez is the representative and mother of Marino de Jesus Bedoya Jimenez.  Marino de Jesus Bedoya Jimenez was forcibly disappeared by the AUC on December 22, 1999 in the municipality of Concordia located in Antioquia, Colombia.

17

86.     Plaintiff Maria Consuelo Morales Castaño is the representative and mother of Elgar de Jesus Sanchez Morales.  Elgar de Jesus Sanchez Morales was forcibly disappeared by the AUC on February 21, 2003 in the municipality of Concordia located in Antioquia, Colombia.

87.     Plaintiff Maria Consuelo Morales Castaño is the representative and mother of Orley de Jesus Sanchez Morales.  Orley de Jesus Sanchez Morales was forcibly disappeared by the AUC on February 21, 2003 in the municipality of Concordia located in Antioquia, Colombia.

88.     Plaintiff Maria del Rocio Calle Gonzalez is the representative and legal heir of Carlos Hernando Calle Gonzalez.  Decedent Carlos Hernando Calle Gonzalez was killed by the AUC on December 27, 1997 in the municipality of Concordia located in Antioquia, Colombia.

89.     Plaintiff Maria del Rosario Pulgarin Garces is the representative and mother of Elkin Dario Moreno Pulgarin.  Elkin Dario Moreno Pulgarin was forcibly disappeared by the AUC on November 20, 2002 in the municipality of Concordia located in Antioquia, Colombia.

90.     Plaintiff Maria Graciela Caro Alvarez is the representative and sister of Jhon Jaime Caro Alvarez.  Jhon Jaime Caro Alvarez was forcibly disappeared by the AUC on September 15, 2000 in the municipality of Concordia located in Antioquia, Colombia.

91.     Plaintiff Maria Graciela Caro Alvarez is the representative and sister of Jorge Leon Caro Alvarez.  Jorge Leon Caro Alvarez was forcibly disappeared by the AUC on September 15, 2000 in the municipality of Concordia located in Antioquia, Colombia.

92.     Plaintiff Maria Leticia Correa is the representative and legal heir of Argemiro de Jesus Cañas Velez.  Decedent Argemiro de Jesus Cañas Velez was killed by the AUC on October 17, 1997 in the municipality of Concordia located in Antioquia, Colombia.

93.     Plaintiff Maria Lilian Quintero Ramirez is the representative and wife of Belisario Palacio Montoya.  Belisario Palacio Montoya was forcibly disappeared by the AUC on March 20, 2002 in the municipality of Concordia located in Antioquia, Colombia.

18

94.     Plaintiff Maria Lucelly Agudelo is the representative and mother of Nelson de Jesus Sanchez Agudelo.  Nelson de Jesus Sanchez Agudelo was forcibly disappeared by the AUC on February 26, 2001 in the municipality of Concordia located in Antioquia, Colombia.

95.     Plaintiff Maria Marleny Urrego is the representative and mother of Jorge Andres Urrego.  Jorge Andres Urrego was forcibly disappeared by the AUC on August 17, 2002 in the municipality of Concordia located in Antioquia, Colombia.

96.     Plaintiff Maria Ninfa Restrepo de Cardenas is the representative and legal heir of Raul de Jesus Cardenas Restrepo.  Decedent Raul de Jesus Cardenas Restrepo was killed by the AUC on June 27, 2001 in the municipality of Concordia located in Antioquia, Colombia.

97.     Plaintiff Marleny de Jesus Alvarez is the representative and wife of Oscar Emilio Restrepo Ramirez.  Oscar Emilio Restrepo Ramirez was forcibly disappeared by the AUC on July 15, 2000 in the municipality of Concordia located in Antioquia, Colombia.

98.     Plaintiff Martha Cecilia Palacio Palacio is the representative and legal heir of Gustavo Alonso Garcia Palacio.  Decedent Gustavo Alonso Garcia Palacio was killed by the AUC on September 14, 1997 in the municipality of Concordia located in Antioquia, Colombia.

99.     Plaintiff Nelsyn Catalina Mesa is the representative and legal heir of Maximiliano Mesa.  Decedent Maximiliano Mesa was killed by the AUC on January 12, 1997 in the municipality of Concordia located in Antioquia, Colombia.

100.     Plaintiff Orlinde Palacio Lopez is the representative and legal heir of Juan Fernando Palacio Lopez.  Decedent Juan Fernando Palacio Lopez was killed by the AUC on November 8, 1997 in the municipality of Concordia located in Antioquia, Colombia.

101.     Plaintiff Rosa Marina Amariles Palacio is the representative and legal heir of Hugo de Jesus Davila Amariles.  Decedent Hugo de Jesus Davila Amariles was killed by the AUC on March 7, 1997 in the municipality of Concordia located in Antioquia, Colombia.

102.    Plaintiff Rosalba Ortega Restrepo is the representative and legal heir of Jose Gabriel Benjumea.  Decedent Jose Gabriel Benjumea was killed by the AUC on August 3, 1997 in the municipality of Concordia located in Antioquia, Colombia.

103.    Plaintiff Rosalba Ruiz Restrepo is the representative and legal heir of Fabio Alexander Ruiz.  Decedent Fabio Alexander Ruiz was killed by the AUC on June 28, 2001 in the municipality of Concordia located in Antioquia, Colombia.

104.    Plaintiff Rosmira Pino Higuita is the representative and mother of Walter de Jesus Zapata Pino.  Walter de Jesus Zapata Pino was forcibly disappeared by the AUC on February 16, 1999 in the municipality of Concordia located in Antioquia, Colombia.

105.    Plaintiff Ruth Nelly Estrada Muñoz is the representative and legal heir of Rosember Henao Villa.  Decedent Rosember Henao Villa was killed by the AUC on January 2, 2000 in the municipality of Concordia located in Antioquia, Colombia.

106.    Plaintiff Virginia de Jesus Sanchez is the representative and legal heir of Gilberto Lasso.  Decedent Gilberto Lasso was killed by the AUC on July 13, 1998 in the municipality of Concordia located in Antioquia, Colombia.

107.    Plaintiff Yhirley Vanesa Ochoa Velez is the representative and legal heir of Gladys Magnolia Velez Perez.  Decedent Gladys Magnolia Velez Perez was killed by the AUC on November 18, 2003 in the municipality of Concordia located in Antioquia, Colombia.

108.    Plaintiff Maria Cristina Chaverra Higuita is the representative and legal heir of Parmenio Alberto Seña Guerrero.  Decedent Parmenio Alberto Seña Guerrero was killed by the AUC on January 22, 2001 in the municipality of Currulao located in Antioquia, Colombia.

109.    Plaintiff Gloria Nelly Tuberquia Osorio is the representative and legal heir of Gilberto Antonio Cartagena Osorio.  Decedent Gilberto Antonio Cartagena Osorio was killed by the AUC on January 5, 1999 in the municipality of Dabeiba located in Antioquia, Colombia.

110. Plaintiff Luz Marina Tuberquia Osorio is the representative and legal heir of Gerardo Antonio Gomez Ramirez. Decedent Gerardo Antonio Gomez Ramirez was killed by the AUC on September 18, 1997 in the municipality of Dabeiba located in Antioquia, Colombia.

111. Plaintiff Emilce del Socorro Castro de Patino is the representative and legal heir of Jhon Alexander Patino Castro. Decedent Jhon Alexander Patino Castro was killed by the AUC on December 6, 1998 in the municipality of El Carmen de Viboral located in Antioquia, Colombia.

112. Plaintiff Maria Nubia Gonzalez Patiño is the representative and legal heir of Dario Antonio Rodriguez Ortiz. Decedent Dario Antonio Rodriguez Ortiz was killed by the AUC on June 2, 2001 in the municipality of El Carmen de Viboral located in Antioquia, Colombia.

113. Plaintiff Teresa De Jesus Munoz Zapata is the representative and legal heir of Pablo Cesar Blandon Munoz. Decedent Pablo Cesar Blandon Munoz was killed by the AUC on September 4, 2000 in the municipality of El Carmen de Viboral located in Antioquia, Colombia.

114. Plaintiff Ana Fabiola Monsalve Pulgarin is the representative and legal heir of Hernan Gabriel Garcia Monsalve. Decedent Hernan Gabriel Garcia Monsalve was killed by the AUC on March 20, 1999 in the municipality of El Retiro located in Antioquia, Colombia. At the time he was killed, Hernan Gabriel Garcia Monsalve had been detained by local police while travelling. The police delivered Hernan Gabriel Garcia Monsalve to the AUC, who killed him.

115. Plaintiff Carlos Alberto Florez Valencia is the representative and legal heir of Andres Julian Florez Carmona. Decedent Andres Julian Florez Carmona was killed by the AUC on November 8, 2003 in the municipality of El Retiro located in Antioquia, Colombia.

116. Plaintiff Carmen Dolores Carmona Roman is the representative and legal heir of Andres Julian Florez Carmona. Decedent Andres Julian Florez Carmona was killed by the AUC on November 8, 2003 in the municipality of El Retiro located in Antioquia, Colombia.

21

117.    Plaintiff Carmen Julia Chica de Suaza is the representative and legal heir of William de Jesus Suaza Chica.  Decedent William de Jesus Suaza Chica was killed by the AUC on July 21, 1999 in the municipality of El Retiro located in Antioquia, Colombia.

118.    Plaintiff Jesus Maria Villada Valencia is the representative and legal heir of Jhon Jairo Villada Bedoya.  Decedent Jhon Jairo Villada Bedoya was killed by the AUC on February 27, 2002 in the municipality of El Retiro located in Antioquia, Colombia.

119.    Plaintiff Maria Isabel Ocampo de Ocampo is the representative and legal heir of Alirio De Jesus Ocampo Ocampo.  Decedent Alirio De Jesus Ocampo Ocampo was killed by the AUC on June 1, 2001 in the municipality of El Retiro located in Antioquia, Colombia.

120.    Plaintiff Maria Nubia Jimenez de Ramirez is the representative and legal heir of Victor Alonso Ramirez Jimenez.  Decedent Victor Alonso Ramirez Jimenez was killed by the AUC on August 5, 2000 in the municipality of El Retiro located in Antioquia, Colombia.

121.    Plaintiff Maria Olivia Castro Rios is the representative and legal heir of Carlos Antonio Tabares Castro.  Decedent Carlos Antonio Tabares Castro was killed by the AUC on March 12, 2002 in the municipality of El Retiro located in Antioquia, Colombia.

122.    Plaintiff Maria Soely Florez Orozon is the representative and legal heir of Juan Carlos Perez Ceballos.  Decedent Juan Carlos Perez Ceballos was killed by the AUC on August 24, 2002 in the municipality of El Retiro located in Antioquia, Colombia.

123.    Plaintiff Olga Del Socorro Rodas Villada is the representative and legal heir of Roberto Carlos Muñeton Rodas.  Decedent Roberto Carlos Muñeton Rodas was killed by the AUC on August 22, 1997 in the municipality of El Retiro located in Antioquia, Colombia.

124.    Plaintiff Amparo Henao Arias is the representative and mother of Adrian Kaleth Escobar Henao.  Adrian Kaleth Escobar Henao was forcibly disappeared by the AUC on June 11, 1998 in the municipality of Envigado located in Antioquia, Colombia.

22

125.    Plaintiff Adriana Patricia Villada Grisales is the representative and legal heir of Milton Orbey Villada Grisales.  Decedent Milton Orbey Villada Grisales was killed by the AUC on May 2, 1999 in the municipality of La Ceja located in Antioquia, Colombia.

126.    Plaintiff Ana Maria Gaviria Tabares is the representative and legal heir of Jhon Jairo Blandon.  Decedent Jhon Jairo Blandon was killed by the AUC on May 6, 2001 in the municipality of La Ceja located in Antioquia, Colombia.

127.    Plaintiff Ana Maris Cardona De Pavas is the representative and legal heir of Monica Maria Pavas Cardona.  Decedent Monica Maria Pavas Cardona was killed by the AUC on April 18, 2002 in the municipality of La Ceja located in Antioquia, Colombia.

128.    Plaintiff Bernarda Osorio Marulanda is the representative and legal heir of Robinson Alexander Valencia Osorio.  Decedent Robinson Alexander Valencia Osorio was killed by the AUC on June 4, 1997 in the municipality of La Ceja located in Antioquia, Colombia.

129.    Plaintiff Betsabe Mejia de Lopez is the representative and legal heir of Januario Antonio Lopez Dominguez.  Decedent Januario Antonio Lopez Dominguez was killed by the AUC on February 22, 1998 in the municipality of La Ceja located in Antioquia, Colombia.

130.    Plaintiff Blanca Luz Villada Alzate is the representative and legal heir of William Arsenio Villada Alzate.  Decedent William Arsenio Villada Alzate was killed by the AUC on October 10, 2001 in the municipality of La Ceja located in Antioquia, Colombia.

131.    Plaintiff Blanca Olivia Toro Rios is the representative and legal heir of Marina del Socorro Toro Rios.  Decedent Marina del Socorro Toro Rios was killed by the AUC on November 7, 1997 in the municipality of La Ceja located in Antioquia, Colombia.

132.    Plaintiff Blanca Ruth Osorio is the representative and legal heir of Rodrigo Alvaran.  Decedent Rodrigo Alvaran was killed by the AUC on August 13, 2000 in the municipality of La Ceja located in Antioquia, Colombia.

133.    Plaintiff Carmen Emilia Villa is the representative and legal heir of Hugo Alexander Villa.  Decedent Hugo Alexander Villa was killed by the AUC on June 28, 2001 in the municipality of La Ceja located in Antioquia, Colombia.

134.    Plaintiff Cecilia Rios de Rincon is the representative and legal heir of Elkin de Jesus Rincon Rios.  Decedent Elkin de Jesus Rincon Rios was killed by the AUC on November 28, 1999 in the municipality of La Ceja located in Antioquia, Colombia.

135.    Plaintiff Celia Margarita Tobon Tobon is the representative and legal heir of Gonzalo Tobon Tobon.  Decedent Gonzalo Tobon Tobon was killed by the AUC on June 14, 1999 in the municipality of La Ceja located in Antioquia, Colombia.

136.    Plaintiff Celia Margarita Tobon Tobon is the representative and legal heir of Victor Tobon Tobon.  Decedent Victor Tobon Tobon was killed by the AUC on February 13, 2001 in the municipality of La Ceja located in Antioquia, Colombia.

137.    Plaintiff Celina de Jesus Otalvaro Osorio is the representative and legal heir of Juan Fernando Lopez Otalvaro.  Decedent Juan Fernando Lopez Otalvaro was killed by the AUC on March 29, 1998 in the municipality of La Ceja located in Antioquia, Colombia.

138.    Plaintiff Clara Rosa Cardenas de Gutierrez is the representative and legal heir of Diego Leon Gutierrez Cardenas.  Decedent Diego Leon Gutierrez Cardenas was killed by the AUC on May 12, 1997 in the municipality of La Ceja located in Antioquia, Colombia.

139.    Plaintiff Claudia del Socorro Rios Castro is the representative and legal heir of Hector de Jesus Marulanda Rodriguez.  Decedent Hector de Jesus Marulanda Rodriguez was

killed by the AUC on July 13, 2001 in the municipality of La Ceja located in Antioquia, Colombia.

140.     Plaintiff Diana Patricia Velasquez is the representative and legal heir of Raul Alberto Ramirez Arenas.  Decedent Raul Alberto Ramirez Arenas was killed by the AUC on or about May 11, 1997 in the municipality of La Ceja located in Antioquia, Colombia.

141.     Plaintiff Elvia Tobon de Jurado is the representative and mother of Javier Alexander Jurado Tobon.  Decedent Javier Alexander Jurado Tobon was forcibly disappeared by the AUC on July 28, 2002 in the municipality of La Ceja located in Antioquia, Colombia. On July 30, 2002, Plaintiff was advised that Decedent had been murdered and told to retrieve his body.

142.     Plaintiff Flor Maria Arias Galeano is the representative and legal heir of Wilmar Alexander Marulanda Arias.  Decedent Wilmar Alexander Marulanda Arias was killed by the AUC on October 9, 2002 in the municipality of La Ceja located in Antioquia, Colombia.

143.     Plaintiff Gloria del Carmen Carmona Perez is the representative and legal heir of Heriberto de Jesus Jurado Gutierrez.  Decedent Heriberto de Jesus Jurado Gutierrez was killed by the AUC on July 13, 2001 in the municipality of La Ceja located in Antioquia, Colombia.

144.     Plaintiff Gloria Patricia Valencia Lopez is the representative and legal heir of Alfonso Delgado Ortiz.  Decedent Alfonso Delgado Ortiz was killed by the AUC on September 16, 1998 in the municipality of La Ceja located in Antioquia, Colombia.

145.     Plaintiff Heriberto de Jesus Patino Ocampo is the representative and legal heir of Rolando de Jesus Patino Arboleda.  Decedent Rolando de Jesus Patino Arboleda was killed by the AUC on January 17, 2001 in the municipality of La Ceja located in Antioquia, Colombia.

146.    Plaintiff Jaime de Jesus Gaviria Botero is the representative and legal heir of Juan Felipe Gaviria Molina.  Decedent Juan Felipe Gaviria Molina was killed by the AUC on April 12, 2002 in the municipality of La Ceja located in Antioquia, Colombia.

147.    Plaintiff Jesus Maria Villada Valencia is the representative and legal heir of Diego Antonio Villada Bedoya.  Decedent Diego Antonio Villada Bedoya was killed by the AUC on July 13, 2001 in the municipality of La Ceja located in Antioquia, Colombia.

148.    Plaintiff John Julio Casteñeda Toro is the representative and legal heir of Julio Jaime Castañeda Arango.  Decedent Julio Jaime Castañeda Arango was killed by the AUC on April 23, 1998 in the municipality of La Ceja located in Antioquia, Colombia.

149.    Plaintiff Jorge Ivan Ocampo Arenas was attacked and severely injured by the AUC on January 17, 2001 in the municipality of La Ceja located in Antioquia, Colombia.

150.    Plaintiff Liliana Patricia Alvarez Mazo is the representative and legal heir of Wilson Alberto Pavas Lopez.  Decedent Wilson Alberto Pavas Lopez was killed by the AUC on November 4, 1999 in the municipality of La Ceja located in Antioquia, Colombia.

151.    Plaintiff Lucia Molina Rios is the representative and legal heir of Juan Guillermo Molina Rios.  Decedent Juan Guillermo Molina Rios was killed by the AUC on September 4, 2001 in the municipality of La Ceja located in Antioquia, Colombia.

152.    Plaintiff Luis Alfonso Botero Botero is the representative and legal heir of Jorge Humberto Botero Castaneda.  Decedent Jorge Humberto Botero Castaneda was killed by the AUC on April 23, 1999 in the municipality of La Ceja located in Antioquia, Colombia.

153.    Plaintiff Luis Eduardo Morales is the representative and legal heir of Jose David Morales Valencia.  Decedent Jose David Morales Valencia was killed by the AUC on March 11, 2002 in the municipality of La Ceja located in Antioquia, Colombia.

154.    Plaintiff Luz Dary Bedoya Gaviria is the representative and legal heir of German Alonso Cardona Rios.  Decedent German Alonso Cardona Rios was killed by the AUC on December 8, 2001 in the municipality of La Ceja located in Antioquia, Colombia.

155.    Plaintiff Luz Marina Rodriguez Valencia is the representative and legal heir of Edwin German Rodriguez.  Decedent Edwin German Rodriguez was killed by the AUC on February 12, 2002 in the municipality of La Ceja located in Antioquia, Colombia.

156.    Plaintiff Luz Mery Garcia Henao is the representative and legal heir of Reinaldo de Jesus Botero Tobon.  Decedent Reinaldo de Jesus Botero Tobon was killed by the AUC on or about July 9, 2001 in the municipality of La Ceja located in Antioquia, Colombia.

157.    Plaintiff Luz Mery Muñoz Muñoz is the representative and wife of Gilberto Rios Murillo.  Gilberto Rios Murillo was forcibly disappeared by the AUC on September 11, 2001 in the municipality of La Ceja located in Antioquia, Colombia.

158.    Plaintiff Magdalena Ines Ocampo de Perez is the representative and legal heir of Fabian Andres Perez Ocampo.  Decedent Fabian Andres Perez Ocampo was killed by the AUC on or about March 23, 1997 in the municipality of La Ceja located in Antioquia, Colombia.

159.    Plaintiff Margarita de Jesus Correa de Bedoya is the representative and legal heir of Fabian Alonso Bedoya Correa.  Decedent Fabian Alonso Bedoya Correa was killed by the AUC on June 14, 1997 in the municipality of La Ceja located in Antioquia, Colombia.

160.    Plaintiff Maria Cecilia Florez Valencia is the representative and legal heir of May Deyber Florez.  Decedent May Deyber Florez was killed by the AUC on February 8, 2003 in the municipality of La Ceja located in Antioquia, Colombia.

161.    Plaintiff Maria Cielo Villada is the representative and legal heir of Robert Andrey Villada Villada.  Decedent Robert Andrey Villada Villada was killed by the AUC on February 4, 2001 in the municipality of La Ceja located in Antioquia, Colombia.

162.     Plaintiff Maria Consuelo Marulanda Martinez is the representative and legal heir of Elkin Fernando Arango Marulanda. Decedent Elkin Fernando Arango Marulanda was killed by the AUC on May 19, 2002 in the municipality of La Ceja located in Antioquia, Colombia.

163.     Plaintiff Maria Consuelo Montoya Ramirez is the representative and legal heir of Juan Camillo Rios Montoya. Decedent Juan Camillo Rios Montoya was killed by the AUC on February 12, 1998 in the municipality of La Ceja located in Antioquia, Colombia.

164.     Plaintiff Maria Elena Rios Gaviria is the representative and legal heir of Pedro Jose Alvarez Ruiz. Decedent Pedro Jose Alvarez Ruiz was killed by the AUC on April 30, 2000 in the municipality of La Ceja located in Antioquia, Colombia.

165.     Plaintiff Maria Elvia Orozco de Arias is the representative and legal heir of Javier Orozco Loaiza. Decedent Javier Orozco Loaiza was killed by the AUC on June 3, 2003 in the municipality of La Ceja located in Antioquia, Colombia.

166.     Plaintiff Maria Luz Bedoya Echavarria is the representative and legal heir of Leonardo Bedoya. Decedent Leonardo Bedoya was killed by the AUC on January 9, 1998 in the municipality of La Ceja located in Antioquia, Colombia.

167.     Plaintiff Maria Olga Rios Molina is the representative and legal heir of Albert Jony Rios. Decedent Albert Jony Rios was killed by the AUC on February 9, 1997 in the municipality of La Ceja located in Antioquia, Colombia.

168.     Plaintiff Maria Olivia Florez Pavas is the representative and legal heir of Joaquin Guillermo Ledesma Florez. Decedent Joaquin Guillermo Ledesma Florez was killed by the AUC on January 10, 2002 in the municipality of La Ceja located in Antioquia, Colombia.

169.     Plaintiff Maria Omaira Gaviria de Molina is the representative and legal heir of Henry de Jesus Molina Gaviria. Decedent Henry de Jesus Molina Gaviria was killed by the AUC on October 3, 2000 in the municipality of La Ceja located in Antioquia, Colombia.

170.    Plaintiff Maria Romelia Rios is the representative and legal heir of Andres Antonio Castro Rios.  Decedent Andres Antonio Castro Rios was killed by the AUC on May 19, 1997 in the municipality of La Ceja located in Antioquia, Colombia.

171.    Plaintiff Maria Teresa Buritica is the representative and legal heir of Nicolas Albeiro Buritica.  Decedent Nicolas Albeiro Buritica was killed by the AUC on January 19, 2003 in the municipality of La Ceja located in Antioquia, Colombia.

172.    Plaintiff Marleni Villada Buitrago is the representative and legal heir of Hernando Antonio Otalvaro Lopez.  Decedent Hernando Antonio Otalvaro Lopez was killed by the AUC on April 30, 2001 in the municipality of La Ceja located in Antioquia, Colombia.

173.    Plaintiff Marleny Mazo is the representative and legal heir of Jhon Fredy Mazo. Decedent Jhon Fredy Mazo was killed by the AUC on June 27, 1997 in the municipality of La Ceja located in Antioquia, Colombia.

174.    Plaintiff Marleny Restrepo Marulanda is the representative and daughter of Jose Argelio Restrepo Ramirez.  Jose Argelio Restrepo Ramirez was forcibly disappeared by the AUC on January 29, 1998 in the municipality of La Ceja located in Antioquia, Colombia.

175.    Plaintiff Marleny Restrepo Marulanda is the representative and legal heir of Maria Cecilia Marulanda Rodriguez.  Decedent Maria Cecilia Marulanda Rodriguez was killed by the AUC on January 29, 1998 in the municipality of La Ceja located in Antioquia, Colombia.

176.    Plaintiff Marta Lina Otalvaro Otalvaro is the representative and legal heir of Giovanny Alonso Rios Otalvaro.  Decedent Giovanny Alonso Rios Otalvaro was killed by the AUC on March 22, 1997 in the municipality of La Ceja located in Antioquia, Colombia.

177.    Plaintiff Martha Cecilia Ocampo de Otalvaro is the representative and legal heir of Gloria Emilsen Otalvaro Ocampo.  Decedent Gloria Emilsen Otalvaro Ocampo was killed by the AUC on March 27, 1998 in the municipality of La Ceja located in Antioquia, Colombia.

29

178.    Plaintiff Martha Lia Arenas is the representative and legal heir of Jeferson Johanny Roman Arenas.  Decedent Jeferson Johanny Roman Arenas was killed by the AUC on or about November 21, 2003 in the municipality of La Ceja located in Antioquia, Colombia.

179.    Plaintiff Merdado Argote is the representative and legal heir of Leonardo Fabio Argote Villada.  Decedent Leonardo Fabio Argote Villada was killed by the AUC on December 4, 2001 in the municipality of La Ceja located in Antioquia, Colombia.

180.    Plaintiff Miguel Angel Valencia Valencia is the representative and legal heir of Ivan Dario Valencia Cardona.  Decedent Ivan Dario Valencia Cardona was killed by the AUC on January 17, 2001 in the municipality of La Ceja located in Antioquia, Colombia.

181.    Plaintiff Nancy Rodas Gallego is the representative and legal heir of Juan Camilo Rios Rodas.  Decedent Juan Camilo Rios Rodas was killed by the AUC on October 10, 2001 in the municipality of La Ceja located in Antioquia, Colombia.

182.    Plaintiff Ofelia Valencia de Rios is the representative and legal heir of William Fernando Rios Valencia.  Decedent William Fernando Rios Valencia was killed by the AUC on December 20, 2002 in the municipality of La Ceja located in Antioquia, Colombia.

183.    Plaintiff Oliva Arango Andrade is the representative and legal heir of Jose Leonel Andrade Arango.  Decedent Jose Leonel Andrade Arango was killed by the AUC on January 6, 1997 in the municipality of La Ceja located in Antioquia, Colombia.

184.    Plaintiff Policarpa De Los Dolores Lopez Marin is the representative and legal heir of Elkin Dario Pavas Lopez.  Decedent Elkin Dario Pavas Lopez was killed by the AUC on January 12, 1998 in the municipality of La Ceja located in Antioquia, Colombia.

185.    Plaintiff Rodolfo de Jesus Cardona is the representative and legal heir of Rosalba Cardona Galeano.  Decedent Rosalba Cardona Galeano was killed by the AUC on or about July 6, 1997 in the municipality of La Ceja located in Antioquia, Colombia.

186.    Plaintiff Rosa Edilma Lopez Gaviria is the representative and legal heir of Francisco Javier Lopez Gaviria.  Decedent Francisco Javier Lopez Gaviria was killed by the AUC on July 5, 1997 in the municipality of La Ceja located in Antioquia, Colombia.

187.    Plaintiff Rosalba Bedoya Echavarria is the representative and legal heir of Edwin Alexander Gaviria Bedoya.  Decedent Edwin Alexander Gaviria Bedoya was killed by the AUC on or about May 4, 2003 in the municipality of La Ceja located in Antioquia, Colombia.

188.    Plaintiff Rosana Tabares de Gaviria is the representative and legal heir of Arley De Jesus Gaviria Tabares.  Decedent Arley De Jesus Gaviria Tabares was killed by the AUC on June 7, 2002 in the municipality of La Ceja located in Antioquia, Colombia.

189.    Plaintiff Sandra Milena Medina Quintero is the representative and legal heir of Jose de Jesus Medina Yarce.  Decedent Jose de Jesus Medina Yarce was killed by the AUC on December 7, 1998 in the municipality of La Ceja located in Antioquia, Colombia.

190.    Plaintiff Teresa De Jesus Gaviria de Gomez is the representative and legal heir of Diego Antonio Gomez Castro.  Decedent Diego Antonio Gomez Castro was killed by the AUC on September 17, 1997 in the municipality of La Ceja located in Antioquia, Colombia.

191.    Plaintiff Marta Ligia Pavas de Rojas is the representative and legal heir of Lazaro de Jesus Rojas Ruiz.  Decedent Lazaro de Jesus Rojas Ruiz was killed by the AUC on October 2, 2003 in the municipality of La Unión located in Antioquia, Colombia.

192.    Plaintiff Rosana Tabares de Gaviria is the representative and legal heir of Jeison Dario Gaviria Tabares.  Decedent Jeison Dario Gaviria Tabares was killed by the AUC on or about February 24, 1997 in the municipality of La Unión located in Antioquia, Colombia.

193.    Plaintiff Sonia Elizabeth Patino Bedoya is the representative and legal heir of Hernan Alonso Bedoya Jimenez.  Decedent Hernan Alonso Bedoya Jimenez was killed by the AUC on November 23, 1998 in the municipality of La Unión located in Antioquia, Colombia.

194.    Plaintiff Fanny de Jesus Maldonado de Bolivar is the representative and mother of Juan David Bolivar Maldonado.  Juan David Bolivar Maldonado was forcibly disappeared by the AUC on August 14, 2000 while traveling from the municipality of Venecia to the municipality of Medellín located in Antioquia, Colombia.

195.    Plaintiff Juan Fernando Marin Londoño is the representative and son of Rigoberto Marin Restrepo.  Rigoberto Marin Restrepo was forcibly disappeared by the AUC on September 3, 2002 in the municipality of Medellín located in Antioquia, Colombia.

196.    Plaintiff Liliana Maria Garcia Garcia is the representative and legal heir of Jhon Cesar Restrepo Correa.  Decedent Jhon Cesar Restrepo Correa was killed by the AUC on December 26, 2001 in the municipality of Medellín located in Antioquia, Colombia.

197.    Plaintiff Maria Gabriela Restrepo Velez is the representative and legal heir of Ramiro de Jesus Florez Restrepo.  Decedent Ramiro de Jesus Florez Restrepo was killed by the AUC on January 6, 2002 in the municipality of Medellín located in Antioquia, Colombia.

198.    Plaintiff Zulia Cuesta Blandon is the representative and legal heir of Julio Cesar Cuesta.  Decedent Julio Cesar Cuesta was killed by the AUC on May 1, 2000 in the municipality of Medellín located in Antioquia, Colombia.

199.    Plaintiff Luz Neriz Martinez Pedroza is the representative and legal heir of Pablo Emilio Ruiz Rodriguez.  Decedent Pablo Emilio Ruiz Rodriguez was killed by the AUC on April 12, 2004 in the municipality of Murindó located in Antioquia, Colombia.

200.    Plaintiff Gustavo Alonso Coneo Macias is the representative and son of Alfredo Coneo Hernandez.  Alfredo Coneo Hernandez was forcibly disappeared by the AUC on March 4, 1997 in the municipality of Mutatá located in Antioquia, Colombia.

201.     Plaintiff Luis Antonio Guisao is the representative and legal heir of Miguel Antonio Varela Oquendo.  Decedent Miguel Antonio Varela Oquendo was killed by the AUC on February 5, 1997 in the municipality of Mutatá located in Antioquia, Colombia.

202.     Plaintiff Luz Mila Buenaño Rios is the representative and legal heir of Mario Bello Buenaño.  Decedent Mario Bello Buenaño was killed by the AUC on September 17, 1999 in the municipality of Necoclí located in Antioquia, Colombia.

203.     Plaintiff Alicia Garcia de Gaviria is the representative and legal heir of Arnulfo de Jesus Gaviria Garcia.  Decedent Arnulfo de Jesus Gaviria Garcia was killed by the AUC on August 21, 1997 while traveling from the municipality of La Ceja to the municipality of Rionegro in Antioquia, Colombia.

204.     Plaintiff Flor Angela Medina is the representative and legal heir of Wilson Norberto Noreña Medina.  Decedent Wilson Norberto Noreña Medina was killed by the AUC on November 9, 2003 in the municipality of Rionegro located in Antioquia, Colombia.

205.     Plaintiff Francisco Javier Villada Llano is the representative and legal heir of Francisco Javier Villada Alvarez.  Decedent Francisco Javier Villada Alvarez was killed by the AUC on November 27, 1999 in the municipality of Rionegro located in Antioquia, Colombia.

206.     Plaintiff Maria Elena Carmona de Cardona is the representative and legal heir of Juan Bernardo Cardona Carmona.  Decedent Juan Bernardo Cardona Carmona was killed by the AUC on October 29, 1998 in the municipality of Rionegro located in Antioquia, Colombia.

207.     Plaintiff Maria Marleny Castro De Ocampo is the representative and legal heir of Jose Ramiro Ocampo Villa.  Decedent Jose Ramiro Ocampo Villa was killed by the AUC on August 6, 2000 in the municipality of Rionegro located in Antioquia, Colombia.

208.    Plaintiff Maria Gabriela Benitez is the representative and legal heir of Gilberto de Jesus Benitez Ibarra.  Decedent Gilberto de Jesus Benitez Ibarra was killed by the AUC on November 1, 1998 in the municipality of Salgar located in Antioquia, Colombia.

209.    Plaintiff Lucy Andrea Usme Valencia is the representative and legal heir of Orlando Antonio Saldarridga Estrada.  Decedent Orlando Antonio Saldarridga Estrada was killed by the AUC on February 12, 2001 in the municipality of San Roque located in Antioquia, Colombia.

210.    Plaintiff Blanca Margarita Raigoza de Echavarria is the representative and legal heir of Ferney Echavarria Raigoza.  Decedent Ferney Echavarria Raigoza was killed by the AUC on November 12, 1997 in the municipality of Santo Domingo located in Antioquia, Colombia.

211.    Plaintiff Blanca Margarita Raigoza de Echavarria is the representative and legal heir of Wilmar Echavarria Raigoza.  Decedent Wilmar Echavarria Raigoza was killed by the AUC on November 12, 1997 in the municipality of Santo Domingo located in Antioquia, Colombia.

212.    Plaintiff Luz Mery Sanchez de Alvarez is the representative and widow of Otoniel de Jesus Alvarez Arango.  Decedent Otoniel de Jesus Alvarez Arango was forcibly disappeared by the AUC on December 2, 1998 in the municipality of Sonsón located in Antioquia, Colombia. Mr. Alvarez Arango was found dead and subsequently buried on April 12, 1999.

213.    Plaintiff Maria Rosmira Velez de Henao is the representative and legal heir of Saulo Antonio Henao Velez.  Decedent Saulo Antonio Henao Velez was killed by the AUC on August 14, 2000 in the municipality of Sonsón located in Antioquia, Colombia.

214.    Plaintiff Ana Lucia Molla Moreno is the representative and mother of Cristobal Palacio Moya.  Decedent Cristobal Palacio Moya was forcibly disappeared by the AUC on June

11, 2003 in the municipality of Tarazá located in Antioquia, Colombia.  Plaintiff was subsequently provided with Decedent's identification and advised of his death.

215.    Plaintiff Astrid del Socorro Negrete de Amaya is the representative and legal heir of Luis Enrique Amaya Restrepo.  Decedent Luis Enrique Amaya Restrepo was killed by the AUC on December 1, 1997 in the municipality of Turbo located in Antioquia, Colombia.

216.    Plaintiff Carlos Enrique Arena Durango is the representative and brother of Maria Adelaida Arena Durango.  Maria Adelaida Arena Durango was forcibly disappeared by the AUC on January 14, 1997 in the municipality of Turbo located in Antioquia, Colombia.

217.    Plaintiff Cecilia Rosa Espitia is the representative and legal heir of Argelio de Jesus Domico Hernandez.  Decedent Argelio de Jesus Domico Hernandez was killed by the AUC on February 27, 2001 in the municipality of Turbo located in Antioquia, Colombia.

218.    Plaintiff Elena Bello Espitia is the representative and mother of Jorge Eliecer Barrera Bello.  Jorge Eliecer Barrera Bello was forcibly disappeared by the AUC on August 2, 1997 in the municipality of Turbo located in Antioquia, Colombia.

219.    Plaintiff Flor Maria Gaspar Causil is the representative and legal heir of Corcino Antonio Causil Gonzalez.  Decedent Corcino Antonio Causil Gonzalez was killed by the AUC on February 20, 1997 in the municipality of Turbo located in Antioquia, Colombia.

220.    Plaintiff Gladys Maria Montes Urango is the representative and legal heir of Ceferino Lopez Urango.  Decedent Ceferino Lopez Urango was killed by the AUC on August 31, 1997 in the municipality of Turbo located in Antioquia, Colombia.

221.    Plaintiff Gladys Nunez Benitez is the representative and legal heir of Juan Bautista Berrio Nunez.  Decedent Juan Bautista Berrio Nunez was killed by the AUC on July 31, 1999 in the municipality of Turbo located in Antioquia, Colombia.

222.     Plaintiff Gregoria Tapia Marimon is the representative and legal heir of Emilio Herrera Tapias.  Decedent Emilio Herrera Tapias was killed by the AUC on or about January 19, 2000 in the municipality of Turbo located in Antioquia, Colombia.

223.     Plaintiff Ines Pautt Morales is the representative and legal heir of Adanies Martinez Pautt.  Decedent Adanies Martinez Pautt was killed by the AUC on January 18, 2000 in the municipality of Turbo located in Antioquia, Colombia.

224.     Plaintiff Ledys Naudith Yanes Leon is the representative and legal heir of Luis Antonio Flores Martinez.  Decedent Luis Antonio Flores Martinez was killed by the AUC on August 11, 2000 in the municipality of Turbo located in Antioquia, Colombia.

225.     Plaintiff Luz Mila Buenaño Rios is the representative and legal heir of Jhon Fredy Bello Buenaño.  Decedent Jhon Fredy Bello Buenaño was killed by the AUC on July 18, 2001 in the municipality of Turbo located in Antioquia, Colombia.

226.     Plaintiff Margarita Sofia Castillo Lambertinez is the representative and legal heir of Manuel Herrera Betin.  Decedent Manuel Herrera Betin was killed by the AUC on February 6, 1997 in the municipality of Turbo located in Antioquia, Colombia.

227.     Plaintiff Maria del Carmen Usuga Molina is the representative and sister of Henry de Jesus Usuga Molina.  Henry de Jesus Usuga Molina was forcibly disappeared by the AUC on August 12, 1997 in the municipality of Turbo located in Antioquia, Colombia.

228.     Plaintiff Maria Luisa Mesa Mestra is the representative and legal heir of Elkin Jose Mesa Vila.  Decedent Elkin Jose Mesa Vila was killed by the AUC on February 3, 2004 in the municipality of Turbo located in Antioquia, Colombia.

229.     Plaintiff Martha Cecilia Cardona Henao is the representative and legal heir of Guillermo Henao Martinez.  Decedent Guillermo Henao Martinez was killed by the AUC on January 24, 1997 in the municipality of Turbo located in Antioquia, Colombia.

230.   Plaintiff Martin Eliecer de las Aguas Bello is the representative and legal heir of Jorge Luis de las Aguas Bello.  Decedent Jorge Luis de las Aguas Bello was killed by the AUC on July 3, 2003 in the municipality of Turbo located in Antioquia, Colombia.

231.   Plaintiff Martina Cordoba de Berrio is the representative and legal heir of Yonni Mosquera Berrio.  Decedent Yonni Mosquera Berrio was killed by the AUC on May 27, 1997 in the municipality of Turbo located in Antioquia, Colombia.

232.   Plaintiff Natacha Piedrahita Valencia is the representative and legal heir of Carlos Mario Uribe Arias.  Decedent Carlos Mario Uribe Arias was killed by the AUC on or about July 17, 1999 in the municipality of Turbo located in Antioquia, Colombia.

233.   Plaintiff Rosmira Suarez Metrio is the representative and legal heir of Bienvenido Castellano Suarez.  Decedent Bienvenido Castellano Suarez was killed by the AUC on March 5, 1999 in the municipality of Turbo located in Antioquia, Colombia.

234.   Plaintiff Blanca Cecilia Cañaveral is the representative and legal heir of Johny Joel Velasquez Jaramillo.  Decedent Johny Joel Velasquez Jaramillo was killed by the AUC on December 7, 1997 in the municipality of Urrao located in Antioquia, Colombia.

235.   Plaintiff Claudia Yanet Serna Arango is the representative and legal heir of Diego Ernesto Franco Zapata.  Decedent Diego Ernesto Franco Zapata was killed by the AUC on July 1, 1999 in the municipality of Urrao located in Antioquia, Colombia.

236.   Plaintiff Teresa Lopez Julio is the representative and legal heir of Alexis Lopez Julio.  Decedent Alexis Lopez Julio was killed by the AUC on November 19, 2003 in the municipality of Corinto located in Cauca, Colombia.

237.   Plaintiff Marlene Maria Marmol Perez is the representative and legal heir of Dagoberto Manuel Urango Marmol.  Decedent Dagoberto Manuel Urango Marmol was killed by the AUC on November 19, 2000 in the municipality of Aguachica located in Cesar, Colombia.

37

238.    Plaintiff Lucila Mancilla de Gaviria is the representative and mother of Edison Gaviria Mancilla.  Edison Gaviria Mancilla was forcibly disappeared by the AUC on January 28, 1997 in the municipality of Acandí located in Chocó, Colombia.

239.    Plaintiff Lucila Mancilla de Gaviria is the representative and wife of Alberto Gaviria Londoño.  Alberto Gaviria Londoño was forcibly disappeared by the AUC on January 28, 1997 in the municipality of Acandí located in Chocó, Colombia.

240.    Plaintiff Eni Jhoanna Delgado Cordoba is the representative and legal heir of Jose Lorenzo Valoyes Mena.  Decedent Jose Lorenzo Valoyes Mena was killed by the AUC on May 7, 2002 in the municipality of Carmen del Darién located in Chocó, Colombia.

241.    Plaintiff Carlos Enrique Arena Durango is the representative and legal heir of Esaul Antonio Arenas Durango.  Decedent Esaul Antonio Arenas Durango was killed by the AUC on February 20, 1997 in the municipality of Unguía located in Chocó, Colombia.

242.    Plaintiff Cila Maria Correa Sea is the representative and legal heir of Jose Luis Mendoza Monterosa.  Decedent Jose Luis Mendoza Monterosa was killed by the AUC on September 28, 2002 in the municipality of Unguía located in Chocó, Colombia.

243.    Plaintiff Luis Albeiro Moncada Trejos was kidnapped by the AUC on August 13, 2002 in the municipality of Unguía located in Chocó, Colombia and subsequently released under threat of violence.

244.    Plaintiff Argemiro Manuel Espriella Casarrubia is the representative and legal heir of Santiago Espriella Mercado.  Decedent Santiago Espriella Mercado was killed by the AUC on an unknown date in Córdoba, Colombia.

245.    Plaintiff Elvira del Carmen Lozano Lozano is the representative and legal heir of Ubaldo Antonio Arrieta Lozano.  Decedent Ubaldo Antonio Arrieta Lozano was killed by the AUC on July 6, 2003 in the municipality of Monteria located in Córdoba, Colombia.

246.    Plaintiff Luz Dary Carvajal Graciano is the representative and legal heir of Edilson Varela Tuberquia.  Decedent Edilson Varela Tuberquia was killed by the AUC on March 14, 2000 in the municipality of Tierralta located in Córdoba, Colombia.

247.    Plaintiff Alexandra Muñoz Arias is the representative and legal heir of Jhon Jairo Manco David.  Decedent Jhon Jairo Manco David was killed by the AUC on June 4, 2000 in the municipality of Pitalito located in Huila, Colombia.

248.    Plaintiff Gloria Isabel Aguirre is the representative and legal heir of Hugo Albeiro Gonzalez Marulanda.  Decedent Hugo Albeiro Gonzalez Marulanda was killed by the AUC on April 24, 2000 in the municipality of Lérida located in Tolima, Colombia.

249.    Plaintiff Silvia Amparo Giraldo de Obando is the representative and legal heir of Luis Fernando Obando Giraldo.  Decedent Luis Fernando Obando Giraldo was killed by the AUC on September 26, 2001 in the municipality of Cali located in Valle del Cauca, Colombia.

250.    Plaintiff Maria de La Paz Blandon Pulgarin is the representative and legal heir of Hector Jaime Vasquez Grajales.  Decedent Hector Jaime Vasquez Grajales was killed by the AUC on September 22, 2001 in the municipality of El Aguila located in Valle del Cauca, Colombia.

251.    Plaintiff Damaris Vergara Trespalacios is the representative and legal heir of Jorge Alberto Marquez Vergara.  Decedent Jorge Alberto Marquez Vergara was killed by the AUC on November 7, 2003 in the municipality of Jamundí located in Valle del Cauca, Colombia.

**B.    Defendant.**

252.    Defendant Chiquita is a corporation organized under the laws of the State of New Jersey.  Its headquarters are located in the State of Ohio.  Chiquita conducts substantial business in the State of Florida.  Among other things, Chiquita imports bananas and other produce

through Port Everglades, Florida, operates offices in the State of Florida, and has a registered agent in the State of Florida.

253.    At all times relevant to the allegations in this Complaint, Chiquita wholly owned and controlled C.I. Bananos de Exportación, S.A. ("Banadex").  Banadex was headquartered in Medellín, Colombia, and produced bananas in the Santa Marta and Urabá regions of northern Colombia.  At all times relevant to the allegations of this Complaint, Banadex was an agent, alter ego, co-conspirator, and joint tortfeasor with Chiquita, with which it cooperated in a joint criminal enterprise.  For purposes of this Complaint, the term "Chiquita" shall refer to both Chiquita Brands International, Inc. and Banadex interchangeably.

## INTERNATIONAL LAW

254.    The conduct described in this Complaint, which consists of Chiquita actively supporting known terrorist organizations to purposefully facilitate the commission of massacres, extra-judicial killings, torture, murders, forced disappearances, forced displacements and other violent acts against civilians, has been universally condemned under both international law and the law of the United States.

### A.    Terrorism Is A Violation Of The Law Of Nations.

255.    The commission of massacres, extra-judicial killings, murders, torture, forced disappearances, forced displacements, and other violent acts against civilians by the AUC constitute terrorism in that they were committed with the intent to cause death or serious bodily injury to civilians, or to other persons not taking an active part in open hostilities, and with the purpose that the acts intimidate a population to act or abstain from acting.  *See* The International Convention for the Suppression of the Financing of Terrorism, G.A. Res. 54/109, U.N. GA OR, 54th Sess., 76th mtg., Supp. No. 49, U.N. Doc. A/Res/53/108 (1999) (In force Apr. 2002) (the "Financing Convention");

256.    The international community has universally condemned terrorism, thus incorporating this offense into the law of nations.

257.    The following international conventions and/or United Nations Security Council Resolutions make clear that the prohibition against terrorism is incorporated into the law of nations:

- The League of Nations Convention (1937);

- The Universal Declaration of Human Rights, United Nations G.A. Res. 217A(III), U.N. Doc A/810 at 71 (1948)

- The International Covenant on Civil and Political Rights, United Nations G.A. Res. 2200A(XXI) (1966);

- The Declaration on Principles of International Relations Concerning Friendly Relations and Cooperation Among the States in Accordance with the Charter of the United Nations, United Nations G.A. Res. 2625(XXV), annex, 25th Sess., 1883rd mtg. (1970);

- Organization of American States General Assembly Resolution on Acts of Terrorism, Organization of American States (1970);

- Convention to Prevent and Punish the Acts of Terrorism Taking the Form of Crimes Against Persons and Related Extortion That Are of International Significance, Organization of American States (1971);

- The Declaration on Measures to Prevent International Terrorism Which Endangers or Takes Innocent Human Lives or Jeopardizes Fundamental Freedoms, and Study of the Underlying Causes of Those Forms of Terrorism and Acts of Violence Which Lie in Misery, Frustration, Grievance and Despair and Which Cause Some People to Sacrifice Human Lives, Including Their Own, in an Attempt to Effect Radical Changes, United Nations G.A. Res. 3034 (XXVII) (1972);

- European Convention on the Suppression of Terrorism (1977);

- The Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (1984);

- The Declaration on Measures to Prevent International Terrorism which Endangers or Takes Innocent Human Lives or Jeopardizes Fundamental Freedoms and Study of the Underlying Causes of Those Forms of Terrorism

and Acts of Violence which Lie in Misery, Frustration, Grievance and Despair and which Cause Some People to Sacrifice Human Lives, Including Their Own, in an Attempt to Effect Radical Changes, United Nations G.A. 40/61 (1989);

- Human Rights and Terrorism, United Nations G.A. Res. 48/122 (1993);

- The Declaration on Measures to Eliminate International Terrorism, United Nations G.A. Res. 49/60, 49th Sess., 84th mtg. (1994);

- The Declaration on Measures to Eliminate International Terrorism, United Nations G.A. Res. 50/53 (1994);

- The International Convention for the Suppression of Terrorist Bombings, Art. 2.1 (1997);

- The Financing Convention.

**B.**     **Financing Terrorism Is A Violation Of The Law of Nations.**

258.    The international community has universally condemned the financing of

terrorism, thus incorporating this offense into the law of nations.

259.    The following international conventions and/or United Nations Security Council

Resolutions make clear that the prohibition against financing terrorism is incorporated into the

law of nations:

- The Financing Convention;

- Resolution 1267 (1999) of October 15, 1999 on the freezing of the funds and other financial resources of the Taliban.

- Resolution 1269 (1999) of October 19, 1999 calling upon states to take steps to deny those who finance terrorist acts safe haven.

- Resolution 1333 (2000) of December 19, 2000 on the freezing of the funds and other resources of Usama bin Laden and the Al-Qaida organization.

- Resolution 1363 (2001) of July 30, 2001 on the establishment of a mechanism to monitor the implementation of measures imposed by Resolutions 1267 (1999) and 1333 (2000).

- Resolution 1373 (2001) of September 28, 2001 on threats to international peace and security caused by terrorist acts, and mandating the formation of the Counter-Terrorism Committee.

- Resolution 1377 (2001) of November 12, 2001 calling upon states to implement fully Resolution 1373 (2001).

- Resolution 1390 (2002) of January 16, 2002 effectively merging the freezing measures of Resolutions 1267 (1999) and 1333 (2000).

- Resolution 1455 (2003) of January 17, 2003 on measures to improve the implementation of the freezing measures of Resolutions 1267 (1999), 1333 (2000), and 1390 (2002).

- Resolution 1456 (2003) of January 29, 2003 reaffirming that "measures to detect and stem the flow of finance and funds for terrorist purposes must be urgently strengthened"; stating that states must "bring to justice those who finance…terrorist acts"; and urging states to become parties to the Financing Convention; calling on Counter-Terrorism Committee to intensify efforts to implement Resolution 1373 (2001).

- Resolution 1526 (2004) of January 30, 2004 calling upon states to implement fully Resolution 1373 (2001), and measures to improve the freezing measures of Resolutions 1267 (1999) and 1333 (2000).

- Resolution 1535 (2004) of March 26, 2004 calling upon states to implement fully Resolution 1373 (2001).

C.    **War Crimes Are Violations Of The Law Of Nations.**

260.    The commission of massacres, extra-judicial killings, murders, torture, forced disappearances, forced displacements, and other violent acts against civilians by the AUC are war crimes. *See* Geneva Convention, Common Art. 3 (defining war crimes as inhumane acts committed against non-participants in an armed conflict).

261.    The international community has universally condemned war crimes, thus incorporating the offense into the law of nations.

43

262.    The following international conventions and/or United Nations Security Council Resolutions make clear that the prohibition against war crimes is incorporated into the law of nations:

- Geneva Convention, Common Art. 3.

- Convention Relative to the Protection of Civilian Person in Time of War, Art. 3, 6 U.S.T. 3516.

**D.     Crimes Against Humanity Are Violations Of The Law Of Nations.**

263.    The commission of massacres, extra-judicial killings, murders, torture, forced disappearances, forced displacements, and other violent acts against civilians by the AUC are crimes against humanity.  *See* The Rome Statute of the International Criminal Court, U.N. GAOR, 52d Sess., Annex II, at 4, U.N. Doc. A/CONF.183/9 (1998), Art. 7 (defining crimes against humanity as acts "committed as part of a widespread or systematic attack directed against any civilian population, with knowledge of the attack").

264.    The international community has universally condemned crimes against humanity, thus incorporating this offense into the law of nations.

265.    The following international conventions and/or United Nations Security Council Resolutions make clear that the prohibition against crimes against humanity is incorporated into the law of nations:

- The Charter of the International Military Tribunal, Aug. 8, 1945, art. 6I, 59 Stat. 1546, 1547, E.A.S. NO. 472, 82 U.N.T.S. 284;

- The Statute of the International Criminal Tribunal for the Former Yugoslavia, Art. 5;

- The Statute of the International Criminal Tribunal for Rwanda, Art. 3;

- The Rome Statute of the International Criminal Court, Art. 7.

**E.     Official Torture Is A Violation Of The Law Of Nations.**

266.     The commission of any act under color of law with the intention to inflict severe

pain or suffering, whether physical or mental, in order to obtain information, obtain a confession,

intimidate or coerce the person or a third person, or punish the person or a third person is torture.

*See* The Declaration on the Protection of All Persons from Being Subjected to Torture, G.A. Res.

3452, art. 1, 30 U.N. CAOR Supp. (No. 34) 91, U.N. Doc. A/1034 (1975).

267.     The international community has universally condemned torture, thus

incorporating the offense into the law of nations.

268.     The following international conventions and/or United Nations Security Council

Resolutions make clear that the prohibition against torture is incorporated into the law of nations:

- The Universal Declaration of Human Rights, G.A. Res. 217(III)(A), U.N. Doc. A/810 (1948);

- The Declaration on the Protection of All Persons from Being Subjected to Torture, G.A. Res. 3452, 30 U.N. GAOR Supp. (No. 34) 91, U.N. Doc. A/1034 (1975);

- The American Convention on Human Rights, Art. 5, OAS Treaty Series N. 36 at 1, OAS Off. Rec. OEA/SER 4  v/II 23, doc. 21, rev 2 (English ed. 1975);

- The International Covenant on Civil and Political Rights, U.N. G.A. Res. 2200 (XXI)A, U.N. Doc. A/6316 (1966);

- The European Convention for the Protection of Human Rights and Fundamental Freedoms, Art. 3 Council of Europe, European Treaty Series No. 5 (1968), 213 U.N.T.S. 211);

- Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment pt. I, art. 1, 23 I.L.M. 1027 (1984), *as modified*, 24 I.L.M. 535 (1985).

**F.      Extra-Judicial Killing And Summary Execution Are Violations Of The Law Of Nations.**

269.     The deliberate killing of a human being under color of law and without previous

authorization by the judgment of a regularly constituted court affording all the judicial

guarantees which are recognized as indispensable by civilized peoples constitutes the crime of

extra-judicial killing or summary execution.  *See* Pub. L. No. 102-256, § 3(a), 106 Stat. 73

(1992), codified at 28 U.S.C. § 1350, notes (incorporating into United States law the definition of

extra-judicial killing found in customary international law).

270.    The international community has universally condemned extra-judicial killing

and summary execution, thus incorporating the offense into the law of nations.

271.    The following international conventions and/or United Nations Security Council

Resolutions make clear that the prohibition against extra-judicial killing and summary execution

is incorporated into the law of nations:

- The Fourth Geneva Convention, art. 3;

- Universal Declaration of Human Rights, G.A. Res. 217(III)(A), U.N. Doc. A/810 (1948);

- The International Covenant on Civil and Political Rights, U.N. G.A. Res. 2200 (XXI)A, U.N. Doc. A/6316 (1966);

- The European Convention for the Protection of Human Rights and Fundamental Freedoms, Art. 3 Council of Europe, European Treaty Series No. 5 (1968), 213 U.N.T.S. 211).

## FACTUAL ALLEGATIONS

272.    Chiquita is one of the largest banana producers in the world and a major supplier

of bananas throughout Europe and North America.  In 2003, Chiquita reported revenues in

excess of $2.6 billion.  For the year ending 2009, Chiquita had annual revenues in excess of $3.5

billion with a market capitalization of more than $690 million.  Chiquita currently has operations

in more than eighty countries throughout the world.  At all times relevant to the allegations in

this Complaint, Chiquita had operations in the Republic of Colombia.

273.    Colombia is home to some of the most fertile and productive banana-growing

lands in the Western Hemisphere.  The country's banana-growing regions are located in remote,

46

rural areas of Colombia along the Caribbean coast near the city of Santa Marta and in the Urabá region.

274.    Since 1899, Chiquita has been growing, exporting, and marketing bananas grown in Santa Marta.  Beginning in 1966, Chiquita expanded its banana operations to even more productive banana-growing lands located in the Urabá region.  Chiquita's operations in Colombia ultimately became the company's most profitable banana-growing business.

275.    Beginning in or around the late 1970s or early 1980s, Colombia's long-running civil war spilled into the Santa Marta and Urabá banana-growing regions.  Leftist guerillas spread violence, fear, and labor strife throughout these regions.  The violence and instability created by the leftist guerillas directly and negatively impacted Chiquita's banana-growing operations.  Chiquita itself became a target of violence, kidnapping, and extortion by leftist guerillas.

276.    To free itself from the influence and control of leftist guerilla groups operating in the Santa Marta and Urabá banana-growing regions, Chiquita began to fund, arm, and support the AUC in an effort to eliminate and exterminate leftist guerillas, their sympathizers, and supporters in the banana-growing regions in order to create an environment where the company's banana-growing operations could flourish.

A.    **Participants In Colombia's Civil War.**

277.    For more than forty years, a state of open hostilities, armed conflict, and civil war has existed in Colombia (the "War").  The War is being waged by three primary groups:  the government of Colombia, leftist guerilla groups, and right-wing paramilitary groups.

(1)    **The Government of Colombia.**

278.    Colombia is a constitutional, multi-party, democratic republic.  Colombia is defending itself in the War against leftist guerilla groups that are seeking to overthrow the government through violence, armed conflict, and subversion.

279.    Colombia participates in the War through its security forces, which include the military, national and local police forces, and the Department of Administrative Security ("DAS"), which is responsible for gathering intelligence and investigating violations of law relating to, among other things, national security.

280.    At all times relevant to the allegations in this Complaint, Colombia's security forces were ineffective in the War.  The security forces frequently suffered embarrassing losses and were unable to protect Colombia's citizens, landowners, and businessmen from attack, murder, kidnapping for ransom, extortion, and other threats from leftist guerillas.  As a result, many Colombians believed that the leftist guerillas were winning the War.

**(2)    Leftist Guerillas.**

281.    At all times relevant to the allegations of this Complaint, two leftist guerilla groups were actively participating in the War against the government of Colombia.

282.    The Revolutionary Armed Forces of Colombia (*Fuerzas Armadas Revolucionarias de Colombia*, or "FARC") is a Marxist-Leninist politico-military organization established by the military wing of the Colombian Communist Party in 1964 to conduct guerilla warfare against, and seize power from, the government of Colombia.  FARC is Colombia's largest and most active guerilla group.  In 2001, it was comprised of approximately 15,000 to 18,000 combatants who operated in more than 60 fronts.

283.    The National Liberation Army (*Ejército Nacional de Liberación*, or "ELN") is a violent revolutionary Marxist guerilla group founded in 1964 by a pro-Cuban revolutionary

group.  The ELN became the second largest guerilla group with approximately 4,000 combatants by 1999.

284.    Both guerilla groups claimed to represent the rural poor in a struggle against Colombia's wealthier classes, aggressively opposed multinational corporations operating in Colombia, and fought against privatization of the country's natural resources, especially by foreign companies.

285.    The guerilla groups financed their operations in the War through, among other things, kidnapping for ransom, bombing, extortion, drug trafficking, and "war taxes" collected from the wealthy.  They also regularly committed murder and destroyed business infrastructure as part of their strategy to maintain their control and influence over local residents and businesses operating in areas they controlled through the use of fear.

286.    Colombian security forces were unable to defeat the leftist guerillas in the Santa Marta and Urabá banana-growing regions of Colombia, and were unable to protect landowners, businessmen, and foreign companies operating those areas from violence, kidnapping, or extortion perpetrated by the leftist guerillas.  In fact, Colombian security forces ceded control of both regions to the FARC and the ELN from the 1980s through the mid-1990s, leaving the guerillas free to terrorize individuals and business operations in the area with impunity.

287.    The guerilla's terrorist activities during the 1980s caused non-governmental organizations to declare the Urabá region the most violent place in the Western Hemisphere. The Colombian government declared the region a war zone.

288.    In 1997, the United States Secretary of State officially declared both the FARC and the ELN to be Foreign Terrorist Organizations ("FTO") pursuant to 8 U.S.C. § 1189.  As of the date of this Complaint, both remain designated FTOs.  Both also continue to participate in the

War and seek to overthrow the government of Colombia through violence, armed conflict, and subversion.

**(3)   The AUC.**

289.   The AUC was a violent, right-wing organization in Colombia.  The AUC participated in the War, fighting on the same side as the Colombian government and against the leftist guerillas.

290.   The AUC was formed in or about April 1997 to organize and unite loosely-affiliated, regional paramilitary groups that had been formed during the 1980s by wealthy landowners, businessmen, and drug traffickers who were trying to defend themselves against attacks, kidnappings, and extortion by leftist guerillas.  The AUC actively fought against the leftist guerillas in the Santa Marta and Urabá banana-growing regions, as well as almost every other region of Colombia.

291.   Before the AUC was organized, a regional paramilitary group called the Rural Self-Defense Group of Córdoba and Urabá (*Autodefensas Campesinas de Córdoba y Urabá*, "ACCU") operated in the banana-growing regions.  The ACCU was led by an individual named Carlos Castaño ("Castaño").  The ACCU became part of the AUC and Castaño became the AUC's leader.  At all times relevant to the allegations in this Complaint, Castaño was the AUC's leader.  For purposes of this Complaint, the term "AUC" shall refer to both the AUC and the ACCU, together with any constituent parts of either paramilitary organization.

292.   The AUC financed its participation in the War through its extensive involvement in drug trafficking activities and from financial support it received from sponsors who financed its operations in the War and paid for protection against leftist guerilla attacks, kidnappings, and murders.  Sponsors included, among others, wealthy landowners, businessmen, and multinational

50

corporations, like Chiquita, with business operations in areas subject to the influence or control of leftist guerillas.

293.    From the time it was formed in 1997 until it began to demobilize in 2004, the AUC grew rapidly.  In 1997, the AUC comprised approximately 4,000 combatants.  By 2001, the AUC claimed to have approximately 11,000 combatants.  When the AUC began to demobilize in 2004, it claimed to have as many as 17,000 armed fighters with an additional 10,000 associated members.

294.    The AUC, like the paramilitary groups that preceded its formation, sided with the Colombian government and became participants in the War against the leftist guerillas.  Because it shared the Colombian government's objective in the War, the AUC consistently coordinated operations with, and received training, equipment, and logistical support from, Colombia's security forces, including the military, police forces, and DAS.

295.    In addition to engaging the FARC and the ELN in direct combat, the AUC, and the paramilitary groups that preceded its formation, participated in the War using strategies and tactics that were illegal under both Colombian and international law.  Among other things, the AUC:

a.    Attacked non-combatant civilians who were accused of being guerillas, guerilla sympathizers, or otherwise supporting guerillas.  As part of its strategy in the War, the paramilitary groups intentionally and deliberately targeted civilians to "cleanse" municipalities and villages of guerilla influences.  "Cleansing" involved the brutal execution, torture, and/or forced disappearance of individuals the paramilitary groups believed to be, in any way, involved with guerillas.  The cleansing operations targeted categories of people who were typically aligned with leftist political movements, such as labor union leaders and members, workers with

ties to labor unions, community activists, human rights defenders, and politicians sympathetic to leftist causes.

        b.    Used extraordinary brutality and violence against guerillas and civilians who were accused of being guerilla sympathizers and supporters. The paramilitary groups intentionally and deliberately engaged in extra-judicial killings, massacres, rapes, kidnappings, forced disappearances, and forced displacements as a war strategy to ensure that civilians would never again join or support guerilla groups or causes. To maximize fear and terror, the paramilitary groups often decapitated, tortured, and dismembered victims. Among other atrocities, paramilitary units cut off heads and dismembered bodies with chainsaws, left limbs on fence posts, gutted pregnant women, poured acid on exposed flesh, and stripped and camouflaged bodies then booby trapped them with fragmentation grenades.

        c.    Forcibly displaced entire communities of civilians. The paramilitary groups intentionally and deliberately engaged in the forced displacement of entire communities of civilians as part of a war strategy intended to eliminate logistical support for leftist guerillas. More than two million Colombians were driven from their homes and communities as a result of the paramilitary effort to defeat the leftist guerillas in the War.

        d.    Attacked, killed, and forcibly disappeared socially undesirable civilians who were not guerillas or guerilla sympathizers. As part of its strategy in the War, the paramilitary groups intentionally and deliberately targeted civilians to cleanse municipalities and villages of undesirable influences. The "social cleansing" operations targeted individuals who were believed to be drug addicts, criminals, prostitutes, street children, homosexuals, and others deemed socially undesirable by the paramilitary groups.

        e.    The tactics and strategies described in subparagraphs (a) through (d) are collectively referred to as the "Paramilitary Terrorism Tactics."

296.    The Colombian security forces used, and directed the actions of, the AUC, and the paramilitary groups that preceded its formation, as allies, agents, partners, and military assets in the War against the leftist guerillas.  Colombian security forces deliberately used the paramilitary groups to employ tactics and carry out missions that would have been illegal under Colombian and international law.

297.    The goals, strategies, and tactics of the paramilitary groups fighting leftist guerillas were widely reported by the news media and well known throughout Colombia and the world.

298.    On September 10, 2001, the United States Secretary of State designated the AUC an FTO pursuant to 8 U.S.C. § 1189.  In making the FTO designation, the Secretary of State determined that the AUC threatened the national security of the United States and the safety of U.S. nationals.  As of the date this Complaint was filed, the AUC remains a designated FTO.

299.    On October 31, 2001, the United States Secretary of State designated the AUC a Specially-Designated Global Terrorist ("SDGT"), pursuant to Executive Order 13224 issued by the President of the United States under authority conferred on him by the International Emergency Economic Powers Act, 50 U.S.C. § 1701, *et seq.*  In making the SDGT designation, the Secretary of State found that the AUC had committed, or posed a significant risk of committing, acts of terrorism that threaten the security of U.S. nationals or the national security, foreign policy or economy of the United States.  As a result of the SDGT designation, it is a crime for any United States person to, among other things, willfully engage in transactions with the AUC, without having first obtained a license or other authorization from the United States Department of the Treasury.

300.    Around the same time that the United States made its designations, the European Union also designated the AUC as a terrorist organization.

**B.      A Symbiotic Relationship Existed Between The Government Of Colombia And The AUC.  Therefore, The AUC Was Acting Under The Color Of Law.**

301.     A symbiotic relationship existed between the government of Colombia and the AUC.  The symbiotic relationship was so pervasive and intertwined that, at all times and in connection with all events relevant to the allegations in this Complaint, the AUC was acting under the authority or color of law.  Paramilitary units were so deeply integrated into, and so highly coordinated with, the effort by Colombian security forces to defeat the leftist guerillas that they became known as the "Sixth Division" – referring to the paramilitaries' role as an additional division in Colombia's then official five-division army.

302.     The symbiotic nature of the relationship between the Colombian government and the AUC is demonstrated by, among other things, the following:

**(1)      The Colombian Military Created, Maintained, And Directed Paramilitary Groups As A Central Component Of The Colombian Government's Strategy To Defeat The Leftist Guerillas In The War.**

303.     The tactics employed by the FARC and the ELN in the War included terrorism against civilians and "hit and run" attacks against Colombian security forces.  The leftist guerillas' tactics made it difficult for security forces to defend themselves and impossible for them to protect landowners, businesses, and civilians.  The Colombian military lacked the manpower, resources, or training to effectively fight guerilla warfare through the thousands of kilometers of mountainous jungle terrain and remote rural areas where leftist guerillas maintained strongholds.

304.     In an effort to more effectively combat the leftist guerillas, Colombian security forces, together with political and business leaders, organized private, highly mobile paramilitary groups to hunt and exterminate guerillas and their sympathizers using tactics that were illegal under Colombian and international law.  The tactics included the Paramilitary Terrorism Tactics.

54

305.    The Colombian security forces' use of paramilitary groups to fight the FARC and the ELN guerillas was consistent with counterinsurgency training and strategy adopted by the military in previous years.  Consistent with its counterinsurgency strategy, the Colombian security forces were legally authorized by Colombian law to organize, train, motivate, support, and jointly operate with the paramilitary groups.

306.    Paramilitary groups were organized, trained, and supported by the Colombian military to operate as a central component in the Colombian government's strategy to defeat the leftist guerillas in the War.  At all times relevant to the allegations in this Complaint, the Colombian security forces used, supported, and directed paramilitary groups as allies, partners, agents, and military assets in the War against leftist guerillas.

307.    Joint operations and unity with Colombian security forces were facilitated by manning paramilitary groups with active duty and retired military personnel, national police officers, and other members of Colombia's security forces, as well as civilian fighters.  No clear division existed between military units and paramilitary groups because active duty members of Colombia's military regularly moved back and forth between military units and paramilitary groups during the course of operations against suspected leftist guerillas, their sympathizers, and supporters.

308.    Colombian security forces trained paramilitary groups.  Among others, the military trained Carlos Castaño, who helped organize the ACCU during the 1980s and became the AUC's leader in 1997.  The military trained other individuals specifically to organize and lead paramilitary groups in other parts of Colombia.

309.    Colombian security forces armed paramilitary groups.  Among other things, the military provided paramilitary groups with arms and ammunition that were restricted by law to use by military personnel only.  The Colombian government also authorized its state-owned

weapons and ammunitions manufacturer to sell arms to paramilitary groups so they could participate in the War.

310.    Colombian security forces provided paramilitary groups with sophisticated communications equipment.  Colombian security forces gave paramilitary groups powerful two-way radios that allowed them to communicate with each other and with the Colombian military.

311.    Colombian security forces and paramilitary groups shared intelligence. Paramilitary groups were used to gather intelligence about leftist guerillas and their sympathizers and supporters in the regions where they operated.  The paramilitary groups communicated their intelligence to military intelligence units and to the DAS.  Military intelligence and DAS units reciprocated by sharing intelligence information with the paramilitary groups, including but not limited to lists of individuals the Colombian government suspected of being leftist guerillas, sympathizers, or supporters.  Colombian security forces often directed the AUC to kill or torture the individuals identified on these lists.

312.    Colombian security forces clothed paramilitaries with government authority. Military personnel entered villages and announced that the paramilitary groups accompanying them were a legal organization supported by the Colombian government.  Thereafter, military personnel expressly instructed the local political leaders, police forces, and businessmen to collaborate with the paramilitaries, including providing financial support for the paramilitary groups.

313.    Colombian security forces conducted joint operations with paramilitary groups as part of Colombian government's strategy to hunt and exterminate leftist guerillas, together with their sympathizers and supporters.  The military selected targets, planned operations with paramilitary leaders, and issued operational orders for carrying out the missions.  As part of the joint operations, paramilitary groups were assigned anti-guerilla operations that the military

56

could not lawfully carry out and used Paramilitary Terrorism Tactics the military could not lawfully employ.  For example:

     a.     The First Segovia Massacre.

     i.     On November 11, 1988, the military and paramilitary groups participated in a joint operation against leftist guerillas and their sympathizers in the village of Segovia in the department of Antioquia.  Within an hour, forty-three people were massacred and forty-six others injured using Paramilitary Terrorism Tactics.  The military and paramilitary groups selected the victims by name using a prepared list of people suspected of being leftist guerillas or their sympathizers and supporters.

     ii.     The military facilitated the paramilitary units' entry into and exit from Segovia.  Three army officers and two police officers were indicted for their role in the massacre.

     b.     La Honduras/La Negra Farms Massacres.

     i.     On March 4, 1988, the military and paramilitary groups participated in massacres at two different farms in the department of Antioquia.  In the weeks preceding the massacre, military personnel arrested some of the eventual victims and photographed them.  The military detained and tortured other individuals to obtain intelligence information about leftist guerillas.  On the day of the massacre, military and paramilitary soldiers searched for twenty men by name at the two farms.  Paramilitary groups executed the men.

     ii.     A judicial investigation determined the massacre was a highly coordinated operation carried out jointly by a paramilitary group and four army brigades.

     c.     The La Rochela Massacre.

     i.     On January 18, 1989, paramilitary groups massacred two judges and ten investigators near La Rochela, in the Department of Santander.  The judges and

investigators were, at the time, investigating the military's involvement with paramilitary groups' Paramilitary Terrorism Tactics.

          ii.      An investigation linked the massacre to a paramilitary unit operating under orders from a battalion commander in the Colombian Army's Fourteenth Brigade.  A Colombian court determined that Colombian security forces had organized the massacre.

        d.     <u>The Second Segovia Massacre.</u>

          i.      On April 17, 1989, the evening before a strike organized by leftist guerillas, the military and paramilitary groups entered the municipality of Segovia for the second time.  Upon entering the town, the military forced residents of Segovia into their homes and took control of the village streets.  Leaflets signed by a paramilitary group were then posted on homes and businesses warning inhabitants not to participate in the strike.  On April 22, 1989, five days later, armed gunmen entered Segovia, executed fourteen people, and injured fifteen others.

          ii.      The military coordinated the transportation of the gunmen used during the April 22, 1989 massacre, housed them at a nearby military base until the massacre, and then facilitated their entry into and exit from Segovia.

    314.    By the end of 1989, paramilitary units were responsible for dozens of massacres and hundreds of killings.  Throughout this period of time, Colombian security forces maintained a symbiotic relationship with paramilitary groups in many of Colombia's administrative departments – including Antioquia, the administrative department in which the Urabá banana-growing region is located, and Magdalena, the administrative department in which the Santa Marta banana-growing region is located.

      **(2)    The Colombian Government Enacted Legislation To Continue Using Paramilitary Groups As A Central Component In Its Strategy To Defeat Leftist Guerillas.**

315.    The Paramilitary Terrorism Tactics used by the military and paramilitary groups during the War caused an outcry in the international community.  Foreign nations, non-governmental organizations, and human rights advocates expressed concern that the military's close involvement with paramilitary groups indicated that the Colombian government was promoting war crimes, crimes against humanity, human rights abuses, and other violations of international law.

316.    In June 1989, the Colombian government responded to international pressure by making it a crime for anyone, including Colombia's security forces, to recruit, train, promote, organize, finance, or belong to paramilitary groups.  ("Anti-Paramilitary Law").

317.    When it enacted the Anti-Paramilitary Law, the government of Colombia was incapable of defeating the leftist guerillas in the War and also incapable of protecting wealthy Colombians, landowners, and businesses, including multinational corporations like Chiquita, from attack and extortion by leftist guerillas.  Without paramilitary groups, the Colombian government could not guarantee public safety.

318.    After enacting the Anti-Paramilitary Law, the Colombian government continued using paramilitary groups as a central component of its strategy in the War through new regulations and legislation that authorized security forces to continue organizing, training, arming, directing, and jointly operating with paramilitary groups and that also authorized landowners and businessmen to lawfully continue financing paramilitary operations.

    (i)    **Defense Ministry Order 200-05/91 Authorized Security Forces To Continue Using Paramilitary Groups To Carry Out The Colombian Government's War Strategy.**

319.    In May 1991, the Colombian Defense Ministry promulgated Order 200-05/91, which authorized the military to create, control, and operate civilian intelligence networks for the

specific purpose of combating leftist guerillas.  In all material respects, Order 200-05/91

constituted formal authorization for Colombian security forces and paramilitary groups to

continue their already existing symbiotic relationship.  For example, under Order 200-05/91:

   a.  Intelligence network members and operations were covert;

   b.  The intelligence networks employed active duty officers, retired military

personnel, and civilians.

   c.  Division and brigade commanders, or their equivalents, had operational

command and control responsibility for the intelligence networks.

   d.  Security forces were authorized to recruit, select, organize, train, equip,

arm, and direct members of the intelligence networks.

   e.  The military were authorized to "establish the targets and the technique to

use" in connection with intelligence network operations.

   f.  The military continued to notify municipalities and villages that the

paramilitaries working with them were lawful organizations supported by the government and

continued to instruct landowners and businessmen to pay paramilitaries to support their efforts in

the War instead of paying leftist guerilla "war taxes."

   g.  Colombian security forces were authorized to continue sharing

intelligence with paramilitary units.  This intelligence included but was not limited to lists

identifying the names of suspected leftist guerillas and their sympathizers and supporters.

   h.  The military continued to select individuals for assassination and assign

paramilitary groups the task of carrying out the assassinations.

  320.  Under Order 200-05/91, Colombian security forces continued using paramilitary

groups as military assets in the War, continued directing their operations, and continued to assign

them missions that required using Paramilitary Terrorism Tactics that were unlawful under

Colombian and international law.

        **(ii)**    *Convivir* **Legislation Was Enacted To Continue The AUC's Central Role In The Colombian Government's War Strategy.**

    321.    By 1994 leftist guerilla violence was continuing to increase, particularly in

remote, rural areas of Colombia, including the banana-growing regions in Santa Marta and

Urabá.

    322.    In February 1994, the Colombian government enacted Decree 356 of 1994, which

authorized civilians in high-risk areas to create private security services, called *convivir*, for their

own protection.  Like Order 200-05/91, Decree 356 provided a legal framework for the

Colombian government to continue using paramilitary groups as a central component in its

strategy to defeat the leftist guerillas and to protect wealthy Colombians, landowners, and

businesses, including multinational corporations like Chiquita, from attack and extortion.

    323.    Decree 356 continued and magnified the symbiotic relationship between

Colombian security services and paramilitary groups.  The Decree continued the symbiotic

relationship by giving *convivir* an organizational and operational structure that paralleled the

paramilitary model.  Furthermore, the Decree magnified the symbiotic relationship by giving

*convivir* explicit government support.  For example, under Decree 356:

    a.    Wealthy individuals, landowners, and businesses, including multinational

corporations like Chiquita, were legally authorized to create and sponsor a *convivir* in high-risk

or combat areas where the Colombian government could not guarantee public safety.

    b.    *Convivir* sponsors, including multinational corporations like Chiquita,

were legally authorized to finance the *convivir* operations by making payments directly to them.

      c.     *Convivir* members were authorized to carry arms and protect their sponsors by engaging leftist guerillas.

      d.     The identity of *convivir* members was a secret known only to the Colombian security forces and local police chiefs.

      e.     An agency of the Colombian Defense Ministry was directly responsible for licensing and supervising *convivir*.

      f.     The Colombian military was actively involved in organizing *convivir*.

      g.     *Convivir* members were retired soldiers who had been recommended to the *convivir* by Colombian military commanders in the local area.

      h.     The Colombian military was legally authorized to arm *convivir* with weapons and ammunition that would otherwise have been restricted only to military use.

      i.     *Convivir* members and sponsors were connected by and communicated with two-way radios.

      j.     *Convivir* conducted intelligence operations and shared intelligence with the Colombian military and local police.

      k.     *Convivir* worked closely with Colombian security forces and with local police to jointly patrol the area of their responsibility and jointly respond to aggression by leftist guerillas and other emergencies.

      l.     *Convivir* participated in joint operations against leftist guerillas.  Often, Colombian security forces assigned *convivir* to fight battles because they had better resources and were able to use Paramilitary Terrorism Tactics that were unlawful under Colombian and international law.

      m.     *Convivir* participated in security meetings with local officials.

324.    In the Santa Marta and Urabá banana-growing regions, political, military, and business leaders knew that all of the *convivir* belonged to, and were operated by, the AUC.   By authorizing the funding, arming, and sharing of intelligence with *convivir*, leaders in those regions knowingly and deliberately used *convivir* groups to continue the symbiotic relationship between the Colombian government and paramilitary groups.  Furthermore, political and military leaders in those areas intended that the AUC actively participate in the War and combat leftist guerillas, their sympathizers, and their supporters through *convivir*.

> **(3)    As Part Of The Government's War Strategy, Colombian Security Forces Continued To Jointly Plan And Carry Out Operations With Paramilitary Groups Using Paramilitary Terrorism Tactics.**

325.    After implementing Order 200-05/91 and Decree 356, the Colombian government continued to use the AUC as a central component in its strategy for defeating the FARC and the ELN in the War.  Among other things, Colombian security forces continued to jointly plan, coordinate, and carry out operations with paramilitary groups, including engaging paramilitary groups to carry out assignments using Paramilitary Terrorism Tactics that were unlawful under Colombian and international law.

326.    In 1997, and at other times relevant to the allegations in this Complaint, the Colombian military and the AUC planned, coordinated, and participated in joint offensives against leftist guerillas.  According to AUC leaders, the joint offensives were designed to conquer various regions of Colombia and also to deny leftist guerillas future logistical support by forcing residents to abandon villages that were sympathetic to the leftist guerillas.

327.    The military selected targets for attack, coordinated the attacks with paramilitary leaders, issued operating orders to paramilitary groups, and provided logistical support for the attacks.  Colombian security forces also provided paramilitary groups with arms, equipment, and intelligence to carry out the operations.

328.    In connection with the operations, the AUC was operating under the direction of, and in coordination with, Colombian security forces.

329.    In connection with the operations, the AUC was given assignments that required the use of Paramilitary Terrorism Tactics.

330.    In connection with the operations, Colombian security forces participated in the Paramilitary Terrorism Tactics.  For example:

a.    The Mapiripán Massacre.

i.    In July 1997, as part of a coordinated offensive against leftist guerillas, the Colombian Army's Seventeenth Brigade and the AUC participated in a joint operation in Mapiripán, in the department of Meta.  As determined by the Inter-American Court of Human Rights, the military and AUC jointly and meticulously planned the operation over the course of several months.  According to AUC leaders, Mapiripán was selected as a target because it was a cocaine trade center used as a source of income for leftist guerillas.  The operation was intended to deprive leftist guerillas of an important source of financing.

ii.    The military facilitated and participated in the operation.  Among other things, it permitted the AUC to make "irregular flights" from Urabá and land at a civilian airport under military control in Meta.  The military provided military vehicles to transport the AUC fighters from the airport to Mapiripán.  When the AUC surrounded Mapiripán on July 15, 1997, they wore uniforms that were exclusively used by the military, had weapons and munitions restricted to military use, and used high frequency radios.

iii.    Over the course of seven days, the AUC tortured, dismembered, eviscerated, and decapitated at least forty-nine people in Mapiripán.  Despite repeated requests from residents, including a municipal judge, the military waited one week before entering

64

Mapiripán.  Before entering, helicopters were permitted to land in Mapiripán and fly an injured AUC fighter out of the area.

      b.      <u>The El Aro Massacre</u>.

      i.      In October 1997, the Army's Fourth Brigade and the AUC participated in an offensive in the village of El Aro, in the department of Antioquia.  Like the Mapiripán massacre, the military and AUC leaders planned the offensive over the course of several months.

      ii.      As the offensive began, the Colombian Army established a perimeter to prevent entry into or escape from the village while the AUC was inside.  The Army maintained the perimeter for five days.  During that time, the AUC executed at least eleven people, forcibly disappeared more than thirty other people, burned forty-seven of the sixty-eight houses, looted stores, and destroyed water pipelines.  At least one victim was tied to a tree and tortured by having his eyes gouged out and his testicles cut off.  After the massacre, the AUC forced most of the residents to leave the area.

      iii.      Several members of the Army and local police were charged with participating in the massacre.

      c.      <u>The El Salado Massacre</u>.

      i.      In February 2000, the military and the AUC participated in an offensive in the village of El Salado, in the Bolivar department.  As with other massacres, military and AUC leaders jointly planned the offensive in advance.  El Salado was chosen as a target for the operation because of the area's long-standing, strong leftist guerilla presence.

      ii.      In February 2000, approximately three hundred paramilitary troops entered the village, announced themselves, and used a list of names to summon individuals believed to be leftist guerillas, or their sympathizers and supporters, to a basketball court used as

the village square.  Over the course of three days, the AUC executed, tortured, and raped

civilians.  By the time they left, the AUC had killed at least 36 people.  Some were shot after

being tortured.  Others were stabbed or beaten to death.  Others were strangled.

     iii.  Shortly after the AUC troops entered the village, the military set up

roadblocks and prevented anyone from entering the village or attempting to rescue the residents.

The military maintained the roadblock for three days and did not enter the village until

approximately one hour after the AUC had departed.  In addition, when one of the AUC fighters

was injured while trying to drag victims from their home, a helicopter was allowed to fly into the

village to rescue him.

    d.  <u>The Chengue Massacre</u>.

     i.  On January 17, 2001, the military, local police, and the AUC

participated in an offensive in the village of Chengue, in the Sucre department.

     ii.  On January 17, 2001, approximately eighty AUC fighters entered

the village and rounded up the men.  Shortly thereafter, the AUC troops killed twenty-four

people by smashing their skulls with stones and a sledgehammer.

     iii.  One of the perpetrators later testified that the massacre was

organized by, among others, police and Colombian Navy officials.

  331.  In addition to joint operations against entire villages and municipalities, the

military and the AUC also jointly planned and coordinated the selective assassination of

suspected leftist guerillas and their sympathizers and supporters.  Military intelligence units

selected the individuals for assassination then hired and paid AUC gunmen using authority given

to them under Order 200-05/91.

  332.  In 1997, a colonel in the Colombian military confirmed to the United States

Department of State that Colombian security forces and paramilitary units had been "cooperating

for a number of years." He also informed the United States that the level of cooperation between the military and the AUC in the Santa Marta and Urabá regions had "gotten much worse" since 1996. The increase in the level of cooperation coincided with the time period military and AUC leaders began planning and implementing their offensive to drive leftist guerillas out of the banana-growing regions.

333.    As a result of the joint military-paramilitary operations, leftist guerillas were defeated and driven out of various regions of Colombia, including the banana-growing regions in Santa Marta and Urabá.

334.    As a further result of the joint military-paramilitary operations, the individuals identified in Paragraphs 9 to 252 of this Complaint were killed, injured, or forcibly disappeared during the course of efforts by Colombian security forces and the AUC to defeat the leftist guerillas using Paramilitary Terrorism Tactics.

### (4)    As Part Of The Colombian Government's War Strategy, Traditional Governmental Functions And Roles Were Ceded To The AUC.

335.    As an additional part of its plan for defeating the FARC and the ELN, the Colombian government ceded control of traditional state functions to the AUC in remote, rural areas regained from leftist guerillas. Control of these areas was ceded to the AUC because Colombian security forces were incapable of guaranteeing public safety or preventing the leftist guerillas from returning. Therefore, the Colombian government deliberately used the AUC to maintain control, increase public safety, and protect civilians and businesses from guerilla attack and extortion in areas regained from the leftist guerillas.

336.    In conformity with the plan, the Colombian government and security forces ceded control of the Santa Marta and Urabá banana-growing regions to the AUC. As a consequence, the AUC became the state in Santa Marta and Urabá.

337.    When fulfilling its state functions, the AUC operated in public, often located its headquarters inside municipalities, and worked in open coordination with local political, military, and police leaders.

338.    The AUC set up secure perimeters to protect villages and municipalities from attacks by leftist guerillas who were seeking to regain control of the area.  The AUC also established visible bases and maintained check points along public roads.  The military and police forces regularly passed through, and cooperated with, the AUC check points.

339.    The AUC continued to share information and coordinate operations with the military to maintain control and protect the area from guerilla attack.  In fulfilling this state function, the AUC notified the military of any leftist guerilla presence in the area and aided the military if it was attacked.

340.    The AUC assumed police authority and became local law enforcement agents responsible for identifying, locating, and punishing criminals.

341.    The AUC also functioned, from time to time, as judges to resolve local disputes between residents in the communities.

342.    The AUC used Paramilitary Terrorism Tactics in order to drive the leftist guerillas out of the banana-growing regions, to maintain control over those regions after regaining control, and to carry out the traditional state functions ceded to it by the Colombian government.

343.    As a result of the Colombian government ceding traditional state functions to the AUC, the individuals identified in Paragraphs 9 to 252 of this Complaint were killed, injured, or forcibly disappeared by the AUC's use of Paramilitary Terrorism Tactics.

      **(5)**      **Paramilitarism Was More Than A War Strategy.  It Was State Policy.**

344. According to sworn testimony given by a new AUC leader, Salvatore Mancuso, paramilitarism was "state policy" in the Republic of Colombia during all times relevant to the allegations in this Complaint.

### (i)  Leaders Integrated The AUC Into The Political Process.

345. The symbiotic relationship between the Colombian government and the AUC extended to local, regional, and national political leaders, including those from the Santa Marta and Urabá banana-growing regions. Relationships with political leaders integrated the AUC into the political process and gave it the ability to influence decision- and policy-making at all levels of government.

346. On September 28, 2000, AUC leaders and approximately four hundred municipal and provincial authorities met in the town of Chivolo, in the Magdalena department. During the meeting, AUC and Magdalena political leaders, among other things, jointly agreed to politically support a governor and various congressmen who were affiliated with the AUC. ("Pact of Chivolo").

347. At another point in time during 2000, AUC leaders and regional candidates for gubernatorial and mayoral offices met in a southern region of Colombia to allocate political support, public contracts, and public resources.

348. At another point in time during 2001, AUC leaders and congressmen for the department of Antioquia met in Puerto Berio to allocate political support, public contracts, and public resources.

349. At another point in time during 2001, AUC leaders and candidates for mayoral and congressional offices met in the town of Pivijay, in the department of Magdalena. During the meeting, AUC and Magdalena political leaders agreed to support, among other things, a joint

political campaign with the AUC in connection with mayoral and congressional offices in the department.

350.     On July 23, 2001, approximately forty AUC and political leaders, including seven members of congress, four senators, two governors, five mayors, met in the town of Santa Fe de Ralito in the department of Córdoba.  ("Pact of Ralito").  In the meeting, the AUC and political leaders, among other things, jointly agreed to "refound[] the country," develop and sign a new social contract, and maintain national independence.

### (ii)     Political, Military, And Intelligence Leaders Integrated The AUC Into All Levels Of The Colombian Government.

351.     According to information developed through an investigation being conducted by the Attorney General and Supreme Court of Colombia, there has been an ongoing, long-term collaboration between high-ranking government officials and the AUC.  The collaboration consisted of systemic efforts by officials at all levels and all branches of Colombian government to ally with, aid, and support the AUC.

352.     The investigation has targeted political leaders at all levels of government.  As of April 2008, approximately 62 members of Congress were officially suspected of cooperating and collaborating with the AUC and its operations.  Thirty-three lawmakers, including the cousin of Colombian President Alvaro Uribe, were in jail awaiting trial.  In addition, many local government officials have also been identified as collaborating and cooperating with the AUC in their local areas, including governors, mayors, and police officials in the political departments where the decedents in this case resided and were murdered.

353.     The investigation has also targeted a large number of military personnel who had collaborated with, and directed the operations of, the AUC over a long period of time.  The investigation included military officers who collaborated and coordinated with the AUC in the

Santa Marta and Urabá banana-growing regions and who engaged in Paramilitary Terrorism Tactics.  Among others currently in custody after being charged with participating in Paramilitary Terrorism Tactics is General Rito Alejo del Rio Rojas, who was responsible for military operations in the Urabá banana-growing region from 1995 through 1997.  According to AUC leaders, the coordination and support provided by General del Rio were among the most important factors allowing the AUC to oust the FARC and the ELN guerillas from Urabá.  Because of his substantial support and coordination, General del Rio became known as the "father of paramilitaries."

354.    The investigation has also revealed extensive collaboration between the DAS and the AUC in Paramilitary Terrorism Tactics.  Among other things, the DAS shared intelligence information concerning leftist guerillas and suspected sympathizers, altered or erased the histories of AUC members contained in government intelligence databases, and collaborated concerning support for candidates in municipal, gubernatorial, and presidential elections, including elections in departments where Plaintiffs or their deceased family members lived and worked.

### C.    Chiquita Purposefully Aided And Abetted The AUC's Use Of The Paramilitary Terrorism Tactics.

355.    Until approximately 1997, leftist guerillas controlled the rural northern areas of Colombia, including the banana-growing regions in and around Santa Marta and Urabá.

356.    At all times relevant to the allegations in this Complaint, the Colombian security forces were unable to defeat the leftist guerillas operating in the banana-growing regions and were unable to protect landowners and businesses from guerilla attacks, kidnappings for ransom, massacres, murders, and extortion.  The Colombian security forces effectively ceded control of the banana-growing regions to the FARC and the ELN.

357. Without any opposition from Colombian security forces, leftist guerillas in the Santa Marta and Urabá banana-growing regions created an environment of violence, fear, and danger. Landowners and businesses were regularly subjected to kidnappings for ransom, murders, property damage, extortion, and war taxes. Banana workers and citizens in communities surrounding the banana farms were repeatedly subjected to murder, torture, and massacre by leftist guerillas.

358. In or around 1982, Chiquita stopped banana operations in Colombia, in part because of the political turmoil and violence pervading the banana-growing regions.

359. In 1989, Chiquita returned to Colombia and resumed banana operations in Santa Marta and Urabá. Upon returning, Chiquita formed Banadex to control all of its business operations in Colombia. By the mid-1990s, all of Chiquita's Colombian subsidiaries were consolidated under the management of Banadex and its general manager.

360. Chiquita purchased a large number of banana farms and became a large landowner with approximately 9,500 acres of farmland in the Santa Marta and Urabá banana-growing regions.

361. Chiquita also steadily increased its workforce to support its expanding banana operations. By the mid-1990s, it employed, through Banadex, approximately 4,000 people in the banana-growing regions.

362. At the time it resumed operations in Colombia, Chiquita knew that leftist guerillas controlled the banana-growing regions in and around Santa Marta and Urabá. Chiquita knew the leftist guerillas were hostile to its business interests. Chiquita knew the leftist guerillas would demand the payment of war taxes and that the leftist guerillas controlled the banana-growing regions through almost daily acts of violence, including murder, kidnapping for ransom, and extortion.

363.    At the time it resumed operations in Colombian, Chiquita knew that its executives, employees, and property would be subject to attack by leftist guerillas.

364.    Notwithstanding its knowledge, Chiquita first resumed, and then steadily expanded, banana operations in the leftist guerilla-controlled banana-growing regions in and around Santa Marta and Urabá.  Chiquita knew it would be required to deal with the FARC and the ELN guerillas in the course of operating its business.

### (1)    FARC And Other Leftist Guerillas Damaged Chiquita's Banana Operations By Creating A Hostile And Dangerous Environment In Santa Marta and Urabá.

365.    Shortly after Chiquita resumed business operations in Santa Marta and Urabá, FARC and ELN guerillas began killing Chiquita's banana workers and causing damage to its physical infrastructure.

366.    In and around the same period of time, the FARC began to extort Chiquita by demanding payments from the company.  Chiquita executives understood that the FARC intended to kidnap its employees if the payments were not made.

367.    In order to continue doing business in the Colombian banana-growing regions, Chiquita began making regular payments to FARC and other leftist guerilla groups.  At various times, Chiquita also made payments to the ELN.  High-ranking officers in Chiquita's world-wide headquarters were informed of, and approved, payments to the FARC and the ELN.

368.    Chiquita made regular payments to the FARC and the ELN from in or about 1989 through in or about 1997, when the FARC and the ELN controlled the Santa Marta and Urabá banana-growing regions.

369.    Notwithstanding regular payments, the FARC and the ELN guerillas continued to violently attack banana workers and infrastructure.  The attacks significantly affected Chiquita's operations in the Santa Marta and Urabá banana-growing regions.

370.    In 1990 or 1991, leftist guerillas kidnapped Chiquita's security director in Colombia and held him for ransom.  Chiquita was forced to negotiate for the director's release.

371.    Between 1991 and 1997, leftist guerillas kidnapped and held for ransom at least three other Chiquita employees.

372.    In or about 1992, the ELN destroyed Chiquita's wharf in the city of Turbo.

373.    During the four months between September and December 1993, leftist guerillas killed more than 220 banana workers in the Urabá region.  Even though the area was experiencing high unemployment rates, the frequent slaughter of banana workers by the FARC and the ELN made it difficult for banana growers to find enough employees willing to work. According to press reports, the leftist guerilla-fueled violence resulted in a twenty percent reduction in the production and export of bananas from Urabá.

374.    During 1993, leftist guerillas forcibly shut down operations at a number of banana farms, preventing landowners and banana workers from cultivating the land.  According to press reports, growers expected the leftist guerilla violence to reduce banana production for the year by up to twenty-five percent in comparison to the previous year.

375.    In 1995, leftist guerillas bombed a packing station owned and operated by Chiquita.

376.    On August 30, 1995, seventeen banana workers were massacred during a raid on a banana plantation by leftist guerrillas with automatic weapons.  The guerillas lashed the banana workers hands behind their back, forced them to lay face-down on a muddy soccer field, then shot them in the head.

377.    On August 31, 1995, banana workers went on strike to demand protection from leftist guerillas.  The strike shut down all banana operations in the Urabá region.  At the time of the strike, Urabá accounted for 70% of all banana exports from Colombia.

378.    On September 20, 1995, leftist guerillas massacred twenty-six banana workers. Leftist guerillas made the workers lie down in a ditch beside the road and then shot them, point blank, in the back of the head.  Leftist guerillas captured and shot the workers only a few minutes' drive from a military base.

379.    The violence caused even more banana workers to flee Urabá.  As a result, Chiquita and other banana producers continued to encounter difficulty finding enough employees.  According to press reports, growers and producers in the area expected banana production to drop by twenty-five percent in comparison to the previous year.

380.    In 1996, leftist guerillas bombed another packing station owned and operated by Chiquita.

381.    In or around 1996 or 1997, leftist guerillas ambushed, shot, and wounded Chiquita's Colombian Quality Control Director and his bodyguard while they were inspecting banana farms in a company car.  The leftist guerillas spared the Quality Control Director's life only after discovering that he was not the general manager of Banadex, who was their intended target and was reportedly Chiquita's most senior employee in Colombia.

382.    In or around 1996 or 1997, leftist guerillas ambushed two cars carrying the general manager of Banadex and Chiquita executives who were traveling to a company farm in Santa Marta.  The leftist guerillas opened fire on both cars with automatic weapons.  Chiquita's employees escaped unharmed and evaded capture only because they were inside bullet-proof vehicles.

(2)    **Colombian Security Forces Were Incapable Of Defending Chiquita Against Leftist Guerilla Attacks.**

383.    At all times relevant to the allegations in this Complaint, Colombian security forces were incapable of defending Chiquita, its executives, employees, and infrastructure, from attacks by FARC and ELN guerillas.

384.    Local and national law enforcement agencies were incapable of defending Chiquita against the FARC and the ELN guerillas.  Local law enforcement agencies lacked the weapons, training, and personnel to successfully confront the leftist guerillas.  In addition, the effectiveness of most local police agencies was degraded by rampant corruption.  The national police force was equally ineffective at confronting leftist guerillas and incapable of defending Chiquita from attack.

385.    Colombia's military could not defend Chiquita.  In fact, the military was unable to defend itself from attack by leftist guerillas.  Throughout the 1980s and 1990s, the FARC and the ELN regularly attacked military bases, killed soldiers, and stole weapons, munitions, and equipment.

386.    On several occasions, the Colombian Army demonstrated its inability to protect Chiquita from attack by leftist guerillas.  For example, following the destruction of its wharf in Turbo, Chiquita asked the military for help.  The military informed Chiquita that it could not respond promptly because it did not have flashlights and fuel.

387.    In late 1994, the military notified Chiquita that intelligence indicated that leftist guerillas intended to attack two Chiquita facilities.  In a January 8, 1995 letter concerning the impending attacks, Brigadier General Alvarez Vargas of the Colombian Army informed the company that the military could not provide protection.  Instead, General Alvarez recommended that the company "make a greater commitment to increase and improve [its] own security."

> **(3)    Chiquita Agreed To Provide The AUC With Practical Assistance And Material Support To Pacify The Banana-Growing Regions.**

388.    In late 1996 or early 1997, the Banadex general manager, and another Chiquita employee from Colombia, participated in a meeting of banana growers to discuss security issues arising from leftist guerilla activity in the Santa Marta and Urabá regions.  The meeting was also attended by Carlos Castaño, the leader of the AUC. ("Castaño Meeting").

389.    Chiquita's employees recognized Castaño and were familiar with the AUC. Among other things, they knew the AUC was a participant in the War against the leftist guerillas. They also knew that the AUC used the Paramilitary Terrorism Tactics as part of its strategy for defeating the leftist guerillas and protecting landowners and businesses.  From information widely reported in the Colombian media, Chiquita's employees knew that the AUC's tactics included, among other things, massacres, extra-judicial killings, forced disappearances, torture, and forced displacements.

390.    During the Castaño Meeting, Castaño told Chiquita's executives that the AUC had begun a sustained offensive to drive the leftist guerillas out of the Santa Marta and Urabá regions.  Because of what they knew about Castaño and the AUC, Chiquita's executives understood that the AUC intended to use the Paramilitary Terrorism Tactics.

391.    Castaño asked Chiquita to support the AUC in its War effort against the leftist guerillas in two ways.  First, Castaño asked Chiquita to stop making payments to the leftist guerillas.  Second, Castaño asked Chiquita to begin paying the AUC.

392.    Castaño informed Chiquita's executives that the AUC would use money it received from Chiquita to finance Paramilitary Terrorism Tactics that would be used to drive the leftist guerillas out of the Santa Marta and Urabá banana-growing regions; protect the company, its executives, employees, and infrastructure from future attacks by leftist guerillas; and create a business and work environment that would enable Chiquita's Colombian banana-growing operations to thrive.

393. At the Castaño Meeting, and at all relevant times thereafter, Chiquita took sides with the AUC in the War against the leftist guerillas and helped to finance and assist the AUC's efforts in that War.

394. At the Castaño Meeting, and at all relevant times thereafter, Chiquita agreed, and acted with the intent, to aid and abet the AUC's use of Paramilitary Terrorism Tactics to drive leftist guerillas out of, and maintain control over, the Santa Marta and Urabá banana-growing regions.

395. Following the Castaño Meeting, Chiquita knowingly and intentionally provided practical assistance and material support to enable the AUC to use Paramilitary Terrorism Tactics for the purpose of (i) driving leftist guerillas out of the Santa Marta and Urabá banana regions; (ii) maintaining control over the banana-growing regions; and (iii) creating an environment where the company's banana-growing operations could prosper.

396. According to information developed by the Attorney General for the Republic of Colombia, the agreement between Chiquita and the AUC constituted a "criminal relationship" to bring about the "bloody pacification" of the banana-growing regions.

397. The assistance provided by Chiquita had a substantial effect on the AUC's ability to successfully employ the Paramilitary Terrorism Tactics in the two regions. Chiquita knew the AUC was using its assistance to employ the Paramilitary Terrorism Tactics.

### (4) Chiquita Purposefully Assisted The AUC When It Made More Than 100 Payments Totaling Over $1.7 Million Between 1996 And 2004.

398. For more than seven years – from in or about 1996 through on or about February 4, 2004 – Chiquita, through Banadex, paid money to the AUC in Santa Marta and Urabá. Chiquita paid the AUC, directly or indirectly, nearly every month. From in or about 1996

through on or about February 4, 2004, Chiquita made over 100 payments to the AUC totaling over $1.7 million.

> **(i)  High-Ranking Company Officers And Directors Knew That The AUC Engaged In The Paramilitary Terrorism Tactics And Approved The Payments.**

399.    Chiquita's payments to the AUC were reviewed and approved by senior executives of the corporation, including high-ranking officers, directors, and employees.  No later than in or about September 2000, Chiquita's senior executives knew that the corporation was paying the AUC and that the AUC was a violent, paramilitary organization led by Carlos Castaño.  An in-house attorney for Chiquita conducted an internal investigation into the payments and provided a high-ranking officer in the company with a memorandum detailing that investigation.  The results of that internal investigation were discussed at a meeting of the Audit Committee of the Board of Directors in the company's Cincinnati headquarters in or about September 2000.

400.    For several years, from in or about 1996 until April 2002, Chiquita paid the AUC by check through various *convivir* in both the Santa Marta and Urabá regions.  The checks were nearly always made out to the *convivir* and were drawn from Banadex's bank accounts.  Chiquita recorded these payments in its corporate books and records as "security payments" or payments for "security" or "security services."

401.    In or about April 2002, Chiquita seated a new Board of Directors and Audit Committee following its emergence from bankruptcy.

402.    On or about April 23, 2002, at a meeting of the Audit Committee of the Board of Directors in Chiquita's Cincinnati headquarters, the Audit Committee adopted new procedures for secretly paying the AUC.  Pursuant to the new procedures, Chiquita's executives in Colombia would issue checks payable to an individual employee who would endorse the checks.  After

converting the check to cash, another Chiquita employee in Colombia was assigned to deliver the funds, in cash, to the AUC.

403.    Beginning in or about June 2002, Chiquita began paying the AUC in the Santa Marta region of Colombia directly, secretly, and in cash according to new procedures established by Chiquita's senior executives.  The Chiquita employee to whom the AUC checks were made payable maintained a private ledger of the payments that did not reflect that the AUC was the ultimate and intended recipient of the payments.

### (ii)    Chiquita Continued To Assist The AUC Even After The United States Government Designation Made The Payments A Felony.

404.    The United States government designated the AUC as an FTO on September 10, 2001.  That designation was well publicized in the American public media.  The AUC's designation was first reported in the national press by the Wall Street Journal and New York Times, among others, on September 11, 2001.  It was later reported in the local press in Cincinnati, Ohio where Chiquita's headquarters were located.  The Cincinnati Post reported the AUC's FTO designation on October 6, 2001, and the Cincinnati Enquirer reported the designation on October 17, 2001.  The AUC's designation was even more widely reported in public media in Colombia.

405.    Chiquita had information about the AUC'S designation as an FTO specifically and global security threats generally through an Internet-based, password-protected subscription service that it paid money to receive.  On or about September 30, 2002, a Chiquita employee, from a computer within Chiquita's Cincinnati headquarters, accessed the service's "Colombia-Update page," which contained the following reporting on the AUC.

"US terrorist designation

International condemnation of AUC human rights abuses culminated in 2001 with the US State Department's decision to include the paramilitaries in its annual list of foreign terrorist organizations. This designation permits the US authorities to implement a range of measures against the AUC, including denying AUC members US entry visas; freezing AUC bank accounts in the US; and barring US companies from contact with the personnel accused of AUC connections."

406.    Even after learning that the United States government had formally designated the AUC as an FTO, Chiquita continued to make payments to the AUC in the Santa Marta and Urabá regions of Colombia without applying for a required government license. From on or about September 10, 2001, through on or about February 4, 2004, Chiquita made 50 payments to the AUC totaling over $825,000.

> **(iii)    Chiquita Continued To Assist The AUC Against The Advice Of Its Outside Counsel In The United States.**

407.    On or about February 20, 2003, high-ranking officers and employees of Chiquita spoke with attorneys in the District of Columbia office of a national law firm ("outside counsel") about the United States government's designation of the AUC as an FTO and Chiquita's ongoing payments to the AUC.

408.    Beginning on or about February 21, 2003, outside counsel advised Chiquita that the payments were illegal under United States law and that Chiquita should immediately stop paying the AUC directly or indirectly. Among other things, outside counsel, in words and in substance, advised Chiquita:

- "Must stop payments."
  (notes, dated February 21, 2003)

- "Bottom Line:  CANNOT MAKE THE PAYMENT"
  "Advised NOT TO MAKE ALTERNATIVE PAYMENT through CONVIVIR"
  "General rule:  Cannot do indirectly what you cannot do directly"
  "Concluded with:  CANNOT MAKE THE PAYMENT"
  (memo, dated February 26, 2003)

81

- "You voluntarily put yourself in this position.  Duress defense can wear out through repetition.  Buz [business] decision to stay in harm's way.  Chiquita should leave Columbia."
  (notes, dated March 10, 2003)

- "[T]he company should not continue to make the Santa Marta payments, given the AUC's designation as a foreign terrorist organization[.]"
  (memo, dated March 11, 2003)

- "[T]he company should not make the payment."
  (memo, dated March 27, 2003)

409.    Chiquita ignored the legal advice of its outside counsel and continued to make unlawful payments to the AUC.  In February and March 2003, Chiquita made cash payments to the AUC totaling $36,871.

410.    On or about April 3, 2003, a member of the board of directors and a high-ranking officer reported to the full board of directors that Chiquita was making payments to a designated FTO.  The board agreed to disclose the payments to the DOJ.

411.    On or about April 4, 2003, according to the notes of Chiquita's outside counsel concerning a discussion about the AUC payments, high-ranking Chiquita executives were of the opinion to "just let them sue us, come after us."

412.    On or about April 8, 2003, high-ranking Chiquita executives instructed the company to continue making make payments to the AUC.

413.    On or about April 24, 2003, a director and high-ranking officer of Chiquita, together with Chiquita's outside counsel, met with DOJ officials.  The DOJ officials told Chiquita that the company's payments to the AUC were illegal and could not continue.

414.    However, Chiquita continued to make payments to the AUC.  Between May 12, 2003 and September 1, 2003, Chiquita made nine cash payments totaling approximately $140,866.

415.     On or about September 8, 2003, Chiquita's outside counsel advised Chiquita in writing that DOJ officials had repeatedly stated that they could not condone current or future payments to the AUC.

416.     Despite this warning, Chiquita continued to make payments to the AUC. Between September 8, 2003 and December 16, 2003, Chiquita made six cash payments totaling approximately $126,250.

417.     On or about December 22, 2003, a member of Chiquita's board of directors warned other board members in an email that the company appeared to be "committing a felony" by continuing to make the AUC payments.

418.     Despite this warning, Chiquita continued to make payments to the AUC. Between December 22, 2003 and February 4, 2004, Chiquita made three more cash payments to the AUC totaling approximately $43,023.

419.     On March 13, 2007, the United States filed a criminal information against Chiquita in the United States District Court for the District of Columbia.

420.     On or about March 19, 2007, Chiquita pleaded guilty to one count of Engaging in Transactions with a Specially-Designated Global Terrorist, in violation of 50 U.S.C. § 1705(b) and 31 C.F.R 594.204.  In conformity with its plea agreement, Chiquita agreed to a criminal fine of $25 million and was placed on corporate probation for a period of five years.

421.     The financial assistance Chiquita provided to the AUC had a substantial effect on the AUC's ability to carry out its plan to drive leftist guerillas out of the Santa Marta and Urabá banana-growing regions and its ability to maintain control after regaining the regions from the leftist guerillas.

422.     According to Jose Gregorio Mangones Lugo ("Mangones"), an AUC leader of the William Rivas Front in the Santa Marta banana region, the income the AUC received from

Chiquita was essential to its operations in the area. In a normal month, eighty to ninety percent of the income for the William Rivas Front came from banana companies, including Chiquita. The William Rivas Front used the funds it received from Chiquita to pay salaries for paramilitary soldiers, purchase weapons and supplies for the soldiers, and to provide transportation for its operations. Without the payments from Chiquita, the AUC's William Rivas Front could not have prosecuted the War and used the Paramilitary Terrorism Tactics.

423. According to Mangones, during the period of time Chiquita made payments to the AUC, the AUC killed many civilians in the Santa Marta region as part of what the AUC "had to do in order to win" the War against the leftist guerillas. Among those killed by the AUC were some individuals targeted for assassination by Chiquita executives in Colombia.

424. Chiquita made the payments to the AUC for the purpose of facilitating the AUC's ability to combat the leftist guerillas and employ the Paramilitary Terrorism Tactics for which it had become notorious, including massacres, extra-judicial killings, forced disappearances, torture, and forced displacements of civilians accused of being leftist guerillas and their sympathizers or supporters.

425. As a result of the funding it received from Chiquita, the AUC had the resources needed to carry out the War against leftist guerillas, their sympathizers, and supporters and to maintain control over the banana-growing regions.

426. As a result of the funding it received from Chiquita, the AUC killed, injured, or forcibly disappeared the individuals identified in Paragraphs 9 to 252 of this Complaint using Paramilitary Terrorism Tactics.

> **(5) Chiquita Purposefully Assisted The AUC When It Facilitated The Shipment Of Arms And Ammunition Through Its Turbo Port Facilities.**

427.    Chiquita facilitated the AUC's use of Paramilitary Terrorism Tactics by making its seaport facilities in the city of Turbo available to the AUC for illegal arms shipments. Chiquita purposefully made its seaport available in order to assist the AUC in driving leftist guerillas out of the Santa Marta and Urabá banana-growing regions and maintaining control over the regions so the company's banana-growing operations could prosper.

428.    In 2001, the Nicaraguan National Police made arrangements to exchange 3,000 AK-47 assault rifles and 5 million rounds of ammunition for weapons more suited to police work.  The Nicaraguan National Police employed a private Guatemalan arms dealer to handle the exchange.   The arms dealer, in turn, arranged to sell the AK-47 assault rifles and ammunition for $575,000 to an arms merchant based in Panama acting on behalf of the AUC.

429.    In November 2001, a vessel named the "Otterloo" left Nicaragua with Panama as its declared destination carrying the assault rifles and ammunition.  Instead of sailing to Panama, the Otterloo traveled to Turbo, Colombia.

430.    Bills of lading, shipping invoices, and other documents identified Chiquita as the intended recipient of the arms and ammunition shipment.

431.    The arms and ammunition were off-loaded at sea from the Otterloo onto Chiquita's barges by Chiquita's employees and brought to Chiquita's private warehouse facility where they were stored for a period of time.  Chiquita employees and/or agents supervised a fictitious inspection of the shipping containers and arranged to load the weapons and ammunition onto trucks for delivery to the AUC.

432.    A formal report by a General Secretariat of the Organization of American States concluded that the transfer of arms and ammunition to AUC could not have occurred without accomplices in Turbo.

433.    Plaintiffs are informed and believe that Chiquita facilitated at least four more arms and ammunition shipments through its Turbo port facilities.  According to an interview with the Colombian newspaper *El Tiempo*, Castaño boasted in response to a question about the Otterloo incident, "This is the greatest achievement by the AUC so far.  Through Central America, five shipments, 13 thousand rifles."

434.    Chiquita was aware that it had substantially assisted the AUC's use of Paramilitary Terrorism Tactics by helping them acquire a large number of military-grade assault rifles together with a large quantity of ammunition for those rifles.  The arms had a substantial effect on the AUC's ability to carry out its strategy to drive leftist guerillas out of the Santa Marta and Urabá banana-growing regions and to, thereafter, maintain control over the regions through the use of Paramilitary Terrorism Tactics.

435.    As a result of obtaining weapons with assistance from Chiquita, the AUC had the resources needed to carry out the War against leftist guerillas, their sympathizers, and supporters and to maintain control over the banana-growing regions.

436.    As a further result of obtaining weapons with assistance from Chiquita, the AUC killed, injured, or forcibly disappeared the individuals identified in Paragraphs 9 to 252 of this Complaint using Paramilitary Terrorism Tactics.

### (6)    Chiquita Purposefully Assisted The AUC When It Facilitated The Shipment Of Narcotics Through Its Turbo Port Facilities.

437.     Chiquita also purposefully assisted the AUC by allowing it to use the company's private seaport facilities to smuggle large quantities of illegal drugs, especially cocaine, out of Colombia.

438.    According to Colombian prosecutors, the AUC shipped drugs on Chiquita's boats carrying bananas to Europe.  AUC leaders have stated that the AUC tied drugs to the hulls of

banana ships at high sea to evade security agencies' control points.  On seven different occasions, the Colombian government seized cocaine hidden in banana shipments on Chiquita's boats.  More than one and one-half tons of cocaine has been found hidden in the company's produce, valued at over $33 million dollars.  Two of the ships on which drugs were found were named the *Chiquita Bremen* and the *Chiquita Belgie*.

439.    Upon information and belief, drug shipments could not have been attached to Chiquita's banana boats, or hidden in the cargo, without the active collusion or willful ignorance of Chiquita employees.

440.    Chiquita knew the AUC obtained large sums of money from its illegal drug trafficking activities.  Chiquita also knew the AUC used the money it obtained from drug trafficking activities to finance its participation in the War, including its use of the Paramilitary Terrorism Tactics.  Chiquita purposefully allowed the AUC to use its banana boats and ships to help the AUC acquire money that could be used to support and facilitate its effort to drive leftist guerillas out of the Santa Marta and Urabá banana-growing regions and to, thereafter, maintain control over the regions using the Paramilitary Terrorism Tactics.

441.    By providing the AUC with access to its private port at Turbo and to freighters that are owned, operated, or controlled by the company, Chiquita had a substantial effect on the AUC's ability to carry out its plan to drive leftist guerillas out of the Santa Marta and Urabá banana-growing regions and to maintain control over the regions.

442.    As a result of the funding it derived from drug trafficking activities carried out with assistance from Chiquita, the AUC had the resources needed to carry out the War against leftist guerillas, their sympathizers, and supporters and to maintain control over the banana-growing regions.

443.    As a further result of the funding it derived from drug trafficking activities carried out with assistance from Chiquita, the AUC killed, injured, or forcibly disappeared the individuals identified in Paragraphs 9 to 252 of this Complaint using Paramilitary Terrorism Tactics.

**D.      Chiquita Took Sides With The AUC For The Benefits It Would Receive From The Defeat And Expulsion Of Leftist Guerillas, Sympathizers, And Supporters In The Banana-growing Regions.**

444.    As a result of purposefully providing assistance and material support to the AUC, Chiquita received significant benefits arising from the AUC's use of the Paramilitary Terrorism Tactics to drive the leftist guerillas, and their sympathizers and supporters, out of the Santa Marta and Urabá banana-growing regions.  Chiquita received additional benefits when the AUC used the Paramilitary Terrorism Tactics to maintain control over the banana-growing regions.

445.    Because the AUC succeeded in driving the leftist guerillas out of the banana-growing regions, Chiquita executives in Colombia were no longer in constant danger of being kidnapped and held for ransom.  Chiquita's executives were no longer subject to great risk of being shot and killed by leftist guerillas.  The AUC also protected Chiquita's banana workers from attacks by leftist guerillas.

446.    The AUC used Paramilitary Terrorism Tactics to ensure that local people living in the banana-growing regions would never again entertain the idea of supporting or joining the leftist guerillas.

447.    The AUC guarded Chiquita's farms and infrastructure to protect them from being bombed, burned or destroyed by leftist guerillas.  The AUC stopped common criminals from hijacking banana shipments, looting company storage facilities, or damaging company infrastructure.  The AUC also provided armed escorts to accompany major bananas shipments from the farm to storage facilities and then from storage facilities to the port for shipping.

448. Chiquita also used the AUC to resolve complaints and problems with banana workers and labor unions. Among other things, when individual banana workers became "security problems," Chiquita notified the AUC, which responded to the company's instructions by executing the individual. According to AUC leaders, a large number of people were executed on Chiquita's instructions in the Santa Marta region.

449. The AUC also helped Chiquita by "pacifying" the labor union that represented banana workers in the region by assassinating its leftist president and installing a new union leader that would represent both the workers and Chiquita. Following the assassination, the AUC continued to oversee the labor unions on Chiquita's behalf to ensure that union members did not attempt to take advantage of the company.

450. Throughout the period of time it made payments to the AUC, Chiquita and the AUC communicated regularly to identify problems and resolve problems.

451. As the AUC took and maintained control over the banana-growing regions, land prices improved and became stable, benefiting large landowners like Chiquita.

452. By 2003, Chiquita's operations in the Santa Marta and Urabá regions were the company's most profitable banana-producing operation anywhere in the world.

### GENERAL ALLEGATIONS

453. At all times relevant to this Complaint, Chiquita knew that the AUC was a violent paramilitary organization continually engaging in terrorism, brutal crimes, and human rights violations against civilians in Colombia using the Paramilitary Terrorism Tactics. The Paramilitary Terrorism Tactics were inflicted under color of law and under color of official authority, and/or in conspiracy with, and/or in a joint criminal enterprise with, and/or in concert with, and/or on behalf of those acting under color of official authority. The AUC carried out its activities with the approval and cooperation of official government security forces, pursuant to

the overall war strategy of the Colombian government.  Moreover, high-ranking officials from across the Colombian government collaborated with the AUC, including at least fourteen members of Congress, seven former lawmakers, the head of the secret police, military general and officers, mayors, and former governors.  Furthermore, the AUC's activities were facilitated by Chiquita's payments to the AUC's *convivir*, which were licensed by and operated with the express authority of the Colombian government.  Through its payments to the AUC and by allowing the AUC to use its Turbo seaport facilities for illegal drug and arms shipments, Chiquita purposefully aided and abetted the Paramilitary Terrorism Tactics.

454.    The acts described herein were conducted in the course of an internal armed conflict as part of the Colombian government's war strategy.  The AUC and other paramilitaries were parties to this armed conflict and engaged in combat with guerrilla forces on behalf of the government; they committed the abuses against Plaintiffs and their deceased family members as part of their prosecution of this conflict.  The AUC and other paramilitaries were engaged in this conflict in partnership with the Colombian military.  The acts described herein were part of a widespread and systematic attack by the AUC against the civilian population of the banana-growing regions, as well as against several discrete sub-populations, including but not limited to leftist politicians, labor organizers, community activists, persons considered socially undesirable, and suspected guerrilla sympathizers.  This attack spanned a large swath of land in Colombia, resulted in the deaths of thousands of individuals, and was directed by a centrally-commanded paramilitary organization in coordination and cooperation with Colombian government and security forces.  At all relevant times, Chiquita had knowledge of the Colombian government's symbiotic relationship with the AUC and the AUC's use of Paramilitary Terrorism Tactics to carry out the War.

455.    The attacks on Plaintiffs and their deceased family members described herein were part of a pattern and practice of systematic human rights violations paid for, facilitated, condoned, confirmed, aided and abetted, and/or ratified by Chiquita and/or committed in conspiracy with the AUC.

456.    As a direct and proximate result of Chiquita's unlawful conduct, Plaintiffs have suffered and will continue to suffer harm including pain and suffering, personal injuries, property damage, harm to their livelihoods, and extreme and severe mental anguish and emotional distress.  Plaintiffs are thereby entitled to general and compensatory damages in amounts to be proven at trial.

457.    Plaintiffs' causes of action arise under and constitute torts under, among others, the following laws and treaties:

    a. Alien Tort Claims Act, 28 U.S.C. § 1350;

    b. Torture Victims Protection Act, Pub. L. No. 102-256, 106 Stat. 73 (1992), codified at 28 U.S.C. § 1350, notes;

    c. The Law of Nations;

    d. United Nations Charter, 59 Stat. 1031, 3 Bevans 1153 (1945);

    e. Universal Declaration of Human Rights, G.A. Res. 217A(iii), U.N. Doc. A/810 (1948);

    f. International Covenant on Civil and Political Rights, G.A. Res. 2220A(xxi), 21 U.N. Doc., GAOR Supp. (No. 16) at 52, U.N. Doc. A/6316 (1966);

    g. Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. Res 39/46, 39 U.N. Doc., GAOR Supp. (No. 51) at 1100, U.N. Doc. A/39/51 (1984);

h.      Declaration on the Protection of All Persons From Being Subjected to Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. Res. 3452, 30 U.N. Doc., GAOR Supp. (No. 34) at 91, U.N. Doc. A/10034 (1976);

i.      International Convention for the Suppression of Terrorist Bombings, G.A. Res. 164, U.N. GAOR 52nd Sess., U.N. Doc. A/RES/52/164 (1998), 37 I.L.M. 249 (1998) ("Bombing Convention").

j.      International Convention for the Suppression of the Financing of Terrorism, 39 I.L.M 270 (December 9, 1997); G.A. Res. 54/109, 1 UN Doc. A/RES/54/109 (December 1, 1999);

k.      Common article 3 of the 1949 Geneva Conventions; Articles 4 and 13 of the 1977 Geneva Protocol II;

l.      The Anti-Terrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (1996);

m.      Customary international law;

n.      Common law of the United States of America;

o.      Statutory and common law of the State of Ohio; and

p.      The Laws of Colombia.

458.    Legal action by Plaintiffs in Colombia would be futile. In June 2004, Chiquita sold its Colombian subsidiary, Banadex. On information and belief, Chiquita no longer owns any production operations in Colombia and is not subject to service there. Furthermore, the political and legal system in Colombia is characterized by virtual impunity for the crimes of paramilitaries and those who assist them. The vast majority of arrest warrants for paramilitary leaders are never carried out, and when such figures are arrested they are frequently released or allowed to escape from security facilities. Military officers accused of collaboration with

92

paramilitaries are routinely exonerated or given token sentences by military courts.  Prosecutors, investigators, and judicial officials who pursue cases of human rights abuses implicating paramilitaries are subject to death threats and assassinations, and many have had to resign or flee the country as a result.

459.   Legal action by Plaintiffs in Colombia would also result in serious reprisals. Individuals who seek redress for paramilitary crimes committed against them or their family members are regularly targeted for further retributive violence.

460.   Chiquita took active steps to conceal its payments and other forms of support to the AUC.  In fact, during a 60 Minutes report broadcast by CBS News, Chiquita's Chief Executive Officer, Fernando Aguirre, admitted that Chiquita hid the payments to terrorists so well that "if we hadn't gone to the Justice Department, we probably would not be talking about this whole issue.  No one would know about this."

461.   Chiquita's concealment had the effect of preventing Plaintiffs from learning that Chiquita was responsible for their injuries. Plaintiffs were unaware of Chiquita's support of the AUC until sometime after Chiquita's guilty plea in March of 2007.

462.   Chiquita's concealment of its role in the deaths of Plaintiffs' decedents and Plaintiffs' injuries prevented Plaintiffs from filing their claims at an earlier date.

463.   Plaintiffs were additionally unable to bring suit in Colombia or the United States until 2007 due to the poor security situation and the danger of reprisals, to which Chiquita's support of the AUC contributed.

464.   Several of the AUC units active in the banana-growing region did not demobilize until 2006.

93

465.    Throughout this period, paramilitaries continued to kill and make threats against civilians in the banana-growing region.  In 2006, several human rights workers received death threats, including lawyers challenging paramilitary violence.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF
(Financing Terrorism)

466.    Plaintiffs repeat and reallege the allegations in each of the preceding paragraphs as if fully set forth herein.

467.    Financing terrorism is a violation of the law of nations, and thus a violation of 28 U.S.C. § 1350.  Financing terrorism is also a violation of international law, the common law of the United States and the State of Ohio, the laws of Colombia, and the international treaties, agreements, conventions, and resolutions identified in this Complaint.

468.    The AUC was a terrorist organization, and has been designated as such by the United States and the European Union since 2001.

469.    The Paramilitary Terrorism Tactics used by the AUC constitute terrorism in that they are (i) violent acts, or acts dangerous to human life, that were intended to intimidate or coerce a civilian population or influence the policy of a government and/or (ii) criminal acts intended or calculated to create a state of terror in the minds of particular persons, a particular group of persons, or the general public.

470.    The AUC killed or forcibly disappeared the Plaintiffs' deceased family members or seriously injured the Plaintiffs using the Paramilitary Terrorism Tactics.

471.    Chiquita knew the AUC was a terrorist organization and knew it used the Paramilitary Terrorism Tactics as part of a war strategy to defeat leftist guerillas and to maintain control over areas it regained.

94

472.   Chiquita financed terrorism, in violation of the law of nations, by knowingly making over one hundred payments totaling more than $1.7 million to the AUC between 1996 and 2004.

473.   Chiquita made the payments with the intention that the funds be used, in full or in part, by the AUC to carry out the Paramilitary Terrorism Tactics during the War against the FARC and the ELN guerillas, their sympathizers, and supporters and to help the AUC maintain control over the banana-growing regions.

474.   Chiquita purposefully made the payments to the AUC with the knowledge and intention that the AUC engage in the Paramilitary Terrorism Tactics that resulted in the death, forced disappearance, or serious injury of the Plaintiffs or their deceased family members.

475.   The agreement between Chiquita and the AUC constituted a criminal relationship to bring about the bloody pacification of the banana-growing regions.

476.   As a proximate result of Chiquita's payments to the AUC, the Plaintiffs have suffered serious physical and mental injuries.  Among other things, the Plaintiffs' deceased family members have been killed, or forcibly disappeared, or the Plaintiffs have been seriously injured by the AUC's terrorism using the Paramilitary Terrorism Tactics.

477.   As a result of Chiquita's unlawful financing of terrorism, the Plaintiffs are entitled to compensatory and punitive damages in an amount in excess of $75,000 per plaintiff.

## SECOND CLAIM FOR RELIEF
(Aiding And Abetting Terrorism In Violation Of The Law Of Nations)

478.   Plaintiffs repeat and reallege the allegations in each of the preceding paragraphs as if fully set forth herein.

479.   Terrorism is a violation of the law of nations, and thus a violation of 28 U.S.C. § 1350.  Terrorism is also a violation of international law, the common law of the United

States and the State of Ohio, the laws of Colombia, and the international treaties, agreements, conventions, and resolutions identified in this Complaint.

480.    The Paramilitary Terrorism Tactics used by the AUC constitute terrorism in that the Tactics were used with the intent to cause death or serious bodily injury to civilians, or to other persons not taking an active part in open hostilities, and with the purpose that the acts intimidate a population to act or abstain from acting.

481.    The AUC engaged in terrorism using the Paramilitary Terrorism Tactics.

482.    Chiquita knew the AUC engaged in terrorism using the Paramilitary Terrorism Tactics as a part of a strategy to defeat leftist guerillas and to maintain control over areas it regained.

483.    Chiquita aided and abetted terrorism, in violation of the law of nations, by, among other things, knowingly and intentionally (i) making over one hundred payments totaling more than $1.7 million to the AUC between 1996 and 2004; (ii) allowing its seaport facilities to be used by the AUC to unlawfully receive shipments of military-grade firearms; and (iii) allowing its ships and seaport facilities to be used by the AUC to ship narcotics throughout the world.

484.    Chiquita acted with the purpose of facilitating the AUC's engagement in terrorism through use of the Paramilitary Terrorism Tactics to wage the War against the leftist guerillas, their sympathizers, and supporters and to maintain control over the banana-growing regions.

485.    The financial and other support Chiquita provided the AUC substantially assisted the AUC in engaging in terrorism through the use of the Paramilitary Terrorism Tactics that resulted in the death, forced disappearance, or serious injury of the Plaintiffs or their deceased family members.

486. The agreement between Chiquita and the AUC constituted a criminal relationship to bring about the bloody pacification of the banana-growing regions.

487. As a proximate result of Chiquita's conduct, the Plaintiffs have suffered serious physical and mental injuries. Among other things, the Plaintiffs' deceased family members have been killed, or forcibly disappeared, or the Plaintiffs have been seriously injured, by the AUC's terrorist acts.

488. As a result of Chiquita aiding and abetting the AUC's terrorism, the Plaintiffs are entitled to compensatory and punitive damages in an amount in excess of $75,000 per Plaintiff.

## THIRD CLAIM FOR RELIEF
(Aiding And Abetting Crimes Against Humanity)

489. Plaintiffs repeat and reallege the allegations in each of the preceding paragraphs as if fully set forth herein.

490. Crimes against humanity are violations of the law of nations, and thus a violation of 28 U.S.C. § 1350. Crimes against humanity are also violations of international law, the common law of the United States and the State of Ohio, the laws of Colombia, and the international treaties, agreements, conventions, and resolutions identified in this Complaint.

491. The Paramilitary Terrorism Tactics used by the AUC constitute crimes against humanity in that the Tactics included murder, extra-judicial killing, enslavement, arbitrary arrest and detention, kidnapping, forced disappearances, forcible displacement, torture, rape, and other inhumane acts that were committed by the AUC as part of a widespread or systematic attack directed at a civilian population.

492. The AUC committed crimes against humanity using the Paramilitary Terrorism Tactics during the course of the War and in furtherance of their objectives in the War.

493.    Chiquita knew the AUC committed crimes against humanity using the Paramilitary Terrorism Tactics as a part of a strategy to defeat leftist guerilas and to maintain control over the banana-growing regions.

494.    Chiquita aided and abetted crimes against humanity, in violation of the law of nations, by, among other things, knowingly and intentionally (i) making over one hundred payments totaling more than $1.7 million to the AUC between 1996 and 2004; (ii) allowing its seaport facilities to be used by the AUC to unlawfully receive shipments of military-grade firearms; and (iii) allowing its ships and seaport facilities to be used by the AUC to ship narcotics throughout the world.

495.    Chiquita acted with the purpose of facilitating the AUC's commission of crimes against humanity through use of the Paramilitary Terrorism Tactics against leftist guerilas, their sympathizers, and supporters and to maintain control over the banana-growing regions.

496.    The financial and other support Chiquita provided the AUC substantially assisted the AUC in committing crimes against humanity through the use of the Paramilitary Terrorism Tactics that resulted in the death, forced disappearance, or serious injury of the Plaintiffs or their deceased family members.

497.    The agreement between Chiquita and the AUC constituted a criminal relationship to bring about the bloody pacification of the banana-growing regions.

498.    As a proximate result of Chiquita's conduct, the Plaintiffs have suffered serious physical and mental injuries.  Among other things, the Plaintiffs' deceased family members have been killed, or forcibly disappeared, or the Plaintiffs have been seriously injured, by the AUC's crimes against humanity.

499.   As a result of Chiquita aiding and abetting the AUC's crimes against humanity, the Plaintiffs are entitled to compensatory and punitive damages in an amount in excess of $75,000 per Plaintiff.

### FOURTH CLAIM FOR RELIEF
(Aiding And Abetting War Crimes)

500.   Plaintiffs repeat and reallege the allegations in each of the preceding paragraphs as if fully set forth herein.

501.   War crimes are a violation of the law of nations, and thus a violation of 28 U.S.C. § 1350.  War crimes are also violations of international law, the common law of the United States and the State of Ohio, the laws of Colombia, and the international treaties, agreements, conventions, and resolutions identified in this Complaint.

502.   The Paramilitary Terrorism Tactics used by the AUC constitute war crimes in that the Tactics included murder, mutilation, cruel treatment, torture, kidnapping and hostage taking, outrages upon personal dignity, extra-judicial killing, forced disappearances, forcible displacement, rape, and other degrading acts that were committed by the AUC against non-combatants during the course of the War.

503.   The AUC committed war crimes using the Paramilitary Terrorism Tactics to further their objectives in the War.

504.   Chiquita knew the AUC committed war crimes using the Paramilitary Terrorism Tactics as a part of a strategy to defeat leftist guerillas and to maintain control over areas it regained.

505.   Chiquita aided and abetted the AUC's war crimes, in violation of the law of nations, by, among other things, knowingly and intentionally (i) making over one hundred payments totaling more than $1.7 million to the AUC between 1996 and 2004; (ii) allowing its

seaport facilities to be used by the AUC to unlawfully receive shipments of military-grade firearms; and (iii) allowing its ships and seaport facilities to be used by the AUC to ship narcotics throughout the world.

506.    Chiquita acted with the purpose of facilitating the AUC's commission of war crimes through use of the Paramilitary Terrorism Tactics to wage the War against the leftist guerillas, their sympathizers, and supporters and to maintain control over the banana-growing regions.

507.    The financial and other support Chiquita provided the AUC substantially assisted the AUC in committing war crimes through the use of the Paramilitary Terrorism Tactics that resulted in the death, forced disappearance, or serious injury of the Plaintiffs or their deceased family members.

508.    The agreement between Chiquita and the AUC constituted a criminal relationship to bring about the bloody pacification of the banana-growing regions.

509.    As a proximate result of Chiquita's conduct, the Plaintiffs have suffered serious physical and mental injuries.  Among other things, the Plaintiffs' deceased family members have been killed, or forcibly disappeared, or the Plaintiffs have been seriously injured by the AUC's war crimes.

510.    As a result of Chiquita aiding and abetting the AUC's war crimes, the Plaintiffs are entitled to compensatory and punitive damages in an amount in excess of $75,000 per plaintiff.

### FIFTH CLAIM FOR RELIEF
(Aiding And Abetting Extra-Judicial Killings)

511.    Plaintiffs repeat and reallege the allegations in each of the preceding paragraphs as if fully set forth herein.

100

512.    Extra-judicial killing, or summary execution, is a violation of the law of nations, and thus a violation of 28 U.S.C. § 1350.  Extra-judicial killing is also a violation of international law, the common law of the United States and the State of Ohio, the laws of Colombia, and the international treaties, agreements, conventions, and resolutions identified in this Complaint.

513.    The Paramilitary Terrorism Tactics used by the AUC constitute extra-judicial killing in that the AUC deliberately killed the Plaintiffs' deceased family members under color of law and without previous authorization by the judgment of a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples.

514.    When the AUC used the Paramilitary Terrorism tactics to deliberately kill the Plaintiffs' deceased family members without previous judicial authorization, the AUC was acting under the color of law.

515.    The AUC killed the Plaintiffs' deceased family members using the Paramilitary Terrorism Tactics to further their objectives in the War and to maintain control over areas it had regained.

516.    Chiquita knew the AUC engaged in the extra-judicial killings using the Paramilitary Terrorism Tactics as a part of a strategy to defeat leftist guerillas and to maintain control over the areas it regained.

517.    Chiquita aided and abetted the AUC's extra-judicial killings, in violation of the law of nations, by, among other things, knowingly and intentionally (i) making over one hundred payments totaling more than $1.7 million to the AUC between 1996 and 2004; (ii) allowing its seaport facilities to be used by the AUC to unlawfully receive shipments of military-grade firearms; and (iii) allowing its ships and seaport facilities to be used by the AUC to ship narcotics throughout the world.

101

518.     Chiquita acted with the purpose of facilitating the AUC's commission of extra-judicial killings during the War using the Paramilitary Terrorism Tactics against leftists guerillas, their sympathizers, and supporters and to maintain control over the banana-growing regions.

519.     The financial and other support Chiquita provided the AUC substantially assisted the AUC in committing extra-judicial killings using the Paramilitary Terrorism Tactics that resulted in the death of Plaintiffs' deceased family members.

520.     The agreement between Chiquita and the AUC constituted a criminal relationship to bring about the bloody pacification of the banana-growing regions.

521.     As a proximate result of Chiquita's conduct, the Plaintiffs have suffered serious physical and mental injuries.  Among other things, the Plaintiffs' deceased family members have been killed by the AUC.

522.     As a result of Chiquita aiding and abetting the AUC's extra-judicial killing, the Plaintiffs are entitled to compensatory and punitive damages in an amount in excess of $75,000 per plaintiff.

## SIXTH CLAIM FOR RELIEF
(Aiding And Abetting Torture)

523.     Plaintiffs repeat and reallege the allegations in each of the preceding paragraphs as if fully set forth herein.

524.     Torture is a violation of the law of nations, and thus a violation of 28 U.S.C. § 1350.  Torture is also a violation of international law, the common law of the United States and the State of Ohio, the laws of Colombia, and the international treaties, agreements, conventions, and resolutions identified in this Complaint.

525.    The Paramilitary Terrorism Tactics used by the AUC constitute torture in that the AUC intentionally inflicted severe pain or suffering, physically and mentally, on the Plaintiffs or their deceased family members in order to obtain information, obtain a confession, intimidate or coerce the Plaintiffs or their deceased family members, or a third person, or to punish the Plaintiffs or their deceased family members or a third person.  When the AUC used the Paramilitary Terrorism tactics to torture the Plaintiffs or their deceased family members, the AUC was acting under the color of law.

526.    The AUC tortured the Plaintiffs or their deceased family members using the Paramilitary Terrorism Tactics during the course of, and to further their objectives in, the War.

527.    Chiquita knew the AUC engaged in torture using the Paramilitary Terrorism Tactics as a part of a strategy to defeat leftist guerillas and to maintain control over areas it regained.

528.    Chiquita aided and abetted the AUC's torture, in violation of the law of nations, by, among other things, knowingly and intentionally (i) making over one hundred payments totaling more than $1.7 million to the AUC between 1996 and 2004; (ii) allowing its seaport facilities to be used by the AUC to unlawfully receive shipments of military-grade firearms; and (iii) allowing its ships and seaport facilities to be used by the AUC to ship narcotics throughout the world.

529.    Chiquita acted with the purpose of facilitating the AUC's engagement in torture during the War through use of the Paramilitary Terrorism Tactics against the leftist guerillas, their sympathizers, and supporters and to maintain control over the banana-growing regions.

530.    The financial and other support Chiquita provided the AUC substantially assisted the AUC in engaging in torture through the use of the Paramilitary Terrorism Tactics that resulted in the death or serious injury of the Plaintiffs or their deceased family members.

531.    The agreement between Chiquita and the AUC constituted a criminal relationship to bring about the bloody pacification of the banana-growing regions.

532.    As a proximate result of Chiquita's conduct, the Plaintiffs have suffered serious physical and mental injuries.  Among other things, the Plaintiffs or their deceased family members have been killed or seriously injured by torture committed by the AUC.

533.    As a result of Chiquita aiding and abetting the AUC's torture, the Plaintiffs are entitled to compensatory and punitive damages in an amount in excess of $75,000 per plaintiff.

### SEVENTH CLAIM FOR RELIEF
(Extra-Judicial Killing In Violation Of The Torture Victims Protection Act)

534.    Plaintiffs repeat and reallege the allegations in each of the preceding paragraphs as if fully set forth herein.

535.    Extra-judicial killing, or summary execution, is a violation of the Torture Victims Protection Act, Pub. L. No. 102-256, § 3(a), 106 Stat. 73 (1992), codified at 28 U.S.C. § 1350, notes.

536.    The Paramilitary Terrorism Tactics used by the AUC constitute extra-judicial killing in violation of the Torture Victims Protection Act in that the AUC deliberately killed the Plaintiffs' deceased family members under color of law and without previous authorization by the judgment of a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples.

537.    When the AUC used the Paramilitary Terrorism Tactics to deliberately kill the Plaintiffs' deceased family members without previous judicial authorization, the AUC was acting under the color of law.

538.    The AUC killed or injured the Plaintiffs' deceased family members using the Paramilitary Terrorism Tactics to further their objectives in the War.

539.    Chiquita knew the AUC engaged in the extra-judicial killings using the Paramilitary Terrorism Tactics as a part of a strategy to defeat leftist guerillas and to maintain control over areas it regained.

540.    Chiquita aided and abetted the AUC's extra-judicial killings, in violation of the Torture Victims Protection Act, by, among other things, knowingly and intentionally (i) making over one hundred payments totaling more than $1.7 million to the AUC between 1996 and 2004; (ii) allowing its seaport facilities to be used by the AUC to unlawfully receive shipments of military-grade firearms; and (iii) allowing its ships and seaport facilities to be used by the AUC to ship narcotics throughout the world.

541.    Chiquita acted with the purpose of facilitating the AUC's commission of extra-judicial killings during the War using the Paramilitary Terrorism Tactics against the leftist guerillas, their sympathizers, and supporters and to maintain control over the banana-growing regions.

542.    The financial and other support Chiquita provided the AUC substantially assisted the AUC in committing the extra-judicial killings using the Paramilitary Terrorism Tactics that resulted in the death of Plaintiffs' deceased family members.

543.    The agreement between Chiquita and the AUC constituted a criminal relationship to bring about the bloody pacification of the banana-growing regions.

544. As a proximate result of Chiquita's conduct, the Plaintiffs have suffered serious physical and mental injuries. Among other things, the Plaintiffs' deceased family members have been killed by the AUC.

545. As a result of Chiquita aiding and abetting the AUC's extra-judicial killing in violation of the Torture Victims Protection Act, the Plaintiffs are entitled to compensatory and punitive damages in an amount in excess of $75,000 per plaintiff.

## EIGHTH CLAIM FOR RELIEF
(Torture In Violation Of The Torture Victims Protection Act)

546. Plaintiffs repeat and reallege the allegations in each of the preceding paragraphs as if fully set forth herein.

547. Torture is a violation of the Torture Victims Protection Act, Pub. L. No. 102-256, § 3(a), 106 Stat. 73 (1992), codified at 28 U.S.C. § 1350, notes.

548. The Paramilitary Terrorism Tactics used by the AUC constitute torture in that the AUC intentionally inflicted severe pain or suffering, physically and mentally, on the Plaintiffs or their deceased family members in order to obtain information, obtain a confession, intimidate or coerce the Plaintiffs, their deceased family members, or a third person, or to punish the Plaintiffs, their deceased family members or a third person.

549. When the AUC used the Paramilitary Terrorism tactics to torture the Plaintiffs or their deceased family members, the AUC was acting under the color of law.

550. The AUC tortured the Plaintiffs or their deceased family members using the Paramilitary Terrorism Tactics during the course of, and to further their objectives in, the War.

551.    Chiquita knew the AUC engaged in torture using the Paramilitary Terrorism Tactics as a part of a strategy to defeat leftist guerilas and to maintain control over areas it regained.

552.    Chiquita aided and abetted the AUC's torture, in violation of the Torture Victims Protection Act, by, among other things, knowingly and intentionally (i) making over one hundred payments totaling more than $1.7 million to the AUC between 1996 and 2004; (ii) allowing its seaport facilities to be used by the AUC to unlawfully receive shipments of military-grade firearms; and (iii) allowing its ships and seaport facilities to be used by the AUC to ship narcotics throughout the world.

553.    Chiquita acted with the purpose of facilitating the AUC's engagement in torture during the War through use of the Paramilitary Terrorism Tactics against leftist guerillas, their sympathizers, and supporters and to maintain control over the banana-growing regions.

554.    The financial and other support Chiquita provided the AUC substantially assisted the AUC in engaging in the torture of Plaintiffs or their deceased family members using the Paramilitary Terrorism Tactics.

555.    The agreement between Chiquita and the AUC constituted a criminal relationship to bring about the bloody pacification of the banana-growing regions.

556.    As a proximate result of Chiquita's conduct, the Plaintiffs have suffered serious physical and mental injuries.  Among other things, the Plaintiffs or their deceased family members have been killed or seriously injured by the AUC's torture using the Paramilitary Terrorism Tactics.

557.    As a result of Chiquita aiding and abetting the AUC's torture in violation of the Torture Victims Protection Act, the Plaintiffs are entitled to compensatory and punitive damages in an amount in excess of $75,000 per plaintiff.

## NINTH CLAIM FOR RELIEF
(Wrongful Death)

558.    Plaintiffs repeat and reallege the allegations in each of the preceding paragraphs as if fully set forth herein.

559.    This action arises from the deaths of Plaintiffs' deceased family members as described in this Complaint.

560.    Chiquita's conduct substantially assisted, facilitated, aided and abetted the AUC in committing murders, including but not limited to the murders of Plaintiffs' deceased family members.

561.    At the time Chiquita provided substantial assistance to the AUC, including but not limited to monetary payments, Chiquita knew that the AUC was a violent, terrorist organization and knew and intended that Chiquita's financial support would assist, facilitate, aid and abet the AUC in committing murders, including but not limited to the murders of Plaintiffs' deceased family members.

562.    The acts described herein constitute wrongful death under the laws of the State of Ohio.

563.    The deaths of Plaintiff's deceased family members were a direct and proximate result of Chiquita's provision of financial and other support to the AUC.

564.    The AUC's and Chiquita's actions were willful, intentional, wanton, malicious, and oppressive.

565.    As a direct result of Chiquita's acts and omissions, and as a result of the deaths described above, Plaintiffs have sustained pecuniary loss resulting from the loss of society, comfort, attention, services, and support of the decedents.

566.     Chiquita is liable to the Plaintiffs in that it aided and abetted, directed, ordered, requested, paid, was reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, and/or conspired with the AUC in bringing about the deaths of the Plaintiffs' deceased family members.

567.     As a result of Chiquita's conduct, the Plaintiffs are entitled to compensatory and punitive damages in an amount in excess of $75,000 per Plaintiff.

## TENTH CLAIM FOR RELIEF
### (Assault And Battery)

568.     Plaintiffs repeat and reallege the allegations in each of the preceding paragraphs as if fully set forth herein.

569.     The AUC's and Chiquita's actions constituted offensive and harmful touching of Plaintiffs' person or the person of the Plaintiffs' deceased family members without their consent, and/or the creation of a reasonable apprehension that such touching would result.

570.     As a result of the acts described in this Complaint, Plaintiffs or their deceased family members were placed in great fear for their lives and suffered severe physical and psychological abuse and injury.

571.     The acts described herein constitute assault and battery under the laws of the State of Ohio.

572.     The AUC's and Chiquita's actions were willful, intentional, wanton, malicious, and oppressive.

573.     Chiquita is liable to the Plaintiffs in that it aided and abetted, directed, ordered, requested, paid, was reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, and/or conspired with the AUC in bringing about the assault and battery of the Plaintiffs or their deceased family members.

574.    As a result of Chiquita's conduct, the Plaintiffs are entitled to compensatory and punitive damages in an amount in excess of $75,000 per Plaintiff.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the Court to:

(a)    enter judgment in favor of Plaintiffs on all counts of the Complaint;

(b)    award Plaintiffs compensatory and punitive damages in an amount to be determined at trial;

(c)    award Plaintiffs the costs of suit, including reasonable attorneys' fees; and

(d)    award Plaintiffs such other and further relief as the Court deems just under the circumstances.

110

April 14, 2010

By:  /s/ Sigrid S. McCawley

Sigrid S. McCawley
BOIES, SCHILLER & FLEXNER LLP
401 East Las Olas Boulevard
Suite 1200
Fort Lauderdale, FL 33301
Telephone: (954) 356-0011
Facsimile: (954) 356-0022

Stephen N. Zack
BOIES, SCHILLER & FLEXNER LLP
100 S.E. Second Street
Suite 2800
Miami, FL 33131
Telephone: (305) 539-8400
Facsimile: (305) 539-1307

Karen C. Dyer
BOIES, SCHILLER & FLEXNER LLP
121 South Orange Avenue
Suite 840
Orlando, FL 32801
Telephone: (407) 425-7118
Facsimile: (407) 425-7047

*Of counsel*:
Nicholas A. Gravante Jr.
Lee S. Wolosky
Magda M. Jimenez Train
BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue, 7th Floor
New York, NY 10022
Telephone: (212) 446-2300
Facsimile: (212) 446-2350

*Attorneys for Plaintiffs*