UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 08-01916-MD-MARRA

IN RE: CHIQUITA BRANDS INTERNATIONAL,
INC. ALIEN TORT STATUTE AND SHAREHOLDER
DERIVATIVE LITIGATION
_____/

This Document Relates To:

ATS ACTIONS

        07-60821-CIV-MARRA
        08-80421-CIV-MARRA
        08-80465-CIV-MARRA
        08-80480-CIV-MARRA
        08-80508-CIV-MARRA
        10-60573-CIV-MARRA
        10-80652-CIV-MARRA

_____/

## OPINION AND ORDER

THIS CAUSE is before the Court upon Defendants' Motions to Dismiss Amended Complaints. (DEs 92, 295). The motions are fully briefed and ripe for review. The Court has carefully considered the briefing, supplemental briefing, and oral arguments, and is otherwise fully advised in the premises.[1]

_____

[1] Chiquita filed its first motion to dismiss on July 11, 2008. (DE 92). After that motion was fully briefed, and after a hearing was held thereon, Plaintiffs amended their complaints. Accordingly, the Court permitted Chiquita to file a second motion to dismiss, filed on April 9, 2010 (DE 295), which was limited to the amended allegations and developments in the relevant case law. This order addresses the arguments raised by the parties in both rounds of motion-to-dismiss briefing.

Plaintiffs, citizens and residents of Colombia, are the family members of trade unionists, banana-plantation workers, political organizers, social activists, and others tortured and killed by the Autodefensas Unidas de Colombia ("AUC"), a paramilitary organization operating in Colombia. The decedents were allegedly killed by the AUC during the 1990s through 2004 in the Colombian banana-growing regions, primarily in the Uraba and Magdalena areas. Plaintiffs bring this action against Defendants Chiquita Brands International, Inc. and Chiquita Fresh North America LLC (collectively "Chiquita"), alleging claims under various federal statutes, state common laws, international customary law, and foreign law. Specifically, Plaintiffs allege claims under 28 U.S.C. § 1350—commonly known as the Alien Tort Statute ("ATS") or Alien Tort Claims Act ("ATCA")—for terrorism; material support to terrorist organizations; torture; extrajudicial killing; war crimes; crimes against humanity; cruel, inhuman, or degrading treatment; violation of the rights to life, liberty and security of person and peaceful assembly and association; and consistent pattern of gross violations of human rights. Plaintiffs also allege claims under the Torture Victim Protection Act ("TVPA"), 28 U.S.C. § 1350 note, for torture and extrajudicial killing. Last, Plaintiffs allege claims under the laws of Florida, New Jersey, Ohio, the District of Columbia, and the foreign law of Colombia for assault and battery, wrongful death, intentional infliction of emotional distress, negligent infliction of emotional distress, negligence, negligent hiring, negligent per se, and loss of consortium.

# FACTUAL BACKGROUND[2]

*The AUC*

Since the 1940s, Colombia has been engaged in a longstanding civil conflict between the government and left-wing guerrilla insurgents, such as the Revolutionary Armed Forces of Colombia ("FARC") and the National Liberation Army ("ELN").[3]   FAC ¶¶ 407, 497–99.

In the early 1980s, Colombian drug barons, large-land owners, industrialists, and bankers, with the cooperation of the Colombian government, began to create private paramilitary units to combat the left-wing guerrilla forces.  FAC ¶¶ 407–08.  By the mid-1990s, the largest and most well-organized paramilitary group in Colombia was the Rural Self-Defense Group of Cordoba and Uraba (the "ACCU").  FAC ¶ 409.

The commander-in-chief of the ACCU was Carlos Castano.  FAC ¶ 409.  In 1994, Castano and the ACCU sponsored a summit of the paramilitary groups from across Colombia.  FAC ¶ 409.  This summit led to the formation of the AUC, a national federation uniting Colombia's regional paramilitaries under Castano's leadership.  FAC ¶ 409.

---

[2] There are seven complaints before the Court, transferred here by the United States Judicial Panel on Multidistrict Litigation, pursuant to 28 U.S.C. § 1407, for consolidated pretrial proceedings.  Case Nos. 07-cv-60821, 08-cv-80421, 08-cv-80465, 08-cv-80480, 08-cv-80508, 10-cv-60573, and 10-cv-80652.  The factual allegations in these complaints are essentially the same.  For simplicity, the factual discussion that follows relies on and cites the allegations from the First Amended Complaint ("FAC") in *Does 1-144 and Perezes 1-95 v. Chiquita Brands International, Inc.*, No. 08-cv-80465, DE 58 (filed Mar. 1, 2010), which the Court finds representative of the other complaints.

[3] The factual background is drawn from the allegations in the First Amended Complaint, which the Court credits as true for purposes of these motions to dismiss.  *See Instituto de Prevision Militar v. Merill Lynch*, 546 F.3d 1340, 1342 (11th Cir. 2008).

The AUC grew rapidly in size during the late 1990s and into the twenty-first century. FAC ¶ 410.  In 1997, it was comprised of roughly 4,000 combatants.  FAC ¶ 410.  By 2001, Castano claimed to have 11,000 members, and by 2002, AUC forces were present in nearly all regions of Colombia.  FAC ¶ 410.

As part of its war strategy, the AUC sought to eliminate any guerrilla sympathizer who opposed the paramilitaries' control of the territories in which the AUC operated.  FAC ¶ 411. The AUC's primary method was to terrorize individuals and communities suspected of guerrilla sympathies.  FAC ¶ 411.  To this end, the AUC routinely engaged in death threats, summary executions, torture, rape, kidnaping, forced disappearances, looting, and large-scale attacks on civilian populations.  FAC ¶ 411.

While the AUC periodically engaged in direct combat with armed guerrilla forces, the majority of its victims were civilians whom the AUC viewed as supporters of the guerrillas or whom inhabited areas in which the guerrillas operated.  FAC ¶ 412.  The AUC also targeted people thought to share the guerrillas' leftist ideology, such as teachers, community leaders, trade unionists, human rights activists, religious workers, and leftist politicians.  FAC ¶ 413.  The AUC was also known to eliminate groups it considered socially undesirable, such as indigenous persons, people with psychological problems, drug addicts, prostitutes, and petty criminals.  FAC ¶ 413.

The escalation of violence between the paramilitaries and the guerrillas caused the Colombian president to issue Decree 1194 of 1989, adopted as permanent legislation in 1991, which criminalized membership in a paramilitary group or providing any support to such groups. FAC ¶ 408.  In 1994, however, the Colombian government created a new legal mechanism for

4

funding and supporting paramilitaries, known as Chapter 5 of Decree 356.  FAC ¶ 421.

Paramilitaries could reorganize and continue operating under Chapter 5, which allowed private

groups to provide for "Special Vigilance and Private Security Services."  FAC ¶ 421.  These

private security groups, known commonly by their Spanish-language acronym "convivir," were

comprised of civilians who received permission from the government for a license to provide

their own security in high-risk areas.  FAC ¶ 421.  Convivir were permitted to use arms that were

otherwise restricted to the military's use.  FAC ¶ 421.

     Plaintiffs allege that the convivir units were fronts for the paramilitaries from their

inception.  FAC ¶ 422.  In the Uraba region—where Chiquita's wholly owned subsidiary, C.I.

Bananos de Exportacion, S.A. ("Banadex"), operated its banana plantations—the convivir units

were comprised of and led by known AUC paramilitaries.  FAC ¶ 422.

     The convivir units worked closely with the Colombian military, facilitating

communication and collaboration between the military and the AUC.  FAC ¶ 426.  Plaintiffs

allege that the cooperation between the AUC and convivirs on one hand, and the Colombian

military and government officials on the other, was extensive.  Both groups sought to defeat the

left-wing guerrilla insurgency and both worked together towards that end.  FAC ¶ 429.  This

alleged collaboration included joint membership between the AUC and the Colombian military

and security forces, the government's acquiescence to the AUC's permanent military bases and

security checkpoints, the government's refusal to intervene to stop AUC attacks, intelligence

sharing, arms and equipment sharing, and planning and executing joint attacks on civilian

populations.  FAC ¶¶ 426, 429, 433–37.  Plaintiffs allege that this model of collaboration

between the paramilitaries and the government was "developed and perfected" in the Uraba region, the area of Chiquita's banana operations.  FAC ¶ 438.

On September 10, 2001, the U.S. government designated the AUC as a Foreign Terrorist Organization ("FTO").  FAC ¶ 473.

***The Torture and Killing of Plaintiffs' Relatives***

There are several thousand named plaintiffs in the seven complaints, and some complaints are filed as class actions seeking to represent larger classes.  Each named plaintiff alleges that he or she is a family member of a victim who was killed or tortured by the AUC. Each plaintiff alleges that the AUC attacked his or her relative in the banana-growing regions of Colombia, during the period when Chiquita supported the AUC.  While the circumstances of each attack are unique, to summarize each plaintiff's allegations would be impractical given the number of plaintiffs.  Accordingly, this opinion will provide only allegations of several representative plaintiffs.[4]

- Juana Perez 50B is the wife and is also a legal heir of Pablo Perez 50, with whom she had a family.  Pablo Perez 50, an employee of Finca Marte, a banana plantation owned or controlled by Chiquita, or which supplied Chiquita, was an active member of the trade union SINTRAINAGRO, which represented banana workers in Magdalena, including Chiquita workers . . . . On the night of October 31, 1997 or in the early morning hours of November

---

[4] While some allegations of the violence against Plaintiffs' relatives are highly detailed, the complaints also contain lists of brief, undetailed allegations.  *See, e.g.*, FAC ¶ 32 ("On 2/10/1997, Peter Doe 1 was killed by the AUC, which received support from Chiquita and/or Banadex.  Plaintiff John Doe 1, who was the son of Peter Doe 1, is the legal heir to Peter Doe 1 and resides in the municipio of Apartado in Antioquia, Colombia."); *see also* FAC ¶¶ 33–195 (similar allegations).  Because it would be impractical for the complaints to detail each one of the thousands of alleged killings, especially the class-action complaints, at this stage in the litigation the Court will assume that the detailed allegations, quoted in the text below, are representative of all Plaintiffs' claims.  Of course, as this litigation proceeds, Plaintiffs must ultimately prove sufficient facts surrounding the deaths of each victim.

1, 1997, a group of heavily armed paramilitaries dressed in camouflaged uniforms stormed Pablo Perez 50's home in the village of Guacamayal, in the banana zone of Magdalena, while he was sleeping. The paramilitaries broke down the door to the home, found Pablo Perez 50 and seized him, tied him up and forced him to accompany them at gunpoint, beating him as they kidnaped him. Pablo Perez 50's corpse was found the following morning with signs of torture and two gunshots, one to the head and one to the body. In a certificate issued on November 22, 1999, Elvis Emilio Redondo Lopez, the Cienaga Municipal Representative, confirmed that Pablo Perez 50 was murdered in a massacre carried out in the context of the internal armed conflict. FAC ¶¶ 296–97.

- Juan Perez 60 is the father and legal heir of Pablo Perez 60, an employee of Finca San Antonio, a banana plantation owned or controlled by Chiquita, or which supplied Chiquita, located in Turbo, in the Uraba region of Antioquia. . . . At approximately 1:00 AM on June 17, 1999, Pablo Perez 60 was resting at his home in Apartado, Antioquia when a group of paramilitaries who had arrived in several vehicles stormed his home, kicked in his door, seized Pablo Perez 60, and beat him. The paramilitaries demanded to know where Pablo Perez 60 had weapons hidden. Finding no weapons, the paramilitaries kidnaped Pablo Perez 60 and took him to the village of Nueva Colonia . . . . There, the paramilitaries tortured Pablo Perez 60 before executing him with several gunshots to the head and body. At the time when Pablo Perez 60 was kidnaped, tortured and murdered, the AUC was receiving substantial support from Chiquita, and the murder of Pablo Perez 60 was in furtherance of the understanding that the AUC had with Chiquita that in return for Chiquita's support, the AUC would drive the FARC and ELN guerrillas out of the banana area of Uraba, Antioquia and maintain a sufficient presence to keep the guerrillas from regaining a foothold. Further, the AUC provided Chiquita with security, labor quiescence and social stability, and ensured that trade unions were not infiltrated by leftists sympathetic to the FARC and ELN guerrillas. FAC ¶¶ 316–17.

- Juana Perez 13 is the sister and legal heir of Paula Perez 13. Paula Perez 13, an employee of the banana plantation Nabusimake, a Chiquita supplier, was raped, tortured and murdered on October 18, 2005 by AUC paramilitaries from the William Rivas Front, who were in control of the banana zone and surrounding areas of Magdalena, in furtherance of the internal armed conflict. On the evening of October 19, 2005, Paula Perez 13 was on the Nabusimake plantation, located in the town of Sevilla, Zona Bananera, in the company of a security guard when, at approximately 8:00 PM, a group of five armed paramilitaries entered the plantation. The security guard fled as the paramilitaries approached, leaving Paula Perez 13 alone. The paramilitaries raped Paula Perez 13, tortured her with multiple stab wounds and by burning her chest, and then killed her by slitting her throat. On March 13, 2007, the Zona Bananera Municipal Representative issued a letter confirming that Paula Perez 13 was murdered on

7

October 18, 2005, for ideological and political reasons in the context of the internal armed conflict.  FAC ¶¶ 220–21.

***Chiquita's Assistance to the AUC***

Chiquita, an American multinational corporation, is one of the world's largest producers and suppliers of bananas.  FAC ¶ 394.  As the successor to the United Fruit Company and the United Brands Company, Chiquita has been operating in the Colombian banana-growing regions, through its wholly owned subsidiary, Banadex, since the early 1960s.  FAC ¶ 456.  In 2003, Banadex was Chiquita's most profitable banana-producing operation in the world.[5]  FAC ¶ 395.

During labor struggles in the 1980s, left-wing, anti-government guerrilla groups, including the FARC, became active in the banana areas of Uraba and Magdalena.  FAC ¶ 458.  The FARC became particularly involved in union activity.  FAC ¶ 458.  In the 1990s, the rise of FARC-influenced unions was accompanied by increased paramilitary violence, as groups like the AUC moved into these areas to combat the FARC's influence.  FAC ¶ 459.

In or around 1995, Chiquita formed an agreement with the AUC, paying them to pacify the banana plantations and to suppress union activity.  FAC ¶ 472.  In return for Chiquita's support, the AUC agreed it would drive the guerrillas out of Chiquita's banana-growing areas and maintain a sufficient presence to prevent the guerrillas from returning.  FAC ¶ 197.  Furthermore, the AUC would provide Chiquita with security, labor quiescence, and ensure that the unions were not infiltrated by leftists sympathetic to the FARC or ELN guerrillas.  FAC ¶ 197.  This arrangement benefitted Chiquita, as labor unrest and strikes were minimized while profits increased.  FAC ¶¶ 548–50.

_____

[5] Chiquita sold Banadex in June 2004 and no longer owns a Colombian subsidiary.  FAC ¶¶ 8, 396.

Under this agreement, Chiquita paid the paramilitaries a commission based on the number of boxes Chiquita shipped each month. FAC ¶ 472. During the period 1997–2004, Chiquita paid the AUC nearly every month, making over one hundred payments totaling over $1.7 million. FAC ¶ 468.

Chiquita made payments directly to the AUC or to the AUC's convivir front organizations. FAC ¶ 470. Chiquita concealed the nature of these payments by recording them in corporate books as payments for "security services." FAC ¶ 470.

Chiquita also made payments indirectly to the AUC by depositing payments into the accounts of Banadex executives who would then withdraw cash and hand it directly to AUC representatives. FAC ¶ 471. Chiquita concealed these payments by recording them in corporate books as income contributions. FAC ¶ 471.

These payments were reviewed and approved by Chiquita's senior company executives who knew that the AUC was a violent, illegal paramilitary group. FAC ¶ 469. In 2003, Chiquita consulted with outside counsel, a U.S.-based law firm, regarding its ongoing payments to the AUC, which was by then a designated FTO. FAC ¶¶ 473–74. Outside counsel advised Chiquita that its payments to an FTO were illegal under U.S. law and that Chiquita should immediately stop the payments. FAC ¶ 474.

On April 3, 2003, Chiquita's Board of Directors agreed to disclose its AUC payments to the U.S. Department of Justice. FAC ¶ 475. On April 8, 2003, Chiquita instructed Banadex to continue making payments to the AUC. FAC ¶ 475. On April 24, 2003, Chiquita met with Justice Department officials, who told Chiquita that the AUC payments were illegal. FAC ¶ 475. Nonetheless, Chiquita continued paying the AUC until February 2004. FAC ¶ 475.

Plaintiffs also allege that Chiquita assisted the AUC by facilitating arms shipments. For example, Plaintiffs allege that in 2001, a ship left Nicaragua carrying 3,000 AK-47 assault rifles and 5 million rounds of ammunition. FAC ¶ 478. Instead of docking in Panama, its official destination, the ship went instead to Turbo, Colombia, where Chiquita, through Banadex, operated a private port facility for transporting bananas and other cargo. FAC ¶ 479. After the ship docked in Turbo, Banadex employees unloaded the rifles and ammunition, which remained at Chiquita's facilities for two days before being loaded onto AUC vehicles. FAC ¶¶ 480–81. Some of these arms were later confiscated from AUC units operating in Uraba. FAC ¶ 486.

***Chiquita's Guilty Plea and Plaintiffs' Lawsuits***

On March 19, 2007, Chiquita pled guilty in the U.S. District Court for the District of Columbia to one count of violating federal anti-terrorism laws by engaging in transactions with a designated FTO. FAC ¶ 476. Chiquita's sentence included a $25 million criminal fine, the requirement to implement and maintain an effective compliance and ethics program, and five years' probation. FAC ¶ 476.

In March 2007, shortly after Chiquita's public guilty plea, Plaintiffs first learned of Chiquita's assistance to the AUC. FAC ¶ 10. On June 7, 2007, the first civil complaint was filed against Chiquita arising from its alleged support to the AUC. *Perezes (1-95) v. Chiquita Brands Int'l, Inc.*, No. 08-cv-80465 (D.D.C., filed June 7, 2007). Additional complaints followed in various judicial districts. On February 20, 2008, the Judicial Panel on Multidistrict Litigation transferred these actions to the Southern District of Florida for consolidated pretrial proceedings with the related actions already pending before this Court. (DE 1).

Chiquita now moves to dismiss the complaints for lack of subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure and for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## STANDARD OF REVIEW

Rule 8(a) of the Federal Rules of Civil Procedure "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief' in order to give the defendant fair notice of what the plaintiff's claim is . . . and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting Fed. R. Civ. P. 8(a)(2)).  The Supreme Court has held that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.  Factual allegations must be enough to raise a right to relief above the speculative level." *Id.* (citations omitted).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*; *see also Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1261 (11th Cir. 2009).  Thus, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 129 S. Ct. at 1950.  When considering a motion to dismiss for failure to state a claim, the court must "accept[] the allegations in the complaint as

11

true and constru[e] them in the light most favorable to the plaintiff." *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1288 (11ᵗʰ Cir. 2010) (internal quotation marks omitted).

A motion to dismiss under Rule 12(b)(1) may "assert either a factual attack or a facial attack to jurisdiction." *Sinaltrainal*, 578 F.3d at 1260.  In a facial attack—that is, an attack on the sufficiency of the jurisdictional allegations in the complaint—the court reviews the allegations as "it does when considering a Rule 12(b)(6) motion," construing "the complaint in the light most favorable to the plaintiff and accept[ing] all well-pled facts alleged in the complaint as true." *Id.*; *see also McElmurray v. Consol. Gov't of Augusta-Richmond Cnty*, 501 F.3d 1244, 1251 (11ᵗʰ Cir. 2007) (explaining that in a Rule 12(b)(1) facial challenge the plaintiff has "safeguards similar to those retained when a Rule 12(b)(6) motion to dismiss for failure to state a claim is raised").

### DISCUSSION

Chiquita asserts numerous grounds for dismissing the complaints, primarily for lack of subject-matter jurisdiction and failure to state a claim.  The Court will first address Chiquita's arguments for dismissing the claims that arise under 28 U.S.C. § 1350, also know as the Alien Tort Statute ("ATS") or the Alien Tort Claims Act ("ATCA").

## I.     The Alien Tort Statute

The First Congress enacted the ATS as part of the Judiciary Act of 1789.  The modern-day version of the ATS provides: "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."  28 U.S.C. § 1350.  Federal subject-matter jurisdiction exists for an ATS claim "when the following three elements are satisfied: (1) an alien (2) sues for a tort (3) committed in

violation of the law of nations." *Sinaltrainal*, 578 F.3d at 1261.  The parties do not dispute that Plaintiffs satisfy the first two elements, so this Court's analysis focuses on the third requirement.

Under the ATS, the "law of nations" refers to the norms of customary international law. *Id.*; *Flores v. S. Peru Copper Corp.*, 343 F.3d 140, 154 (2d Cir. 2003).  Conduct violates the law of nations if it contravenes "well-established, universally recognized norms of international law." *Kadic v. Karadzic*, 70 F.3d 232, 238 (2d Cir. 1995); *Sinaltrainal*, 578 F.3d at 1262 n.11.  In 1789, when Congress passed the ATS, the only recognized violations of the law of nations were "violation of safe conducts, infringement of the rights of ambassadors, and piracy." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 715 (2004).  Since then, a modest number of additional causes of action have been recognized under the ATS.

In *Sosa v. Alvarez-Machain*, the Supreme Court set forth the standard for recognizing new causes of action.  The Court explained that claims under the ATS are not static; new ones may be recognized if they "rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms we have recognized."  542 U.S. at 725; *see also Sinaltrainal*, 578 F.3d at 1263 ("[F]ederal courts have not been precluded from recognizing new claims under the law of nations as an element of the common law, even though the law of nations was originally limited to violation of safe conducts, offenses against ambassadors, and piracy."); *id.* at 1262 n.11 (holding that jurisdiction under the ATS exists "only when a defendant's alleged conduct violates 'well-established, universally recognized norms of international law.'") (quoting *Filartiga v. Pena-Irala*, 630 F.2d 876, 888 (2d Cir. 1980)).  Thus, under *Sosa*, "the ATS is not only a jurisdictional statute; the

ATS also empowers federal courts to entertain 'a very limited category' of claims." *Sinaltrainal*, 578 F.3d at 1262 (quoting *Sosa*, 542 U.S. at 712).

The *Sosa* Court, however, admonished the lower federal courts to exercise "great caution" in considering new causes of action, stating that the door to recognizing new claims under the law of nations is "still ajar subject to vigilant doorkeeping, and thus open to a narrow class of international norms today." 542 U.S. at 728, 729. *Sosa* also directed that lower courts consider the practical consequences of making new claims available to private litigants in federal courts. *Id.* at 732–33. For instance, courts must consider whether recognizing new causes of action under international law would "imping[e] on the discretion of the Legislative and Executive Branches in managing foreign affairs." *Id.* at 727. *Sosa* also noted that Congress may "shut the door to the law of nations" by "treaties or statutes that occupy the field." *Id.* at 731.

Thus, under *Sosa*'s framework, courts may recognize new ATS claims where the conduct violates an international-law norm that is sufficiently well-defined and universally accepted, i.e., comparable to the three 18th-century paradigms. *See, e.g.*, *Sosa*, 542 U.S. at 760 (Breyer, J., concurring) ("[T]o qualify for recognition under the ATS, a norm of international law must have a content as definite as, and an acceptance as widespread as, those that characterized 18th-century international norms prohibiting piracy."). *Sosa* instructs that courts consider international law as it exists today, not as it was in 1789, in determining whether to recognize a new claim under the ATS. 542 U.S. at 733; *see also Filartiga*, 630 F.2d at 881 ("[C]ourts must interpret international law not as it was in 1789, but as it has evolved and exists among the nations of the world today."). The present state of customary international law is discerned from "'the works of jurists, writing professedly on public law; or by the general usage and practice of nations; or by

14

judicial decisions recognizing and enforcing that law.'" *Saperstein v. Palestinian Auth.*, No. 04-20225, 2006 WL 3804718, at *4 (S.D. Fla. Dec. 22, 2006) (quoting *United States v. Smith*, 18 U.S. 153, 160–61 (1820)); *see also Almog v. Arab Bank, PLC*, 471 F. Supp. 2d 257, 271–72 (E.D.N.Y. 2007) (explaining that the sources of law from which a court discerns the current state of international law include treaties, executive or legislative acts, judicial decisions, customs and usages of civilized nations, and scholarly works and treatises).

It is against this backdrop that the Court addresses Chiquita's arguments for dismissing Plaintiffs' ATS claims.

### A.    Plaintiffs' Terrorism-Based Claims

Plaintiffs allege two causes of action against Chiquita based upon the AUC's alleged acts of terrorism:  (1) a claim for terrorism under various indirect-liability theories, and (2) a claim for material support to a terrorist organization under a direct-liability theory.[6]  Specifically, Plaintiffs contend that the AUC committed acts of violence against Colombian civilians to coerce and intimidate those civilians into abandoning their support for the FARC.  Plaintiffs allege that Chiquita is indirectly liable for terrorism because it aided and abetted, conspired with, ratified or were the principals of the AUC in committing these attacks.  Plaintiffs further allege that Chiquita is directly liable for providing material support to the AUC, a terrorist organization. Jurisdiction for both terrorism claims is premised upon the ATS.

---

[6] *See, e.g.*, *Does 1-11 v. Chiquita Brands Int'l, Inc.*, No. 08-80421, DE 63, First Am. Compl. ¶¶ 215–29 (filed Feb. 26, 2010).  Most, but not all, of the complaints allege these two terrorism-based claims.  The Court finds that the causes of action alleged in the *Does 1-11* First Amended Complaint provides a representative example of these two terrorism causes of action.

Chiquita argues that this Court lacks jurisdiction over Plaintiffs' terrorism-related claims because (1) the Anti-Terrorism Act, 18 U.S.C. § 2333 ("ATA"), limits private rights of action for terrorism to U.S. nationals and therefore forecloses recognition of a parallel and broader cause of action for foreign nationals under the ATS; (2) there is no clearly defined and universally accepted customary international law norm against terrorism, and therefore terrorism is not a cognizable claim under the ATS; and (3) that to the extent terrorism is a recognized violation of international law, Plaintiffs have failed to adequately plead the elements of such a claim. Chiquita also contends that practical considerations and foreign-affairs concerns militate against recognizing a new international-law norm against terrorism.

> 1.   *Whether the Anti-Terrorism Act Forecloses Plaintiffs' Terrorism-Based ATS Claims*

Chiquita first argues that the Anti-Terrorism Act precludes Plaintiffs' ATS-based terrorism claims. The ATA provides a civil cause of action for U.S. nationals harmed by international terrorism. *See* 18 U.S.C. § 2333(a) ("Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism . . . may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he or she sustains . . . ."). Chiquita contends that under *Sosa*, Congress's action in passing the ATA, and declining to extend a civil action to foreign victims of terrorism, "occupies the field" of private causes of action for terrorism claims and thus precludes recognizing broader civil liability under the auspices of the ATS. *See Sosa*, 542 U.S. at 731 (holding that Congress can "shut the door" to recognizing new ATS claims through "statutes that occupy the field"). Chiquita points to several congressionally imposed limitations on ATA actions, such as the

limitation to U.S. nationals, that are purportedly inconsistent with, and would be impinged upon by, Plaintiffs' proposed ATS claims.  Chiquita thus concludes that the ATA precludes Plaintiffs' attempt to bring a terrorism claim under international law.

The Court finds this argument unpersuasive.  The limitations on ATA liability that Chiquita highlights as inconsistent with the ATS, e.g., its limitation to U.S. nationals, actually support the finding that the ATA does not "occupy the field" of civil terrorism claims by *non-U.S.* nationals under the ATS.  In passing the ATA, Congress simply provided a statutory cause of action for U.S. nationals; there is no indication in the statute or its legislative history that Congress intended to foreclose claims by *non-U.S.* nationals arising under a different statute.  Thus, the Court finds that the ATA does not expressly foreclose terrorism claims for non-U.S. nationals under the ATS.

Nor does it appear that Congress intended to repeal the ATS, as it may apply to terrorism claims, by implication.  "[R]epeals by implication are not favored."  *Morton v. Mancari*, 417 U.S. 535, 549 (1974) (internal quotation marks omitted).  "In the absence of some affirmative showing of an intention to repeal, the only permissible justification for a repeal by implication is when the earlier and later statutes are irreconcilable."  *Id.* at 550.  When the "'two statutes are capable of coexistence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective.'"  *J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*, 534 U.S. 124, 143–44 (2001) (quoting *Morton*, 417 U.S. at 551).  Here, there is no conflict between the ATA's provision of civil remedies for U.S. nationals injured by acts of terrorism and the ATS's provision of civil remedies for aliens injured by violations of international-law norms.  These two statutes, providing rights to two different groups of

plaintiffs, are capable of coexistence.  The Court therefore concludes that Plaintiffs' terrorism-based claims under the ATS are not precluded by the ATA.

2.      *Whether Terrorism and Providing Material Support to a Terrorist Organization Are Actionable Claims Under the ATS*

Chiquita next argues that Plaintiffs' terrorism-based claims are not cognizable under the ATS because they do not meet *Sosa*'s stringent requirements for recognizing new violations of the law of nations.  Specifically, Chiquita contends that there is no clearly defined and universally accepted rule of international law prohibiting terrorism or material support for terrorism and, therefore, *Sosa* prohibits this Court from recognizing such a norm.

Plaintiffs contend that while there may be disagreement regarding the definitional fringes of terrorism, this lack of universal agreement does not undermine the core prohibition against acts intended to cause death or serious injury to civilians for the purpose of intimidating a population.  Plaintiffs argue that this "core norm" against terrorism is clearly established and widely accepted under customary international law.  For more than forty years, Plaintiffs argue, international treaties and domestic laws have recognized this core norm and prohibited acts of terrorism.

Neither the Supreme Court nor the Eleventh Circuit has addressed whether terrorism constitutes a cognizable claim under the ATS.  A fractured panel of the D.C. Circuit has addressed this issue, albeit before the Supreme Court's decision in *Sosa*.  In *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 775 (D.C. Cir. 1984), survivors and representatives of victims murdered in an armed attack on civilian busses in Israel sued several governmental and private entities under the ATS for violations of the law of nations.  *Id.* at 775.  The "PLO terrorists" seized two

18

civilian buses, a taxi, a passing car and took 121 men, women, and children hostage. *Id.* at 776 (Edwards, J., concurring). The terrorists tortured, shot, wounded, and murdered many of the civilian hostages. *Id.* Before the Israeli police stopped the massacre, twenty-two adults and twelve children were killed, and seventy-three adults and fourteen children were seriously injured. *Id.*

A three-judge panel of the D.C. Circuit unanimously dismissed the lawsuit, with three concurring opinions. Judge Edwards's opinion "consider[ed] whether terrorism is itself a law of nations violation." *Id.* at 795. He found that "the nations of the world are so divisively split on the legitimacy of such aggression as to make it impossible to pinpoint an area of harmony or consensus."[7] *Id.* Accordingly, Judge Edwards concluded that, "[g]iven such disharmony, I cannot conclude that the law of nations . . . outlaws politically motivated terrorism, no matter how repugnant it might be to our own legal system." *Id.* at 796.

Judge Bork's opinion agreed, noting that "appellants' principal claim, that appellees violated customary principles of international law against terrorism, concerns an area of international law in which there is little or no consensus . . . ." *Id.* at 806 (Bork, J., concurring). Judge Bork continued, "Some aspects of terrorism have been the subject of several international conventions, . . . . But no consensus has developed on how properly to define 'terrorism'

---

[7] In support of his finding, Judge Edwards referenced United Nations resolutions, which he explained demonstrate that some states view politically motivated terrorism as legitimate acts of aggression and therefore immune from condemnation. As an example, Judge Edwards cited a resolution entitled "Basic principles of the legal status of combatants struggling against colonial and alien domination and racist regimes," G.A. Res. 3103, 28 U.N. GAOR at 512, U.N. Doc. A/9102 (1973), which declared, "The struggle of peoples under colonial and alien domination and racist regimes for the implementation of their right to self-determination and independence is legitimate and in full accordance with the principles of international law." *Id.* at 795.

generally." *Id.* at 806–07. "As a consequence," Judge Bork concluded, "international law and the rules of warfare as they now exist are inadequate to cope with this new mode of conflict." *Id.* at 807 (internal quotation marks omitted).

More recently, two district courts within this judicial district addressed this issue, both holding that terrorism is not a recognized violation of the law of nations. In *Saperstein v. Palestinian Authority*, No. 04-20225, 2006 WL 3804718 (S.D. Fla. Dec. 22, 2006), survivors of an Israeli citizen murdered by a terrorist attack in Israel sued the Palestinian Authority ("PA") and the Palestine Liberation Organization ("PLO") under the ATS. *Id.* at *3. On February 18, 2002, a Palestinian terrorist—recruited, trained, funded, and armed by the PA and PLO—murdered the plaintiffs' relative, a civilian, by spraying her car with bullets from an AK-47. *Id.* The Plaintiffs sued the PA and PLO under the ATS for violations of the law of nations, alleging that the defendants sponsored terrorist acts against Jewish civilians and provided support to terrorist entities. *Id.* at *2–3. After a thorough analysis of the *Sosa* framework for recognizing ATS claims under international law, and a discussion of the leading ATS cases at that time, the court concluded that the plaintiffs' terrorism claims were not violations of the law of nations. The court first found that Plaintiffs' allegations of terrorism did not "fit the categories of conduct that prior courts have found constitute a violation of the law of nations." *Id.* at *7. Then, finding that the conduct in *Tel Oren* was "substantially similar to the conduct in the present case," the court adopted Judge Edwards's conclusion that it is "abundantly clear that politically motivated terrorism has not reached the status of a violation of the law of nations." *Id.* ("[I]f the conduct of the Defendants is construed as terrorism, then Plaintiffs have not alleged a violation of the law of nations.").

In *Barboza v. Drummond Co.*, No. 06-61527, Slip op., DE 39 (S.D. Fla. July 17, 2007), the court reached the same conclusion, based on allegations similar to those here. There, family members of a Colombian trade unionist murdered by the AUC sued an American corporation and its Colombian subsidiary under the ATS. The plaintiffs alleged that the defendants hired the AUC to protect its Colombian facilities. *Id.* at 2. Later, the AUC surrounded the plaintiffs' relative's house, demanded he exit, and then killed him in front of his family. *Id.* at 3. The plaintiffs then sued the American companies in federal court under the ATS, asserting a claim for providing financial support to a terrorist organization. *Id.* at 18 ("Plaintiffs contend that Defendants violated a norm of customary international law by providing material support to a known terrorist organization."). The court followed the reasoning of *Tel-Oren* and *Saperstein* and rejected the plaintiffs' terrorism-based claims, holding that "claims of terrorism in general" have "'not reached the status of [a] violation of the law of nations.'" *Id.* at 22 (quoting *Saperstein*, 2006 WL 3804718, at *7); *see also id.* ("Plaintiffs have not identified any particular international convention or other recognized source of determining international law to establish a violation of the law of nations here.").[8]

_____

[8] In following *Tel-Oren* and *Saperstein*, the *Barboza* court distinguished the district court's decision in *Almog v. Arab Bank, PLC*, 471 F. Supp. 2d 257 (E.D.N.Y. 2007), which held that "organized, systematic suicide bombings and other murderous attacks against innocent civilians for the purpose of intimidating a civilian population are a violation of the law of nations." *Id.* at 285. *Barboza* found that the international conventions relied upon in *Almog*—the International Convention for the Suppression of Terrorist Bombings, the International Convention for the Suppression of the Financing of Terrorism, and Common Article 3 of the Geneva Conventions of 1949—were inapplicable to the allegations there, and that the *Almog* plaintiffs' allegations were more specific than the "claims of terrorism in general" alleged by the *Barboza* plaintiffs. *Barboza*, No. 06-61527, Slip op. at 19–22. The *Almog* decision, which this Court also finds distinguishable, is discussed in more detail below.

21

The Court finds *Tel-Oren*, *Saperstein*, and *Barboza* persuasive and reaches the same conclusion regarding Plaintiffs' terrorism-based claims here.  Like the plaintiffs in those cases, Plaintiffs essentially assert a "general" terrorism theory of ATS liability.  That is, Plaintiffs' allegations are not limited to any specific, narrow category of conduct, such as hijacking civilian aircraft or suicide bombing civilian targets.  Rather, Plaintiffs allege a broad range of alleged terrorist acts,[9] linked only by the facts that the victims are civilians and the intent is to intimidate. *See* Pls.' First Resp. at 23–24 (DE 111) ("There is a clearly defined and widely accepted prohibition in international law against acts intended to cause death or serious bodily injury to a civilian when the purpose of such an act, by its nature or context, is to intimidate a population."). Plaintiffs thus attempt to group this broad, ill-defined class of conduct under the umbrella of "terrorism," or material support thereof, and create a cause of action against it under the ATS. Given that Plaintiffs' generalized terrorism claims are similar to those rejected in *Tel-Oren*, *Saperstein*, and *Barboza*, this Court will follow those decisions and reject Plaintiffs' attempt to categorize these broad claims as violations of the law of nations.  *See Amergi v. Palestinian Auth.*, 611 F.3d 1350, 1364 (11th Cir. 2010) ("[T]he ATS does not broadly provide for causes of action.  The federal courts are empowered to open the door only to a narrow class of claims, and the tort asserted [here]—a single murder purportedly in the course of an armed conflict—is anything but narrow.") (internal quotation marks and citations omitted).

---

[9] For instance, the complaints allege acts of kidnaping, rape, physical and psychological torture, disappearances, and individual and mass murders.  *See, e.g.*, *Valencia v. Chiquita Brands Int'l, Inc.*, No. 08-cv-80508, DE 283, Second Am. Compl. ¶¶ 131, 351–53, 532–38 (filed Feb. 26, 2010).

The Court first notes that disagreement among the international community regarding the definition of terrorism, which *Tel-Oren* recognized in 1984, continues today. *See, e.g.*, *United States v. Yousef*, 327 F.3d 56, 106–08 (2d Cir. 2003) ("We regrettably are no closer now than eighteen years ago to an international consensus on the definition of terrorism or even its proscription; the mere existence of the phrase 'state-sponsored terrorism' proves the absence of agreement on basic terms among a large number of States that terrorism violates public international law. . . . We thus conclude that the statements of Judges Edwards, Bork, and Robb remain true today . . . ."); *Mwani v. Bin Ladin*, No. 99-125, 2006 WL 3422208, at *3 n.2 (D.D.C. Sept. 28, 2006) ("The law is seemingly unsettled with respect to defining terrorism as a violation of the law of nations."). Such continued disharmony underscores the difference between Plaintiffs' unsettled, controversial terrorism claims and the clearly defined, universally recognized 18th-century paradigmatic international-law claims discussed in *Sosa*.

Next, the Court rejects Plaintiffs' argument that international-law sources establish a modern, well-defined, universally accepted norm against terrorism. Plaintiffs cite dozens of international treaties, United Nations resolutions and declarations, and regional conventions for this point. *See* Pls.' First Resp. at 24–25 nn.15–19 (DE 111). Plaintiffs' argument seems to culminate with the International Convention for the Suppression of the Financing of Terrorism, U.N. Doc. A/54/109 (Dec. 9, 1999) ("Financing Convention"), which Plaintiffs contend codified an existing international norm against terrorism created by decades of treaties and conventions. Article 2 of the Financing Convention provides:

> (1) Any person commits an offence within the meaning of this Convention if that person by any means, directly or indirectly, unlawfully and wilfully, provides or

collects funds with the intention that they should be used or in the knowledge that they are to be used, in full or in part, in order to carry out:

> (a) An act which constitutes an offence within the scope of and as defined in one of the treaties listed in the annex;[10] or

> (b) Any other act intended to cause death or serious bodily injury to a civilian, or to any other person not taking an active part in the hostilities in a situation of armed conflict, when the purpose of such act, by its nature or context, is to intimidate a population, or to compel a government or an international organization to do or to abstain from doing any act.

The Court finds that the Financing Convention neither codifies nor creates an international-law norm against terrorism or financing terrorism. First, the Financing Convention does not establish a *universally accepted* rule of customary international law. An international treaty "will only constitute *sufficient proof* of a norm of customary international law if an

---

[10] The annex to the Financing Convention lists nine treaties:

1.  Convention for the Suppression of Unlawful Seizure of Aircraft, done at The Hague on 16 December 1970;
2.  Convention for the Suppression of Unlawful Acts against the Safety of Civil Aviation, done at Montreal on 23 September 1971;
3.  Convention on the Prevention and Punishment of Crimes against Internationally Protected Persons, including Diplomatic Agents, adopted by the General Assembly of the United Nations on 14 December 1973;
4.  International Convention against the Taking of Hostages, adopted by the General Assembly of the United Nations on 17 December 1979;
5.  Convention on the Physical Protection of Nuclear Material, adopted at Vienna on 3 March 1980;
6.  Protocol for the Suppression of Unlawful Acts of Violence at Airports Serving International Civil Aviation, supplementary to the Convention for the Suppression of Unlawful Acts against the Safety of Civil Aviation, done at Montreal on 24 February 1988;
7.  Convention for the Suppression of Unlawful Acts against the Safety of Maritime Navigation, done at Rome on 10 March 1988;
8.  Protocol for the Suppression of Unlawful Acts against the Safety of Fixed Platforms located on the Continental Shelf, done at Rome on 10 March 1988; and
9.  International Convention for the Suppression of Terrorist Bombings, adopted by the General Assembly of the United Nations on 15 December 1997.

*overwhelming majority* of States have ratified the treaty." *Flores*, 414 F.3d at 256 (second emphasis added). The "evidentiary weight to be afforded to a given treaty varies greatly depending on [] how many, and which, States have ratified the treaty." *Id.* The more States that ratify a treaty, and the greater influence of those States in international affairs, the greater the treaty's evidentiary value towards establishing an international-law norm. *Id.* at 257. Importantly, the inquiry into whether a treaty establishes a rule of international law is limited to the period of the events giving rise to the alleged injuries. *See Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co.*, 517 F.3d 104, 123 (2d Cir. 2008) (stating that ATS claims must rest on a rule of international law "that was universally accepted at the time of the events giving rise to the injuries alleged"); *Khulumani v. Barclay Nat'l Bank Ltd.*, 504 F.3d 254, 325 (2d Cir. 2007) (Korman, J., concurring in part and dissenting in part) (explaining that under international law "conduct may be punished only on the basis of a norm that came into force *prior* to when the conduct occurred") (internal quotation marks omitted). In April 2002, when the Financing Convention came into force, only 26 of the 192 nations of the world, or roughly 14%, had ratified it.[11] In February 2004, when Chiquita's alleged payments to the AUC terminated, 111 States, or roughly 58% of the nations of the world, had ratified the Financing Convention.[12] These figures do not constitute the "overwhelming majority" necessary to

---

[11] U.N. Treaty Collection, Int'l Convention for the Suppression of the Financing of Terrorism, Status, Apr. 20, 2011, http://treaties.un.org/Pages/ViewDetails.aspx?src=IND&mtdsg _no=XVIII-11&chapter=18&lang=en (listing dates upon which States ratified the Financing Convention).

[12] *Id.*

establish a widely accepted norm of international law prohibiting financial support for terrorism at the time of Chiquita's purported wrongful acts.

Second, the norms in the Financing Convention are not *well-established.*  Rather, the signatories to the Financing Convention dispute many of the rules therein, as illustrated by the many declarations and reservations, i.e., non-consents and varying interpretations,[13] appended to the convention.  For instance, Egypt declared that it "does not consider acts of national resistance *in all its forms*, including armed resistence against foreign occupation and aggression with a view to liberation and self-determination, as terrorist acts."[14]  Egypt's declaration prompted an objection by the Czech Republic, which declared that it "considers the declaration to be incompatible with the object and purpose of the Convention."[15]  Moreover, a substantial number of states declared that they are not bound to entire subject areas of the Convention.  For example, Bahrain, Thailand, and Venezuela each declared that six of the nine treaties upon which the Finance Convention is based do not apply to it.[16]  Similarly, Brazil, China, Guatemala, Syria, and

---

[13] A reservation is non-consent to particular treaty terms.  Restatement (Third) of Foreign Relations Law of the United States § 313 cmt. a (1986) ("A reservation is defined in the Vienna Convention, Article 2(1)(d), as a unilateral statement made by a state when signing, ratifying, accepting, approving, or acceding to an international agreement, whereby it purports to exclude or modify the legal effect of certain provisions of that agreement in their application to that state.").  A declaration is a State's own interpretation of particular treaty terms, which may conflict with another State's understanding of the treaty.  *Id.*

[14] U.N. Treaty Collection, Int'l Convention for the Suppression of the Financing of Terrorism, Status, Apr. 20, 2011, http://treaties.un.org/Pages/ViewDetails.aspx?src=IND&mtdsg _no=XVIII-11&chapter=18&lang=en (emphasis added).

[15] *Id.*

[16] *Id.*

26

Vietnam declared the same with regard to three of the treaties.[17]  Such disagreements, non-consents, and divergent interpretations of the Finance Convention demonstrate that the prohibitions of the convention are disputed and not well-established.

Plaintiffs' briefing also provides several footnotes that string cite dozens of other international treaties, United Nations resolutions and declarations, and regional conventions that Plaintiffs contend prohibit specific acts of terrorism.  *See* Pls.' First Resp. at 24–25 nn.15–19 (DE 111).  Plaintiffs do not discuss any of these sources, but contend that they created the international norm against terrorism that the Financing Convention ultimately "codified."  Because the Court finds that the Financing Convention did not codify an international norm against terrorism, and because Plaintiffs provide no discussion regarding how these string-cited sources establish an international norm, the Court does not individually address these many treaties, resolutions, and conventions.  The Court notes generally, however, that many of these sources address norms not applicable to the allegations here.[18]  The Court further notes that many of these sources address the subject of terrorism, if at all, only at a high level of abstraction and do not provide any definition of terrorism.[19]  Thus, like the Financing Convention, these

---

[17] *Id.*

[18] *See, e.g.*, Convention of Offenses and Certain Other Acts Committed On Board Aircraft, 20 U.S.T. 2941, 1969 WL 97848 (Sept. 14, 1963); Convention for Suppression of Unlawful Acts against Safety of Civil Aviation, 24 U.S.T. 565, 1973 WL 151803 (Sept. 23, 1971); Convention on Prevention and Punishment of Crimes against Internationally Protected Persons, Including Diplomatic Agents, 28 I.L.M. 1975, 1977 WL 181657 (Dec. 14, 1973); Convention on the Physical Protection of Nuclear Material, 18 I.L.M. 1419 (Mar. 3, 1980); Protocol for the Suppression of Unlawful Acts Against the Safety of Fixed Platforms Located on the Continental Shelf, 1678 U.N.T.S. 304, 27 I.L.M. 685 (Mar. 10, 1988).

[19] *See, e.g.*, Convention on the Marking of Plastic Explosives for the Purpose of Detection, 30 I.L.M. 721 (Mar. 1, 1991); International Convention for the Suppression of

additional sources also fail to provide a well-defined, universally accepted norm of international

law against terrorism or material support thereof.

Plaintiffs next argue that "nearly every state has incorporated the international prohibition

against terrorism in its domestic laws." Pls.' First Resp. at 25 (DE 111). The United States,

Plaintiffs highlight, enacted the Antiterrorism and Effective Death Penalty Act ("AEDPA") in

1996, Pub. L. No. 104-132, 110 Stat. 1214 (codified at 18 U.S.C. § 2338B), and the USA Patriot

Act in 2001, Pub. L. No. 107-56, 115 Stat. 272, as prohibitions against terrorism. Under *Sosa*,

however, a norm of international law sufficient to create a claim under the ATS must be drawn

from international, not domestic, laws *See Sosa*, 542 U.S. at 732 & n.20 (observing that

"whether a norm is sufficiently definite to support a cause of action" under the ATS involves a

"related consideration [of] whether international law extends the scope of liability for a violation

of a given norm to the perpetrator being sued"); *see also Presbyterian Church of Sudan v.

Talisman Energy, Inc.*, 582 F.3d 244, 259 (2d Cir. 2009) ("*Sosa* and our precedents send us to

international law to find the standard for accessorial liability."); *Khulumani*, 504 F.3d at 269

(Katzmann, J., concurring) ("We have repeatedly emphasized that the scope of the ATCA's

jurisdictional grant should be determined by reference to international law."); *Abecassis v. Wyatt*,

704 F. Supp. 2d 623, 654 (S.D. Tex. 2010) ("*Sosa* establishes international law as the touchstone

of the ATS analysis."); *Doe v. Drummond Co.*, No. 09-1041, DE 43, Slip op. at 20 n.21 (N.D.

---

Terrorist Bombings, G.A. Res. 52/164, U.N. Doc. A/RES/52/164 (Jan. 12, 1998); Organization
of American States Convention to Prevent and Punish Acts of Terrorism Taking the Form of
Crimes against Persons and Related Extortion that are of International Significance, 27 U.S.T.
3949, 1976 WL 166939 (Feb. 2, 1971); *see also Flores*, 414 F.3d at 252 ("[I]t is impossible for
courts to discern or apply in any rigorous, systematic, or legal manner international
pronouncements that promote amorphous, general principles.").

Ala. Apr. 30, 2010) ("*Drummond II*") ("*Sosa* supports the broader principle that the scope of liability for ATS violations should be derived from international law").  Reliance on domestic laws, even those of the United States, cannot support recognition of an international norm under the ATS.  *See Flores*, 414 F.3d at 249 ("Even if certain conduct is universally proscribed by States in their domestic law, that fact is not necessarily significant or relevant for purposes of customary international law. . . . [F]or example, murder of one private party by another, universally proscribed by the domestic law of all countries (subject to varying definitions), is not actionable under the ATCA as a violation of customary international law . . . ."); *Filartiga*, 630 F.2d at 888 ("[T]he mere fact that every nation's municipal law may prohibit theft does not incorporate the Eighth Commandment, 'Thou Shalt not steal' [into] the law of nations.  It is only where the nations of the world have demonstrated that the wrong is of mutual, and not merely several, concern, by means of express international accords, that a wrong generally recognized becomes an international law violation within the meaning of the [ATS].") (alterations in original) (internal quotation marks omitted); *Barboza*, No. 06-61527, DE 39, Slip op. at 18 (rejecting the plaintiffs' reliance on the ATA, AEDPA, and USA Patriot Act as evidence of an international-law norm against financing terrorism).

Finally, Plaintiffs urge this Court to follow the district court's decision in *Almog v. Arab Bank, PLC*, 471 F. Supp. 2d 257 (E.D.N.Y. 2007), which Plaintiffs contend supports their claim that terrorism is actionable under the ATS.  There, survivors of Israeli citizens killed by Palestinian suicide bombers sued a Jordanian bank alleged to have provided financial services that facilitated Palestinian groups' terrorist attacks.  The district court held that "organized,

29

systematic suicide bombings and other murderous attacks against innocent civilians for the

purpose of intimidating a civilian population are a violation of the law of nations." *Id.* at 285.

To the extent that *Almog* can be read as holding that terrorism, or material support

thereof, constitutes a violation of the law of nations, the Court respectfully disagrees with that

conclusion for the reasons discussed above.  In recognizing an international norm against suicide

bombing and other attacks on civilians, the *Almog* court relied largely on the Financing

Convention and the International Convention for the Suppression of Terrorist Bombings.  *See*

*Almog*, 471 F. Supp. 2d at 276–78.  As discussed above, this Court finds that the Financing

Convention fails to establish a universally recognized, well-settled norm of customary

international law.  Moreover, and as noted above, the Bombing Convention addresses terrorism

at a highly abstract level and does not provide any definition of the subject.  The Court thus

disagrees with *Almog*'s conclusion that these conventions support an international norm, under

*Sosa*'s stringent requirements, prohibiting terrorism.

*Almog* is also distinguishable in that the court there did not recognize an ATS claim for

terrorism in general, as Plaintiffs here urge upon this Court.  Rather, *Almog* rested its holding on

the specific allegations before it, which the court described as suicide bombings and

assassinations of civilians.  *See id.* at 264 (listing representative allegations from Almog's

amended complaint).  Indeed, the court explained that its holding was limited to the specific

factual allegations before it, and not based upon a cause of action for "terrorism" generally.  *See*

*id.* at 280 ("[T]here is no need to resolve any definitional disputes as to the scope of the word

'terrorism,' for the Conventions expressing the international norm provide their own specific

descriptions of the conduct condemned.  Although the Conventions refer to such acts as

30

'terrorism,' the pertinent issue here is only whether the acts as alleged by plaintiffs violate a norm of international law, however labeled.").

For the foregoing reasons, the Court concludes that Plaintiffs' terrorism-based claims are not actionable under the ATS.  Like *Tel-Oren*, *Saperstein*, and *Barboza*, and mindful of *Sosa*'s mandate that courts exercise great caution in recognizing new ATS claims, this Court finds that a claim for terrorism in general, or material support thereof, is not based on a sufficiently accepted, established, or defined norm of customary international law to constitute a violation of the law of nations.  Accordingly, the Court lacks subject-matter jurisdiction under the ATS over Plaintiffs' terrorism-based claims and those claims are dismissed.[20]

| *3.*     *Practical Consequences*

Chiquita also contends that *Sosa*'s directive that courts consider the "practical consequences," such as foreign-policy implications, of recognizing new ATS claims precludes this Court from recognizing Plaintiffs' terrorism-based claims.  While the Court need not address this issue given the dismissal of Plaintiffs' terrorism-based claims, the Court will briefly address it here because Chiquita weaves this theme throughout its briefing, arguing that the Court should decline to exercise jurisdiction over *all* of Plaintiffs' claims because this action will touch on foreign-policy and political issues.

The Court finds nothing extraordinary about Plaintiffs' claims, such that the potential for adverse foreign-policy consequences balances against adjudication on the merits.  Many courts

---

[20] Because the Court dismisses Plaintiffs' terrorism-based claims for lack of subject-matter jurisdiction, the Court does not address Chiquita's additional arguments for dismissal, i.e., that any prohibition against terrorism under international law is limited to criminal, not civil, liability, and that Plaintiffs' have failed to plead the requisite elements of their terrorism-based claims.

have adjudicated ATS claims based on allegations involving significant foreign-relations issues, some involving allegations nearly identical to those here.  *See, e.g.*, *Drummond II*, No. 09-1041, Slip op. (addressing ATS claims arising out of AUC's alleged violence in the course of the Colombian civil war); *Aldana v. Del Monte Fresh Produce, N.A.*, 416 F.3d 1242 (11th Cir. 2005) (holding that the plaintiffs sufficiently pleaded ATS claims against a U.S. company that allegedly hired private Guatemalan security forces to torture labor unionists); *Kadic*, 70 F.3d 232 (addressing ATS claims arising out of the Bosnian genocide); *Almog*, 471 F. Supp. 2d 257 (addressing ATS claims arising out of suicide bombings by Palestinian terrorist organizations in Israel).  There is no indication that those cases "imping[ed] on the discretion of the Legislative and Executive Branches in managing foreign affairs."  *Sosa*, 542 U.S. at 727.  Adjudicating Plaintiffs' claims is similarly unlikely to risk unwarranted judicial interference with the political branches' foreign policy vis-a-vis Colombia.  Indeed, unlike other ATS cases addressing significant foreign-policy issues, neither the U.S. nor Colombian governments have voiced any concern regarding this Court's jurisdiction over Plaintiffs' claims.  *See, e.g.*, *In re South African Apartheid Litig.*, 617 F. Supp.2d 228, 276–77 (S.D.N.Y. 2009) (adjudicating ATS claims arising from U.S. companies' business practices with the Apartheid-era government of South Africa despite a statement of interest from the U.S. State Department stating that "continued adjudication of the above-referenced matters risks potentially serious adverse consequences for significant interests of the United States" and that continued litigation "will compromise a valuable foreign policy tool"); *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, No. 01-9882, 2005 WL 2082846, at *1 (S.D.N.Y. Aug. 30, 2005) (upholding ATS claims despite the "United States Government [having] submitted a Statement of Interest . . . expressing concerns

32

regarding the impact of this litigation on this Nation's foreign affairs").  This Court will not

decline to exercise jurisdiction over Plaintiffs' ATS claims solely because the allegations touch

on issues concerning Colombian officials and the Colombian civil war.  *See Amergi*, 611 F.3d at

1365 ("There can be little doubt that the ATS permits federal courts to assert jurisdiction over

hot-button matters of international law."); *Khulumani*, 504 F.3d at 263 ("[N]ot every case

touching foreign relations is nonjusticiable and judges should not reflexively invoke these

doctrines to avoid difficult and somewhat sensitive decisions in the context of human rights.")

(internal quotation marks omitted); *Kadic*, 70 F.3d at 249 ("Although these cases present issues

that arise in a politically charged context, that does not transform them into cases involving

nonjusticiable political questions.  The doctrine is one of 'political questions,' not one of

'political cases.'") (internal quotation marks omitted).

      The Court also rejects as a basis for dismissal Chiquita's argument that hearing Plaintiffs'

claims would give rise to thousands of new ATS claims stemming from its alleged support to the

AUC, resulting in unmanageable litigation.  The Federal Rules of Civil Procedure provide

adequate procedures for managing large, complicated lawsuits, including class actions involving

thousands of plaintiffs.  Moreover, Chiquita's position risks rewarding offenders who commit

large-scale, as opposed to individual, international torts.  Under Chiquita's argument, an offender

who commits a small number of international-law violations would be subject to ATS claims in

federal court, while an offender who commits thousands of offenses, thereby making any lawsuit

more complex, could escape liability.  The Court refuses to adopt such a rule.

### B.      Plaintiffs' Additional ATS Claims

As a threshold matter, the Court rejects Chiquita's suggestion that the Court's ruling on Plaintiffs' terrorism-related claims disposes of Plaintiffs' remaining ATS claims. Chiquita argues that all of Plaintiffs' ATS causes of action are really just material-support-for-terrorism claims that Plaintiffs attempt to "shoehorn" into other theories of ATS violations, such as war crimes, crimes against humanity, torture, and extrajudicial killing. The Court disagrees with this assessment of Plaintiffs' claims. The complaints allege multiple, distinct non-terrorism causes of action—claims that federal courts have recognized as independent, valid ATS claims—and the Court will analyze Plaintiffs' claims as such. The Court now turns to Chiquita's specific arguments directed at Plaintiffs' ATS claims.

Chiquita first argues that Plaintiffs' ATS claims for (1) cruel, inhuman, or degrading treatment, (2) violation of the rights to life, liberty and security of person and peaceful assembly and association, and (3) consistent pattern of human-rights violations are not recognized violations of the law of nations. The Court agrees. First, while asserting these causes of action in their complaints, Plaintiffs' briefing ignores entirely Chiquita's arguments for dismissing these claims and provides no authority recognizing these causes of action under the ATS. Without any authority recognizing these claims, the Court cannot conclude that they are sufficiently established or universally recognized under international law to satisfy *Sosa*'s requirements for recognizing new ATS claims. Additionally, other courts have expressly rejected these types of claims under the ATS. *See, e.g.*, *Aldana*, 416 F.3d at 1247 ("We see no basis in law to recognize Plaintiffs' claim for cruel, inhuman, degrading treatment or punishment."); *Villeda Aldana v. Fresh Del Monte Produce, Inc.*, 305 F. Supp. 2d 1285, 1299 (S.D. Fla. 2003) ("[T]his Court

34

cannot let this claim proceed as Plaintiffs have not established the existence of [a] customary international law 'right to associate and organize.'"), *rev'd in part on other grounds*, 416 F.3d 1242 (11th Cir. 2005); *Kiobel v. Royal Dutch Petroleum Co.*, 456 F. Supp. 2d 457, 467 (S.D.N.Y. 2006) (dismissing the plaintiffs' claim for violations of the "rights to life, liberty, security and association" because there "is no particular or universal understanding of the civil and political rights covered by Plaintiffs' claim, and thus, pursuant to *Sosa*, these 'rights' are not actionable under the ATS.") (internal quotation marks omitted), *rev'd in part on other grounds*, 621 F.3d 111 (2d. Cir. 2010); *Sarei v. Rio Tinto PLC*, 221 F. Supp. 2d 1116, 1162 n.190 (C.D. Cal. 2002) ("[P]laintiffs have not demonstrated that prohibitions against cruel, inhuman, and degrading treatment (other than torture) and gross violations of human rights constitute established norms of customary international law."), *rev'd in part on other grounds*, 456 F.3d 1069 (9th Cir. 2006), *aff'd in part, rev'd in part, and vacated in part en banc*, 487 F.3d 1193 (9th Cir. 2007).  Having provided no authority recognizing these claims under international law, the Court follows the many cases holding that these causes of action are not cognizable under the ATS.

The Court now turns to Plaintiffs' remaining ATS claims: torture, extrajudicial killing, war crimes, and crimes against humanity.  Chiquita's first argument concerns whether Plaintiffs sufficiently allege that the AUC committed these four offenses.

### 1.    *Primary Violations of International Law By the AUC*

Chiquita argues that Plaintiffs' remaining ATS claims fail because the complaints do not allege primary violations of international law by the AUC and, therefore, there are no offenses for which it can be found secondarily liable.  Specifically, Chiquita argues that (1) Plaintiffs do not plead the requisite state action with respect to the AUC's alleged offenses, and therefore fail

to plead a necessary element for the torture and extrajudicial killing claims; (2) Plaintiffs do not

sufficiently allege that the alleged torture and killing were war crimes; and (3) Plaintiffs do not

sufficiently allege that the alleged torture and killing were crimes against humanity.

> a.   *State-Action Requirement for Torture and Extrajudicial-Killing Claims*

Torture and extrajudicial killings are recognized violations of the law of nations under the

ATS.  *See, e.g.*, *Sinaltrainal*, 578 F.3d at 1265 n.15; *Romero v. Drummond Co.*, 552 F.3d 1303,

1316 (11th Cir. 2008); *Kadic*, 70 F.3d at 234.  For ATS purposes, the Eleventh Circuit has

adopted the definition of torture set forth by the Convention Against Torture and Other Cruel,

Inhuman or Degrading Treatment or Punishment, G.A. Res. 39/46, U.N. GAOR, U.N. Doc.

A/39/51 (1984).  This convention defines torture as the intentional infliction of severe pain or

suffering, whether physical or mental, on a person for the purposes of obtaining information or a

confession, punishment, intimidation or coercion, or discrimination.  *Aldana*, 416 F.3d at 1252.

The Eleventh Circuit has not specifically addressed the elements of an extrajudicial-killing claim

under the ATS.  Under the analogous TVPA, however, the Eleventh Circuit explains that

extrajudicial-killing is defined as a deliberate killing not previously authorized by a regularly

constituted court affording recognized judicial guarantees.  *Sinaltrainal*, 578 F.3d 1252 (citing 28

U.S.C. § 1350 note § 3(a)).

As with most ATS claims, torture and extrajudicial killing are cognizable only when

committed by state actors or under color of law.  *See, e.g.*, *Sinaltrainal*, 578 F.3d at 1265;

*Aldana*, 416 F.3d at 1247; *Kadic*, 70 F.3d at 234.  To plead state action for ATS purposes, the

Eleventh Circuit "demand[s] allegations of a symbiotic relationship" between the private actor

and the government.  *Sinaltrainal*, 578 F.3d at 1266; *see also Romero*, 552 F.3d at 1317

(adopting same symbiotic-relationship standard in the context of torture and extrajudicial-killings

claims under the TVPA).  Under this symbiotic-relationship standard, Plaintiffs must assert

"more than allegations of a general, joint-relationship between the government and the alleged

state actor."  *Drummond II*, No. 09-1041, DE 43, Slip op. at 8.  Allegations of "Colombia's mere

'registration and toleration of private security forces does not transform those forces' acts into

state acts.'"  *Sinaltrainal*, 578 F.3d at 1266 (quoting *Aldana*, 416 F.3d at 1248).  Rather,

Plaintiffs must allege a close relationship between the government and the AUC that "'involves

the torture or killing alleged in the complaint to satisfy the requirement of state action.'"  *Id.*

(quoting *Romero*, 552 F.3d at 1317); *see also Romero*, 552 F.3d at 1317 ("[P]roof of a general

relationship is not enough.  The relationship must involve the subject of the complaint.").[21]

      Chiquita contends that Plaintiffs have not adequately pleaded the state-action requirement

for these claims.  The complaints, Chiquita argues, rely upon generalized allegations of collusion

between Colombian authorities and the paramilitaries that are similar to those found insufficient

in *Sinaltrainal*.  Chiquita concedes that the complaints allege that the "Colombian government

helped create, promote and finance paramilitaries, was complicit in paramilitary operations,

participated in certain paramilitary massacres, and delegated certain government functions to the

paramilitaries."  Second Mot. at 24 (DE 295).  Chiquita concludes, however, that these

allegations fail because they do not assert any "government involvement in any of the more than

---

[21] Based on these Eleventh Circuit precedents recognizing the symbiotic-relationship standard for state action, the Court rejects Chiquita's argument, advanced in its first motion to dismiss, that there is no clearly defined and widely accepted standard under the law of nations for extending liability reserved for state actors to private entities acting under color of law.

one thousand violent acts at issue here," and therefore fail to plead the requisite government involvement in the "'murder and torture alleged in the complaints.'" *Id.* (quoting *Sinaltrainal*, 578 F.3d at 1266).

As an initial matter, the Court disagrees with Chiquita's argument that to plead state action Plaintiffs must allege government involvement in the specific torture and killings of Plaintiffs' specific relatives.  While the symbiotic relationship must involve "the torture or killing alleged in the complaint," *Romero*, 552 F.3d at 1317, the "Eleventh Circuit has approved a district court exercising this standard by inquiring whether 'the symbiotic relationship between the paramilitaries and the Colombian military had anything to do with the conduct at issue.'" *Drummond II*, No. 09-1041, DE 43, Slip op. at 11 (quoting *Romero*, 552 F.3d at 1317).  Here, the conduct at issue is the AUC's torture and killing of thousands of civilians in Colombia's banana-growing regions, torture and killing which allegedly harmed or killed Plaintiffs' relatives.  This Court finds that to plead state action at the motion-to-dismiss stage, Plaintiffs must allege a symbiotic relationship between the Colombian government and the AUC with respect to the AUC's campaign of torture and killing of civilians in the banana-growing regions, not specific government involvement with each individual act of torture and killing of Plaintiffs' relatives.  Such allegations suffice to show a "relationship [that] involve[s] the subject of the complaint." *Romero*, 552 F.3d at 1317; *see also Drummond II*, No. 09-1041, DE 43, Slip op. at 12-13 (finding that the plaintiffs sufficiently alleged a symbiotic relationship with respect to the killings alleged in the complaint based on allegations that the defendant paid the AUC with the intent to assist the AUC's war crimes and with the knowledge that the AUC would direct its war efforts in the areas in which the plaintiffs' decedents lived.).

38

Turning to Plaintiffs' allegations, the Court finds that the complaints allege facts regarding a direct, symbiotic relationship between the Colombian government and the AUC that involves the AUC's torture and killing of civilians in the banana-growing regions of Uraba and Magdalena.  For example, the complaints allege:

- [D]espite the official criminalization of the paramilitaries, they became a central component of the government's strategy to win the civil war.  At all times relevant to this complaint, the AUC and other paramilitary groups in fact collaborated closely with the Colombian government and were used by the government to oppose anti-government guerrilla groups like the FARC.[22]

- As part of the Colombian government's strategy for defeating the left-wing insurgency, senior officials in the Colombian civilian government and the Colombian security forces collaborated with the AUC and assisted the paramilitaries in orchestrating attacks on civilian populations, extra-judicial killings, murders, disappearances, forced displacements, threats and intimidation against persons including Plaintiffs.[23]

- As a result of this interdependence, longstanding and pervasive ties have existed between the paramilitaries and official Colombian security forces from the beginning. In the 1980s, paramilitaries were partially organized and armed by the Colombian military and participated in the campaigns of the official armed forces against guerrilla insurgents.  Paramilitary forces included active-duty and retired army and police personnel among their members. . . . Cooperation with paramilitaries has been demonstrated in half of Colombia's eighteen brigade-level Army units, spread across all of the Army's regional divisions.   Such cooperation is so pervasive that the paramilitaries are referred to by many in Colombia as the "Sixth Division"—a reference to their close integration with the five official divisions of the Colombian Army.[24]

- Senior officers in the Colombian military, including but not limited to former Military Forces Commanders Major General Manuel Bonett, General Harold Bedoya, Vice Admiral Rodrigo Quinones, Gen. Jaime Uscategui; Gen. Rito Alejo Del Rio, General Mario Montoya, Colonel Danilo Gonzalez, Major Walter Fratinni and Defense Minister Juan Manuel Santos,

---

[22] *Does 1-11 v. Chiquita Brands Int'l, Inc.*, No. 08-80421, DE 63, First Am. Compl. ¶ 27 (filed Feb. 26, 2010).

[23] *Id.* ¶ 45.

[24] *Id.* ¶ 48.

collaborated with, facilitated, and/or aided and abetted the AUC in the commission of various attacks on civilian populations, extrajudicial killings and other atrocities . . . .[25]

• Boundaries between the AUC and the military at times were amorphous, as some paramilitary members were former police or army members, while some active-duty military members moonlighted as paramilitary members and became thoroughly integrated into these groups. Paramilitary leaders noted that Colombian security forces in Uraba allowed members of the AUC to serve as proxies in their pursuit of guerrilla forces, largely due to the military's operative incapacity to defeat the guerrillas on its own.[26]

• Colombian security forces in Uraba—with the knowledge and collaboration of high-level officials in the national government—have willfully failed to prevent or interrupt the crimes of the AUC, actively conspired with them, and coordinated activities with them. Documented examples in Uraba include:
  . . .
  • Failing to carry out arrest warrants for paramilitary leaders, who move about the country freely;
  . . .
  • Failing to intervene to stop ongoing attacks on civilian populations occurring over a period of days;
  • Sharing intelligence, including the names of suspect guerrilla collaborators;
  • Sharing vehicles, including army trucks used to transport paramilitary fighters;
  • Supplying weapons and munitions;
  • Providing special military training;
  . . .
  • Providing support with helicopters and medical aid;
  • Communicating via radio, cellular telephones, and beepers;
  • Sharing members, including active-duty soldiers serving in paramilitary units and paramilitary commanders lodging on military bases; and
  • Planning and carrying out joint operations.[27]

• It was in Uraba that a model of collaboration between the paramilitaries, the business sector, and the government was developed and perfected. An alliance was formed between politicians, active military units, multinational companies, businessmen, and paramilitaries in order to impose a regime of terror and consolidate the dominance of the AUC, which would wrest control of the countryside back from the leftist guerrillas. The first paramilitary

---

[25] *Id.* ¶ 49.

[26] *Id.* ¶ 50.

[27] *Id.* ¶ 51.

groups to operate in Uraba in a systematic and continuous manner received special training from the Colombian military.[28]

• When the government or the military was not able to legally arrest or attack civilians, they would delegate the task to the AUC or to *convivir* associated with the paramilitaries to act on their behalf. These targets included suspected guerrilla sympathizers, including teachers, community leaders, trade unionists, human rights defenders, religious workers, and leftist politicians, as well as people with no known or suspected ties to the guerrillas but who were killed to terrify and dominate the civilian population. According to both H.H. and Raúl Hasbún, the military gave the AUC lists of people to kill when they felt impotent to fight the guerrillas themselves legally and constitutionally, or when they could not arrest and try them for any crime.[29]

• The AUC in Uraba consistently ran joint operations with the military. The 17th Brigade of the Colombian Army, located in the Uraba region, and the 4th Brigade, sister unit to the 17th Brigade in the Medellin region, were especially active in their support of and involvement in paramilitary activities, up to and including engaging in joint operations. For example, the Elmer Cardenas Bloc of the AUC regularly received logistical support and transportation from the 17th Brigade and other units of the Colombian army and conducted joint operations with the 17th Brigade. General Rito Alejo del Rio Rojas, the commander of the 17th Brigade from 1995 to 1997 who was responsible for military operations in Uraba, was notorious for his collaboration and collusion with paramilitaries in the region.[30]

• General del Rio was finally arrested in 2008 . . . . He is accused of conspiracy to murders committed by paramilitaries in Uraba during his time as 17th Brigade Commander. H.H. has testified that he twice witnessed del Rio meeting with the founder and national commander of the AUC, Carlos Castano.[31]

• AUC paramilitaries could enter and leave the 17th Brigade's headquarters at will, with the knowledge and permission of General del Rio. In one instance, H.H. discovered that a criminal whom the AUC sought was being held at the Brigade headquarters; he and others from the AUC went to the 17th Brigade, picked up the prisoner, transported him to the port at Turbo using a military van, and murdered him.[32]

---

[28] *Id.* ¶ 53.

[29] *Id.* ¶ 54.

[30] *Id.* ¶¶ 56–57.

[31] *Id.* ¶ 58.

[32] *Id.* ¶ 59.

- General del Rio's role in promoting and supporting paramilitarism was not merely the work of a single rogue military officer; rather it was part of the Colombian government's strategy to fight the guerrillas.[33]

- Colombian security forces and paramilitary groups shared intelligence. Paramilitary groups were used to gather intelligence about leftist guerillas and their sympathizers and supporters in the regions where they operated. The paramilitary groups communicated their intelligence to military intelligence units and to the DAS. Military intelligence and DAS units reciprocated by sharing intelligence information with the paramilitary groups, including but not limited to lists of individuals the Colombian government suspected of being leftist guerillas, sympathizers, or supporters. Colombian security forces often directed the AUC to kill or torture the individuals identified on these lists.[34]

- On February 19, 2000, the AUC selectively assassinated five banana workers in the "peace community" of San Jose de Apartado, in Uraba; reports indicated that members of the 17th Brigade were direct participants in the attack.[35]

- This model of collaboration between the paramilitaries, the companies, and the government was so successful in Uraba that Raul Hasbun explained it to Jorge 40, commander of the AUC in the Magdalena region, so he could implement it there. Thereafter, the model spread to many other regions of Colombia.[36]

- Although paramilitarism had been declared illegal in Colombia, the Colombian government still needed the paramilitaries to assist in the armed conflict against the guerillas; Decree 356 of 1994 was therefore enacted as a new legal mechanism to provide cover and a legitimate avenue of funding for the AUC. . . . These security groups [were] known commonly by their Spanish-language acronym "CONVIVIR." . . . The *convivir* units in Uraba were fronts from the AUC from their inception. . . . The 17th Brigade of the Colombian Armed Forces, which was infamous for its close collaboration with the paramilitaries in Uraba, was given the authority to select members of the *convivir* in Uraba.[37]

_____

[33] *Id.* ¶ 60.

[34] *Montes v. Chiquita Brands Int'l, Inc.*, No. 10-60573, DE 1, Compl. ¶ 311 (filed Apr. 14, 2010).

[35] *Does 1-11 v. Chiquita Brands Int'l, Inc.*, No. 08-80421, DE 63, First Am. Compl. ¶ 64 (filed Feb. 26, 2010).

[36] *Id.* ¶ 66.

[37] *Id.* ¶¶ 37–38.

- Alvaro Uribe . . . was governor of Antioquia [the department in which Uraba is located] at the time of the creation of the *convivir*. Uribe authorized the funding, arming, and funneling of information to the *convivir*, thereby facilitating the sharing of such funds, arms, and information with the AUC. Uribe expected the *convivir* groups to fight the guerrillas—both alongside the military and on their own . . . .[38]

- In October 1997, the Army's Fourth Brigade and the AUC participated in an offensive in the village of El Aro, in the department of Antioquia. . . . [T]he military and AUC leaders planned the offensive over the course of several months. As the offensive began, the Colombian Army established a perimeter to prevent entry into or escape from the village while the AUC was inside. The Army maintained the perimeter for five days. During that time, the AUC executed at least eleven people, forcibly disappeared more than thirty other people, burned forty-seven of the sixty-eight houses, looted stores, and destroyed water pipelines. At least one victim was tied to a tree and tortured by having his eyes gouged out and his testicles cut off. After the massacre, the AUC forced most of the residents to leave the area. Several members of the Army and local police were charged with participating in the massacre.[39]

The Court finds that these allegations do more than assert generalized allegations of collusion between Colombian authorities and the AUC. These allegations provide detailed facts of the government's role in creating, financing, promoting, and collaborating with the AUC in the common objective of fighting the leftist guerrillas. This cooperation involves joint membership, intelligence sharing, and the government's role in training and arming the AUC. The complaints then link this close relationship to the campaign of torture and killing in the banana-growing regions—i.e., the subject of the complaints—including allegations that the government and the AUC jointly planned and carried out specific attacks against civilian villages in Uraba. This is more than a "formulaic recitation" of a symbiotic relationship between the

---

[38] *Id.* ¶ 39.

[39] *Montes v. Chiquita Brands Int'l, Inc.*, No. 10-60573, DE 1, Compl. ¶ 330(b) (filed Apr. 14, 2010).

AUC and the Colombian government.  *Sinaltrainal*, 578 F.3d at 1266.  Plaintiffs have alleged

ample facts supporting the requisite state-action elements.

    These detailed facts distinguish the allegations here from those found insufficient in

*Sinaltrainal*, upon which Chiquita principally relies in its second motion to dismiss.  There, the

plaintiffs' conclusorily alleged that the paramilitaries were "permitted to exist," were "assisted by

the Colombian government," that the government "tolerate[d] the paramilitaries, allow[ed] them

to operate, and often cooperate[d], protect[ed] and/or work[ed] in concert with them."  578 F.3d

at 1266.  The plaintiffs also made "the naked allegation the paramilitaries were in a symbiotic

relationship with the Colombian government."  *Id.*  The Eleventh Circuit found that (1) the

"conclusory allegation that the paramilitary security forces acted under color of law is not entitled

to be assumed true and is insufficient to allege state-sponsored action," and (2) that the

allegations that the Colombian government "tolerated and permitted the paramilitary forces to

exist are insufficient to plead the paramilitary forces were state actors."  *Id.*  Here, by contrast,

Plaintiffs allege many facts supporting their allegations of a symbiotic relationship, and those

allegations are therefore not conclusory.  *See id.* ("The plaintiffs' 'formulaic recitation' that the

paramilitary forces were in a symbiotic relationship and were assisted by the Colombian

government, *absent any factual allegations to support this legal conclusion*, is insufficient to

state an allegation of state action that is plausible on its face.") (emphasis added).  Moreover,

Plaintiffs' do not merely allege that the government "tolerated and permitted" the AUC's

activity; the complaints allege the government's active participation in the AUC's activity.  Thus,

unlike *Sinaltrainal*, where there was "no suggestion the Colombian government was involved in,

much less aware of, the murder and torture alleged in the complaints," *id.*, Plaintiffs here provide

detailed allegations of the government's close cooperation with the AUC regarding the torture and killing alleged in the complaint.

Chiquita also argues, in its first motion to dismiss, that the complaints allege that Colombian law currently prohibits assisting paramilitaries and that the Colombian government is currently investigating and prosecuting officials for ties to the AUC. Chiquita contends that these facts are inconsistent with the notion that the AUC was acting under color of law. This argument is unavailing. First, the government's *current* investigations and prosecutions are not relevant to its alleged *past* relationship with the AUC. Second, that government officials are currently being investigated and prosecuted for ties to the AUC is not inconsistent with, and indeed may support, Plaintiffs' allegations that a symbiotic relationship existed between the government and the AUC during the time of the alleged offenses.

The Court thus concludes that the complaints sufficiently allege that the AUC acted under color of law when it committed the offenses alleged in the complaints. Accordingly, Plaintiffs' torture and extrajudicial-killings claims will not be dismissed for failure to plead state action.[40]

> b.    *War Crimes.*

War crimes are recognized violations of the law of nations under the ATS. *See, e.g.*, *Sinaltrainal*, 578 F.3d at 1266–67; *Talisman*, 582 F.3d at 256; *Kadic*, 70 F.3d at 242–43. Such a claim is cognizable under the ATS if Plaintiffs can establish (1) there was an armed conflict, (2) the AUC was a party to the conflict, (3) Plaintiffs' relatives were not active participants in the conflict, and (4) Plaintiffs' relatives were tortured or killed in the course of hostilities. *See*

---

[40] Because the Court finds that the complaints adequately allege state action under the symbiotic-relationship standard set forth in *Sinaltrainal*, the Court does not address Plaintiffs' additional arguments that they sufficiently plead state action under other color-of-law theories.

*Kadic*, 70 F.3d at 243 (applying the war crimes definition from Common Article 3 of the Geneva Convention); *see also Talisman*, 582 F.3d at 257 (adopting *Kadic*'s war crimes standard); *In re Sinaltrainal Litig.*, 474 F. Supp. 2d 1273, 1287 (S.D. Fla. 2006) (same); *Drummond II*, No. 09-1041, DE 43, Slip op. at 14 (same).  Unlike claims for torture and extrajudicial killing, a claim for war crimes does not require state action.  *See Sinaltrainal*, 578 F.3d at 1267 (holding that the "war crimes exception dispenses with the state action requirement."); *id.* ("Some acts, such as torture and murder committed in the course of war crimes, violate the law of nations regardless of whether the perpetrator acted under color of law of a foreign nation or only as a private individual.").

Chiquita argues that it cannot be secondarily liable because Plaintiffs fail to plead that the AUC committed a primary violation of international law.  The parties agree that the civil war in Colombia between the Colombian government and the guerrilla organizations was an armed conflict and that the AUC was a party to that conflict.  Thus, the controlling issue here is the third element of a war crimes claim: whether the AUC committed its alleged violence "in the course of hostilities."  Case law does not provide any clear definition of this requirement.  In *Sinaltrainal*, the Eleventh Circuit clarified that this "in the course of" element requires that the crimes be committed "because of the ongoing civil war."  578 F.3d at 1267.  This requires more than merely alleging that the offenses occurred "during" an armed conflict.  *Id.*; *see also In re XE Servs. Alien Tort Litig.*, 665 F. Supp. 2d 569, 585 (E.D. Va. 2009) ("[A] more substantial relationship must exist between the armed conflict and the alleged conduct than the mere fact that the conduct occurred while an armed conflict was ongoing.").  Plaintiffs must allege a nexus between the AUC's alleged violence and the Colombian civil war.  *See, e.g., In re XE Servs.*, 665

F. Supp. 2d at 585 ("[P]laintiffs must allege a nexus to the armed conflict in order to state a valid claim for war crimes under the ATS. . . . [P]laintiffs must allege that the conduct constituting war crimes occurred in the context of and in association with an ongoing armed conflict."); *Drummond II*, No. 09-1041, DE 43, Slip op. at 15 ("The initial question then is whether the murders alleged . . . occurred 'because of' or 'in the course of' the civil unrest in Colombia.").

The Court finds that Plaintiffs here have sufficiently alleged that the AUC committed the alleged violence *because of*, and not merely during, the civil war in Colombia.  For instance, the complaints allege:

- All of the Plaintiffs' decedents were merely innocent civilians executed in the course of the conflict between the AUC and the FARC. . . . They were not merely incidental victims during a time of war; rather they were victims of the AUC's war strategies and goals.[41]

- [T]o undermine communities' and individuals' support for the guerillas, the AUC . . . adopted a strategy of terrorism, routinely engaging in death threats, extrajudicial killings, attacks on civilian populations, torture, rape, kidnaping, forced disappearances, and looting. While the AUC periodically engaged in direct combat with armed guerrilla forces, the vast majority of its victims were civilians.  The AUC claimed that it was justified in targeting civilians with no known ties to guerrillas because guerrilla groups required the logistical support of local towns in order to operate in the region. Carlos Castaño, the AUC leader, described this strategy as "quitarle agua al pez" (draining the water to catch the fish), as the AUC sought to intimidate and coerce civilians to prevent them from providing support to guerrillas.[42]

- The AUC and other paramilitaries were parties to this armed conflict that engaged in combat with guerrilla armies on behalf of the government; they committed the abuses against Plaintiffs and decedents as part of their prosecution of this conflict.[43]

---

[41] *Does 1-144 v. Chiquita Brands Int'l, Inc.*, No. 08-80465, DE 58, First Am. Compl. ¶¶ 509–10 (filed Mar. 1, 2010).

[42] *Does 1-11 v. Chiquita Brands Int'l, Inc.*, No. 08-80421, DE 63, First Am. Compl. ¶¶ 30–31 (filed Feb. 26, 2010).

[43] *Id.* ¶ 165.

- Decedents were not killed simply against the background of war; rather, the use of criminal violence and intimidation against civilians was part of the war strategy against the FARC agreed on by the AUC and the Colombian Government . . . . The AUC used extremely violent means to take back areas held by the FARC and employed tactics of violence and terror to target civilians regardless of whether they were participants in the civil war, with the intention of discouraging civilians from supporting the leftist guerrillas. . . . Decedents were all members of particular social groups that were particularly targeted by the AUC as part of its war strategy. . . .[44]

- The extreme brutality practiced by the AUC that earned it the terrorist moniker by the U.S. Department of State was from the outset a planned strategy to effectively confront and defeat the FARC.[45]

- Plaintiffs' decedents . . . were victims of the campaign conducted against civilians by the AUC in an effort to discourage support of the FARC.[46]

- [T]he AUC pursued a scorched earth policy of first driving the FARC out and then brutally murdering and torturing people who lived in these areas and were assumed by the AUC to be sympathetic to the FARC.[47]

- The [AUC] intentionally and deliberately engaged in extra-judicial killings, massacres, rapes, kidnapings, forced disappearances, and forced displacements as a war strategy to ensure that civilians would never again join or support guerilla groups or causes.[48]

- Jane Doe 4 . . . was a civic and social activist. As a community activist, she was a member of one of the groups targeted by the AUC and the Colombian state in their war against the FARC and perceived FARC sympathizers.  In 2004, AUC paramilitaries came to Jane Doe 4's house and executed her in the presence of her family.[49]

---

[44] *Id.* ¶¶  202–05.

[45] *Does 1-144 v. Chiquita Brands Int'l, Inc.*, No. 08-80465, DE 58, First Am. Compl. ¶ 493 (filed Mar. 1, 2010).

[46] *Id.* ¶ 503.

[47] *Id.* ¶ 507.

[48] *Montes v. Chiquita Brands Int'l, Inc.*, No. 10-60573, DE 1, Compl. ¶ 295 (filed Apr. 14, 2010).

[49] *Does 1-11 v. Chiquita Brands Int'l, Inc.*, No. 08-80421, DE 63, First Am. Compl. ¶¶ 146–47 (filed Feb. 26, 2010).

- Pablo Perez 4 was murdered on September 9, 2004, by AUC paramilitaries . . . in furtherance of the internal armed conflict. On September 9, 2004, Pablo Perez 4 was at a birthday party in the town of Guacamayal, in Zona Bananera, Magdalena, when two armed paramilitaries suddenly arrived on a motorcycle. The two paramilitaries approached Pablo Perez 4, and one of them pulled out a gun and shot the victim.[50]

- [I]n the early morning hours of November 1, 1997, a group of heavily armed paramilitaries dressed in camouflaged uniforms stormed Pablo Perez 50's home in the village of Guacamayal, in the banana zone of Magdalena, while he was sleeping. The paramilitaries broke down the door to the home, found Pablo Perez 50 and seized him, tied him up and forced him to accompany them at gunpoint, beating him as they kidnaped him. Pablo Perez 50's corpse was found the following morning with signs of torture and two gunshots, one to the head and one to the body. In a certificate issued on November 22, 1999, Elvis Emilio Redondo Lopez, the Cienaga Municipal Representative, confirmed that Pablo Perez 50 was murdered in a massacre carried out in the context of the internal armed conflict.[51]

- Pablo Perez 60 was kidnaped, tortured and murdered on June 17, 1999 by AUC paramilitaries . . . in furtherance of the internal armed conflict. At approximately 1:00 AM on June 17, 1999, Pablo Perez 60 was resting at his home in Apartado, Antioquia when a group of paramilitaries who had arrived in several vehicles stormed his home, kicked in his door, seized Pablo Perez 60, and beat him. The paramilitaries demanded to know where Pablo Perez 60 had weapons hidden. Finding no weapons, the paramilitaries kidnaped Pablo Perez 60 and took him to the village of Nueva Colonia . . . . There, the paramilitaries tortured Pablo Perez 60 before executing him with several gunshots to the head and body.[52]

These allegations state that the AUC intended to torture and kill Plaintiffs' relatives for the purpose of furthering its military objectives in defeating its guerrilla enemies in the Colombian civil war, i.e., these crimes were committed *because* of the war. Furthermore, these allegations provide factual support linking the AUC's killing and torture, carried out in furtherance of its war against the FARC, to the Plaintiffs' relatives. These factual contentions

---

[50] *Does 1-144 v. Chiquita Brands Int'l, Inc.*, No. 08-80465, DE 58, First Am. Compl. ¶ 202 (filed Mar. 1, 2010).

[51] *Id.* ¶¶ 296–97.

[52] *Id.* ¶ 316.

49

sufficiently allege that the unrest in Colombia did not merely "provide[] the background for the unfortunate events that unfolded," but that the "civil war . . .  precipitate[d] the violence that befell plaintiffs."[53]  *Sinaltrainal*, 578 F.3d at 1267.

c.      *Crimes Against Humanity*

Chiquita first argues that a claim for crimes against humanity is not cognizable under the ATS.  Chiquita contends that "under *Sosa*'s cautious approach," crimes against humanity is too ambiguous a norm to satisfy *Sosa*'s definiteness requirement for recognizing violations of the law of nations.  First. Mot. at 65 n.60 (DE 93); Second Mot. at 27 n.28 (DE 295).  Chiquita does not cite any case law for this argument.  Based on Eleventh Circuit, and other circuit, case law recognizing crimes against humanity as an actionable claim under the ATS, the Court rejects Chiquita's argument.  *See Cabello*, 402 F.3d at 1161; *see also Sosa*, 542 U.S. at 762 (Breyer, J., concurring) ("Today international law will sometimes similarly reflect not only substantive agreement as to certain universally condemned behavior but also procedural agreement that universal jurisdiction exists to prosecute a subset of that behavior.  That subset includes torture, genocide, crimes against humanity, and war crimes.") (internal citation omitted); *Talisman*, 582 F.3d at 256 ("Plaintiffs assert that Talisman aided and abetted (and conspired with) the Government in the commission of three violations of international law: genocide, war crimes,

---

[53] Chiquita notes that some complaints include allegations of offenses that were committed to settle personal grievances.  Second Reply at 10-11 & n.7 (DE 333).  While there are several stray allegations of victims killed in part for personal reasons, *e.g.*, *Valencia v. Chiquita Brands Int'l, Inc.*, No. 08-cv-80508, DE 283, Second Am. Compl. ¶¶ 265–70 (filed Feb. 26, 2010), the complaints overwhelmingly assert allegations of crimes carried out in furtherance of the war.  The Court notes, however, that any plaintiff whose relative was in fact killed solely for personal reasons cannot satisfy the elements of a war-crimes claim under the ATS.

and crimes against humanity.  All three torts may be asserted under the ATS."); *Sarei*, 487 F.3d at 1202 ("Plaintiffs here have alleged several claims asserting jus cogens violations that form the least controversial core of modern day ATCA jurisdiction, including allegations of war crimes, crimes against humanity and racial discrimination."); *Kadic*, 70 F.3d at 236 ("[W]e hold that subject-matter jurisdiction exists, [and] that Karadzic may be found liable for genocide, war crimes, and crimes against humanity . . . ."); *Flores*, 414 F.3d at 244 n.18 ("Customary international law rules proscribing crimes against humanity . . . have been enforceable against individuals since World War II.").

Next, Chiquita argues that Plaintiffs have not sufficiently alleged that the AUC committed crimes against humanity.  Crimes against humanity include murder, enslavement, deportation or forcible transfer, torture, rape or other inhumane acts committed as part of a widespread or systematic attack against a civilian population.  *See, e.g.*, *Cabello*, 402 F.3d at 1161; *Aldana*, 416 F.3d at 1247; *Talisman*, 582 F.3d at 257; *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 453 F. Supp. 2d 633, 670 (S.D.N.Y. 2006).  A "widespread attack is one conducted on a large scale against many people, while a systematic attack is an organized effort to engage in violence." *Talisman*, 453 F. Supp. 2d at 670.  Crimes against humanity require "proof of numerous attacks." *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 226 F.R.D. 456, 479 n.24 (S.D.N.Y. 2005).

Chiquita contends that crimes against humanity is not an exception to the state-action requirement, and that Plaintiffs' failed to adequately plead state action.  The Court rejects the former part of this argument and therefore need not address the latter.  While it is true that the Eleventh Circuit has never directly held that crimes against humanity are an exception to the

51

ATS's state-action requirement, it has never been presented with that issue.  Courts that have addressed this issue hold that crimes-against-humanity claims under the ATS do not require state action.  *See, e.g.*, *Kadic*, 70 F.3d at 236 ("The pending appeals pose additional significant issues as to the scope of the Alien Tort Act: whether some violations of the law of nations may be remedied when committed by those not acting under the authority of a state; if so, whether genocide, war crimes, and crimes against humanity are among the violations that do not require state action . . . . [W]e hold that subject-matter jurisdiction exists [and] that Karadzic may be found liable for genocide, war crimes, and crimes against humanity in his private capacity . . . ."); *Drummond II*, No. 09-1041, DE 43, Slip op. at 17 (ruling that a claim for crimes against humanity does not require state-action allegations).  Even if state action were required to state a claim for crimes against humanity, as discussed above Plaintiffs have sufficiently alleged that the AUC acted under color of law in attacking the civilian populations of the Uraba and Magdalena regions.

Chiquita next argues that Plaintiffs' allegations of crimes against humanity are conclusory and failed plead facts tying the alleged killings and injuries to a "widespread or systematic attack."  Thus, Chiquita contends, Plaintiffs' allegations fail to meet *Iqbal*'s pleading requirements.  *See Iqbal*, 129 S. Ct. at 1951 (explaining that conclusory allegations, devoid of factual support, are not entitled to the presumption of truth on a motion to dismiss).  The Court disagrees and finds that the complaints sufficiently allege facts of both widespread and systematic attacks by the AUC against civilians.

Although the Eleventh Circuit has not defined "widespread or systematic" attacks, several district courts have provided persuasive analyses on this requirement.  The concept of

"widespread" action has been defined as "'massive, frequent, large-scale action, carried out collectively with considerable seriousness and directed against a multiplicity of victims.'" *Bowoto v. Chevron Crop.*, 2007 WL 2349343, No. 99-2506, at *3 (N.D. Cal. Aug. 14, 2007) (quoting *Prosecutor v. Akayesu*, Judgment, No. ICTR-96-4-T § 6.4. (Sept. 2, 1998)); *see also Talisman*, 453 F. Supp. 2d at 670 ("A widespread attack is one conducted on a large scale against many people."); *Drummond II*, No. 09-1041, DE 43, Slip op. at 17 (same).  The term "systematic" refers to the "organized nature of the acts of violence and the improbability of their random occurrence."  *Bowoto*, 2007 WL 2349343, at *3 (quoting *Prosecutor v. Blaskic*, No. IT-95-14-A, ¶ 101 (ICTY Appeals Chamber, July 29, 2004)).  It "requires a high degree of orchestration and methodical planning."  *Id.* (internal quotation marks omitted).  The "widespread or systematic" requirement is disjunctive, not cumulative.  *Id.*; *Drummond II*, No. 09-1041, DE 43, Slip op. at 17.

Here, Plaintiffs' allegations include:

- The conduct alleged in this complaint includes willful killing, torture, and arbitrary arrest and detention, constituting crimes against humanity in that the AUC carried out these acts 1) as part of a widespread or systematic attack 2) against a civilian population.[54]

- [T]o undermine communities' and individuals' support for the guerillas, the AUC . . . adopted a strategy of terrorism, routinely engaging in death threats, extrajudicial killings, attacks on civilian populations, torture, rape, kidnaping, forced disappearances, and looting. While the AUC periodically engaged in direct combat with armed guerrilla forces, the vast majority of its victims were civilians.[55]

---

[54] *Does 1-144 v. Chiquita Brands Int'l, Inc.*, No. 08-80465, DE 58, First Am. Compl. ¶ 566 (filed Mar. 1, 2010).

[55] *Does 1-11 v. Chiquita Brands Int'l, Inc.*, No. 08-80421, DE 63, First Am. Compl. ¶¶ 30–31 (filed Feb. 26, 2010).

- The AUC, using tactics of terror on civilians living in and around areas that had been under FARC control, assumed that these innocents were sympathetic to the FARC and systematically murdered thousands of them. . . . The AUC killed thousands of civilians in Uraba and Magdalena. Their war strategy involved targeting civilians in towns near guerrilla groups in order to intimidate the population from providing any support to the guerrillas.[56]

- Plaintiffs' decedents were not killed because they or anyone related to them had taken part in the hostilities in any way. Rather, they were victims of the campaign conducted against civilians by the AUC in an effort to discourage support of the FARC. The AUC, using tactics of terror on civilians living in and around areas that had been under FARC control, assumed that these innocents were sympathetic to the FARC and systematically murdered thousands of them.[57]

- The entire method of operation of the AUC was to direct their violence in a targeted way upon the civilian residents of towns where the FARC had a foothold. According to the U.S. Department of State, "paramilitary groups took the offensive against the guerillas, often perpetrating targeted killings, massacres, and forced displacements of the guerrillas' perceived or alleged civilian support base . . . . Throughout the country, paramilitary groups killed, tortured and threatened civilians suspected of sympathizing with guerillas in an orchestrated campaign to terrorize them into fleeing their homes, thereby depriving guerillas of civilian support."[58]

- At 1:00 AM on May 17, 2001, approximately 50 heavily armed paramilitaries, some wearing AUC uniforms, surrounded Pablo Perez 1's home, broke down the door, and proceeded to savagely beat members of his family. The paramilitaries attempted to rape Juana Perez 1, the petitioner, but were ordered to stop by an unidentified paramilitary leader. After an hour had passed, the paramilitaries took Pablo Perez 1 prisoner, taking him away with at least 10 other victims they had captured that night elsewhere. Pablo Perez 1 was never found.[59]

- The paramilitaries broke down the door to the home, found Pablo Perez 50 and seized him, tied him up and forced him to accompany them at gunpoint, beating him as they kidnaped him. Pablo Perez 50's corpse was found the following morning with signs of torture and two gunshots, one to the head and one to the body. In a certificate issued on November 22, 1999, Elvis Emilio Redondo Lopez, the Cienaga Municipal Representative, confirmed that Pablo

---

[56] *Does 1-144 v. Chiquita Brands Int'l, Inc.*, No. 08-80465, DE 58, First Am. Compl. ¶¶ 567–68 (filed Mar. 1, 2010).

[57] *Id.* ¶ 503.

[58] *Id.* ¶¶ 570–71 (internal quotation marks omitted).

[59] *Id.* ¶ 196.

Perez 50 was murdered in a massacre carried out in the context of the internal armed conflict.[60]

•   In October 1997, members of the Army's 4th Brigade established a perimeter around the village of El Aro, in Antioquia.  While the Army prevented entry and escape, members of the AUC entered the village and over a period of five days executed at least eleven people, burned most of the houses, looted stores, and destroyed pipes that fed the homes potable water.  Upon leaving the village, the paramilitaries forcibly disappeared over thirty more people and compelled most of the residents to flee.[61]

The allegations include the killing, torture, or disappearances of thousands of specific individuals, which establishes that the action was "widespread."  The allegations also discuss the planning and organization that occurred before and during the attacks, which establishes that the action was "systematic."  Additionally, the complaints provide detailed facts regarding the AUC's attacks, including the manner of attack, specific perpetrators, specific victims, locations, motivations underlying the attacks, and in many cases specific dates.  Such detailed allegations, tying the victims' injuries to the AUC's attacks, are not conclusory.

These allegations are distinguishable from *Aldana*, upon which Chiquita relies, where the Eleventh Circuit affirmed the district court's dismissal of the plaintiffs' crimes-against-humanity claims.  There, the Eleventh Circuit first reasoned that "such crimes were not expressly plead in the complaint."  416 F.3d at 1247.  Second, the court found that the requirement of a "widespread or systematic attack against civilian populations" was not alleged "in the complaint, but instead in Plaintiffs' appellate brief."  *Id.* (internal quotation marks omitted).  And third, the court found that the plaintiffs' "reliance—found exclusively in the appellate brief—on alleged

---

[60] *Id.* ¶¶ 296–97.

[61] *Does 1-11 v. Chiquita Brands Int'l, Inc.*, No. 08-80421, DE 63, First Am. Compl. ¶ 63 (filed Feb. 26, 2010).

55

systematic and widespread efforts against organized labor in Guatemala is too tenuous." *Id.* Here, by contrast, Plaintiffs' complaints provide detailed allegations of crimes against humanity that are sufficient to plead this cause of action. Moreover, Plaintiffs do not merely plead widespread and systematic "efforts" against a general class, such as "organized labor," but instead specifically allege widespread and systematic killing, torture, and disappearances against Plaintiffs' relatives. The three factors upon which *Aldana* relied are thus not present here.

Last, the Court notes that there is nothing inconsistent with Plaintiffs' allegations that, on the one hand, the AUC tortured and killed as part of their military campaign against the FARC and, on the other hand, intentionally attacked non-combatant civilians. The complaints allege that the AUC attacked civilians as a means of depriving the FARC of a civilian support base.[62] The civilians were targeted *as civilians*, not as participants in the civil war.

The Court finds that Plaintiffs have alleged detailed facts supporting the requisite elements of their crimes-against-humanity claims. As such, they have sufficiently alleged a primary crimes-against-humanity violation by the AUC.

---

[62] *See, e.g., Does 1-11 v. Chiquita Brands Int'l, Inc.*, No. 08-80421, DE 63, First Am. Compl. ¶¶ 30–31 (filed Feb. 26, 2010) ("[T]o undermine communities' and individuals' support for the guerillas, the AUC . . . adopted a strategy of terrorism, routinely engaging in death threats, extrajudicial killings, attacks on civilian populations, torture, rape, kidnaping, forced disappearances, and looting. . . . The AUC claimed that it was justified in targeting civilians with no known ties to guerrillas because guerrilla groups required the logistical support of local towns in order to operate in the region. Carlos Castano, the AUC leader, described this strategy as 'quitarle agua al pez' (draining the water to catch the fish), as the AUC sought to intimidate and coerce civilians to prevent them from providing support to guerrillas.").

2.      *Chiquita's Secondary Liability for the AUC's Offenses*

While the complaints sufficiently allege international-law violations against the AUC,

Chiquita's liability must rest on a well-pled theory of indirect liability.[63]  The Court thus turns to

whether the complaints adequately plead Chiquita's secondary liability.  The Court must (1)

determine whether Plaintiffs' various secondary-liability theories are recognized in the ATS

context, and, if so, (2) determine the appropriate standards for these theories, and (3) assess

whether the complaints allege sufficient facts to support these indirect-liability theories.

a.      *Secondary Liability Under the Law of Nations*

Chiquita first argues that Plaintiffs' indirect-liability theories are not recognized under

international law.  Plaintiffs' first theory for Chiquita's liability is that Chiquita's support to the

AUC renders it liable for aiding and abetting the AUC's unlawful acts.  While acknowledging

that the Eleventh Circuit recognized aiding and abetting liability under the ATS in *Cabello v.*

*Fernandez-Larios*, 402 F.3d 1148 (11th Cir. 2005) and *Aldana v. Del Monte Fresh Produce, N.A.*,

416 F.3d 1242 (11th Cir. 2005), Chiquita argues that these precedents do not support the broad

aiding and abetting theory advanced by Plaintiffs here.  The Eleventh Circuit, Chiquita argues,

recognizes aiding and abetting liability under the ATS only for *specific* assistance in the

commission of a *specific* tort.  Chiquita contends that here, by contrast, Plaintiffs take the

position that Chiquita's payments to the AUC for "any reason" render it liable for "any violent

act committed by any member of the AUC . . . for any reason."  First Mot. at 40 (DE 93).  The

_____

[63] Aside from the claim for providing material support to a terrorist organization, there are
no allegations that Chiquita directly engaged in the offenses alleged in the complaints.

Court disagrees with Chiquita's readings of both Eleventh Circuit precedent and Plaintiffs' allegations.

First, the Court does not interpret the Eleventh Circuit case law on this issue as imposing Chiquita's proposed limitation on aiding and abetting liability.  In *Cabello*, the plaintiffs alleged that the defendant, a Chilean military officer in a unit responsible for killing political opponents, assisted in killing the plaintiffs' relative, Mr. Cabello.  402 F.3d at 1152.  The complaint alleged that the defendant and five other officers arrived at a military garrison and instructed local officers to provide them with prisoners' files from which the squad selected thirteen prisoners, including Mr. Cabello, for execution.  *Id.*  The complaint alleged that the squad then drove the prisoners ten minutes outside the garrison, ordered them out of the truck, and executed them.  *Id.* Based on the defendant's involvement in locating and selecting the prisoners and his presence at the executions, the plaintiffs brought claims against him under the ATS and TVPA.  With respect to the plaintiffs' indirect theories of liability, the court held that "by their terms, the ATCA and TVPA are not limited to claims of direct liability.  The courts that have addressed the issue have held that the ATCA reaches conspiracies and accomplice liability."  *Id.* at 1157.

In *Aldana*, the plaintiffs, Guatemalan labor unionists, alleged that the defendant, an American banana company operating in Guatemala, hired a private security force to quell union activity.  416 F.3d at 1245.  The plaintiffs alleged that the defendant's agents met with the security force to plan "violent action against the Plaintiffs and other [union] leaders."  *Id.*  The security force arrived at the union's headquarters, held the plaintiffs hostage, and threatened to kill them.  *Id.*  The plaintiffs were then taken to a radio station to announce that their labor dispute was over and that they were resigning.  *Id.*  The plaintiffs were released after eight hours

and told that they would be killed if they did not leave Guatemala. *Id.* Based on these allegations, the plaintiffs sued the American company for violations of the ATS and TVPA under aiding and abetting and conspiracy theories of liability. In holding that the complaint adequately alleged torture claims based on secondary liability, the court reaffirmed the holding in *Cabello* that the "Alien Tort Act 'reaches conspiracies and accomplice liability.'" *Id.* at 1248 (quoting *Cabello* 402 F.3d at 1157).

     *Cabello* and *Aldana* thus establish that aiding and abetting, or accomplice liability, is a recognized theory of indirect liability under the ATS. While these cases involve assistance by the defendants that is arguably more direct than that alleged here—for instance, the defendant in *Cabello* was personally present during the alleged unlawful acts—the Eleventh Circuit's holding in each case was not based on this direct assistance. Rather, *Aldana* and *Cabello* broadly held that conspiracy and accomplice liability are recognized theories for secondary liability under the ATS. Neither the specific holdings nor the underlying reasoning of these decisions discussed Chiquita's proposed specific-versus-general assistance distinction. Chiquita's argument seems to go more towards whether Plaintiffs have sufficiently pled facts supporting indirect liability, a subject addressed below, and not whether such a theory is recognized under the ATS.

     In any event, as discussed in detail below, Plaintiffs' amended allegations are not as far-reaching as Chiquita's original characterization. That is, Plaintiffs' amended allegations are based on payments made for *specific* purposes that render it liable only for *specific* violent acts committed for *specific* reasons. Thus, even accepting Chiquita's position that *Cabello* and *Aldana* recognize only indirect liability for specific assistance in the commission of a specific tort, Plaintiffs' amended allegations meet that standard.

Chiquita also suggests that the continuing viability of aiding and abetting claims under the ATS is questionable after *Sosa*. *See* First Mot. at 40 n.34 (DE 93) (citing, for example, *Doe I v. Exxon Mobil Corp.*, 393 F. Supp. 2d 20, 24 (D.D.C. 2005), which rejected aiding and abetting claims based on *Sosa*'s admonitions that "Congress should be deferred to with respect to innovative interpretations of the Alien Tort Statute" and that courts should be "mindful of the collateral consequences and possible foreign relations repercussions that would result from allowing courts in this country to hear civil suits for the aiding and abetting of violations of international norms across the globe" (internal quotations marks omitted)).  Although *Cabello* and *Aldana* were decided after *Sosa*, Chiquita argues that these decisions failed to consider *Sosa* in their discussion of aiding and abetting liability, relying instead on pre-*Sosa* case law. Accordingly, Chiquita contends that the precedential value of these decisions is questionable.

The Court finds this argument unavailing.  While *Cabello* and *Aldana* did not cite *Sosa* in their indirect-liability discussions, the Eleventh Circuit was presumably aware of the Supreme Court's leading ATS decision and presumably reached these holdings in accordance with *Sosa*'s mandates.  Indeed, the court cited *Sosa* throughout the *Aldana* opinion.  Furthermore, more recent decisions from the Eleventh Circuit continue to hold that aiding and abetting is a recognized theory of indirect liability under the ATS.  *See Sinaltrainal*, 578 F.3d at 1258 n.5 ("The ATS permits conspiracy and accomplice liability"); *Romero*, 552 F.3d at 1315 ("[T]he law of this Circuit permits a plaintiff to plead a theory of aiding and abetting liability under the Alien Tort Statute"); *see also Talisman*, 582 F.3d at 259 (recognizing aiding and abetting liability for ATS claims); *Talisman*, 453 F. Supp. 2d at 668 ("Aiding and abetting liability is a specifically defined norm of international character that is properly applied as the law of nations for purposes

60

of the ATS.").  This Court cannot second guess the analyses underlying the Eleventh Circuit's

binding precedent on this point.  Under the law of this Circuit, aiding and abetting liability

survives the limitations that *Sosa* placed upon ATS claims.

Plaintiffs' next theory of indirect liability is conspiracy.  Chiquita argues that there is no

universally accepted norm of conspiracy liability under international law and, consequently,

Plaintiffs' conspiracy-liability claims are not cognizable under the ATS.  As *Sinaltrainal*,

*Aldana*, and *Cabello* make clear, however, in the Eleventh Circuit conspiracy is a recognized

theory of indirect liability for ATS claims.  *See Sinaltrainal*, 578 F.3d at 1258 n.5 ("The ATS

permits conspiracy and accomplice liability"); *Aldana*, 416 F.3d at 1248 ("The Alien Tort Act

reaches conspiracies") (internal quotation marks omitted); *Cabello*, 402 F.3d at 1157 (same).

Chiquita contends, however, that after *Cabello* and *Aldana*, the Supreme Court, in

*Hamdan v. Rumsfeld*, 548 U.S. 557 (2006), explained that under international law, conspiracy

liability is limited to conspiracies to commit genocide or wage aggressive war, categories that are

not applicable here.  *See Hamdan*, 548 U.S. at 610 ("[I]nternational sources confirm that the

crime charged here [conspiracy] is not a recognized violation of the law of war. . . . And the only

'conspiracy' crimes that have been recognized by international war crimes tribunals . . . are

conspiracy to commit genocide and common plan to wage aggressive war . . . .").  This Court

finds that the Supreme Court's statement in *Hamdan* is not applicable here.

First, the plurality in *Hamdan* addressed conspiracy as an inchoate offense, not as a theory

of accessorial liability for the commission of *other* recognized offenses.  *See id.* at 566–67

(explaining that Hamdan was charged with one count for "the crime of conspiracy").

Accordingly, *Hamdan*'s statement limiting conspiracy (as an inchoate crime) to genocide and

waging aggressive war is inapplicable here where Plaintiffs' assert conspiracy as a theory of indirect liability.

Second, the *Hamdan* plurality's statement limiting conspiracy to two categories was based on the "law of war," not the law of nations.  *See id.* ("[I]nternational sources confirm that the crime charged here [conspiracy] is not a recognized violation of the law of war.").  The law of nations is a broader body of law.  *See, e.g.*, *Application of Yamashita*, 327 U.S. 1, 7 (1946) (referring to "the Law of Nations, of which the law of war is a part"); *al-Marri v. Pucciarelli*, 534 F.3d 213, 315 (4th Cir. 2008) (Wilkinson, J., concurring in part and dissenting in part) ("The law of war represents a distinct canon of the Law of Nations.") (internal quotation marks omitted); *Khulumani*, 504 F.3d at 270 n.6 (Katzmann, J., concurring) ("The law of war has long been recognized as a subset of international law.").  Thus, in limiting criminal conspiracy liability under the law of a war, *Hamdan* did not speak to conspiracy liability under the broader law of nations.

Last, the Eleventh Circuit has recognized, in decisions both before and after *Hamdan*, that conspiracy as a theory of accessorial liability under the ATS applies to claims beyond genocide and a common plan to wage aggressive war.  *See Sinaltrainal*, 578 F.3d at 1258 & n.5 (holding that a conspiracy theory of indirect liability is applicable to torture claims); *Aldana*, 416 F.3d at 1247-48 (same); *Cabello*, 402 F.3d at 1151, 1157 (holding that a conspiracy theory of indirect liability is applicable to claims for extrajudicial killing, torture, and crimes against humanity).  This Court thus holds that under the law of this Circuit, conspiracy is a recognized theory of secondary liability under the ATS.

Plaintiffs also assert an agency theory for Chiquita's secondary liability, relying on domestic agency-law principles.  Chiquita argues that agency liability is not recognized under international law.  Neither side provides any authority directly recognizing or rejecting agency liability under international law.  This alone suggests that there is no well-established international consensus for imposing secondary liability on entities whose agents violate international law, a fact that balances against recognizing agency liability under the ATS.  *See, e.g.*, *Talisman*, 582 F.3d at 259.  However, because, as discussed below, the Court finds that Plaintiffs fail to allege facts supporting their proposed agency theory, the Court does not determine whether customary international law recognizes agency as a form of secondary liability.

### b.       Secondary-Liability Standards

The Court turns now to consider the appropriate standards for aiding and abetting and conspiracy liability.  The parties primarily dispute the *mens rea* requirement for indirect liability and from which body of law to derive that requirement.  Plaintiffs argue that federal common-law standards apply for aiding and abetting and conspiracy liability under the ATS.  Plaintiffs point to *Cabello*, in which the Eleventh Circuit recognized conspiracy liability under the ATS.  *Cabello*'s conspiracy ruling, in turn, relied on *Halberstam v. Welch*, 705 F.2d 472, 481 (D.C. Cir. 1983), a decision setting forth the conspiracy standard in the domestic, federal common-law context.  *See Cabello*, 402 F.3d at 1159 ("For the jury to find Fernandez indirectly liable by means of conspiracy, the Cabello survivors need to prove . . . (1) two or more persons agreed to commit a wrongful act, (2) Fernandez joined the conspiracy knowing of at least one of the goals of the conspiracy and intending to help accomplish it, and (3) one or more of the violations was

committed by someone who was a member of the conspiracy and acted in furtherance of the conspiracy.") (citing *Halberstam*, 705 F.2d at 487); *see also Halberstam*, 705 F.2d at 487 (explaining, in a domestic civil action, the federal common-law standard for conspiracy). Plaintiffs contend that "[i]n adopting the federal common law of conspiracy, the Eleventh Circuit necessarily found that federal common law governs complicity liability," and there "is no basis to conclude the court would not also adopt the federal common law of aiding and abetting."  Pls.' Second Resp. at 8 (DE 321).  Plaintiffs conclude that the applicable standard from *Cabello* requires only knowing substantial assistance to the primary tortfeasor.

Chiquita argues that the standards for indirect liability under the ATS must be drawn from international, not federal, law.  Chiquita relies on the Second Circuit's decision in *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244 (2d Cir. 2009), which held that *Sosa* directs courts to international law to determine standards for secondary liability.  *Id.* at 259 ("*Sosa* and our precedents send us to international law to find the standard for accessorial liability.").  *Talisman* rejected the plaintiffs' argument "that aiding and abetting liability is a matter ordinarily left to the forum country," explaining that "such an expansion would violate *Sosa*'s command that we limit liability to 'violations of . . . international law . . . with . . . definite content and acceptance among civilized nations [equivalent to] the historical paradigms familiar when § 1350 was enacted.'  Recognition of secondary liability is no less significant a decision than whether to recognize a whole new tort in the first place."  *Id.* (quoting *Sosa*, 542 U.S. at 732) (alterations in original).  The court then held that under customary international law, "the *mens rea* standard for aiding and abetting liability in ATS actions is purpose rather than knowledge alone."  *Id.*; *see also id.* ("Even if there is a sufficient international consensus for

64

imposing liability on individuals who *purposefully* aid and abet a violation of international law, no such consensus exists for imposing liability on individuals who *knowingly* (but not purposefully) aid and abet a violation of international law.") (emphasis in original) (citations omitted). *Talisman* thus approved the two-part test set forth in a concurring opinion in *Khulumani v. Barclay Nat'l Bank Ltd.*, 504 F.3d 254 (2d Cir. 2007): a defendant may be liable for aiding and abetting an international-law violation of another when "the defendant (1) provides practical assistance to the principal which has a substantial effect on the perpetration of the crime, and (2) does so with the purpose of facilitating the commission of that crime." *Talisman*, 582 F.3d at 258 (internal quotation marks omitted). The court similarly held that a conspiracy theory of secondary liability "require[s] the same proof of *mens rea* as . . . claims for aiding and abetting." *Id.* at 260. Thus, under *Talisman*, aiding and abetting and conspiracy theories of indirect liability for ATS claims are governed by international law's purpose standard. It is this purpose standard that Chiquita argues applies here.

First, this Court agrees with *Talisman*, as well as many other courts, that under *Sosa* the appropriate standard for secondary liability under the ATS should be derived from international law. *See Talisman*, 582 F.3d at 259; *see also Sosa*, 542 U.S. at 732 & n.20 (observing that "whether a norm is sufficiently definite to support a cause of action" under the ATS involves a "related consideration [of] whether international law extends the scope of liability for a violation of a given norm to the perpetrator being sued"); *Khulumani*, 504 F.3d at 268–69 (Katzmann, J., concurring) ("The district court's conclusion that its jurisdiction under the ATCA should depend on whether international law specifically recognizes liability for aiding and abetting violations of the law of nations is consistent with our prior case law. We have repeatedly emphasized that the

65

scope of the ATCA's jurisdictional grant should be determined by reference to international law."); *id.* at 330–31 (Korman, J., concurring in part and dissenting in part) (agreeing with Judge Katzmann's conclusion that the standard for aiding and abetting liability under the ATS must derive from international law); *Abecassis*, 704 F. Supp. 2d at 654 ("*Sosa* establishes international law as the touchstone of the ATS analysis. . . . There is no reason to believe that international law determines whether private—as well as state—actors can be sued but not whether secondary—as well as primary—actors can be sued."); *Aziz v. Republic of Iraq*, No. 09-cv-00869, DE 51, Slip op. at 11 (D. Md. June 9, 2010) (adopting *Talisman*'s international-law standard for aiding and abetting liability); *Drummond II*, No. 09-1041, Slip op. at 20-21 & n.21 (applying the international-law standard for aiding and abetting liability, reasoning that "*Sosa* supports the broader principle that the scope of liability for ATS violations should be derived from international law"); *Doe v. Drummond Co.*, No. 09-1041, Slip op. at 16, DE 37 (N.D. Ala. Nov. 9, 2009) ("*Drummond I*") ("[T]he international law standard applies to aiding and abetting claims brought under the ATS.").[64]

---

[64] Although *Cabello*'s discussion of the standard for conspiracy liability cited a case applying the federal-law standard, the appropriate body of law from which that standard must derive (federal versus international) was not considered, as that was not an issue on appeal. The issues on appeal were: (1) whether the claims were barred by the statute of limitations; (2) whether the TVPA or ATS provide private causes of action; (3) whether the defendant was liable under the TVPA or ATS where he did not have any command responsibility and did not personally participate in the alleged offenses; and (4) whether the trial court erred in certain evidentiary rulings. *Cabello*, 402 F.3d at 1151–52. Because the Eleventh Circuit has not addressed the issue of which law to apply to indirect-liability standards under the ATS, this Court will adopt the Second Circuit's approach, which it reached after thoroughly analyzing this precise issue. This Court finds the Second Circuit's analysis persuasive and, importantly, as discussed below, the Second Circuit's approach is *not inconsistent* with the standard employed by the Eleventh Circuit in *Cabello*.

In any event, there is no inconsistency between the standard set forth in *Cabello*, urged by

Plaintiffs, and *Talisman*'s standard, urged by Chiquita. That is, *Cabello* and *Talisman* both use a

*purpose* standard for secondary liability. While *Cabello* does not use the term "purpose," its

standard requires that the defendant "join[] the conspiracy knowing of at least one of the goals of

the conspiracy and *intending to help accomplish it*." 402 F.3d at 1159 (emphasis added). The

Court finds that this intent requirement is essentially the same as *Talisman*'s purpose

requirement. Contrary to Plaintiffs' position, *Cabello* requires more than mere knowledge of the

principal's unlawful goals. *Cabello*, like *Talisman*, requires that the defendant act with the

*intention* of accomplishing the offense. Indeed, the court in *Talisman* specifically noted that its

purpose standard was effectively the same as *Cabello*'s intent standard. *See Talisman*, 582 F.3d

at 260 n.11 ("[P]laintiffs would fare no better if we adopted their preferred definition of

conspiracy, because that definition (derived from domestic law) also requires proof 'that . . . [the

defendant] joined the conspiracy *knowing of at least one of the goals of the conspiracy and

intending to help accomplish it*.') (quoting *Cabello*, 402 F.3d at 1159) (emphasis in original).

In sum, the Court holds that in order for Plaintiffs to allege that Chiquita is secondarily

liable for the AUC's violations of international law, they must allege that Chiquita assisted or

conspired with the AUC with the purpose or intent to facilitate the commission of the specific

offenses alleged. Thus, to plead aiding and abetting liability, Plaintiffs must allege that (1) the

AUC committed an international-law violation, (2) Chiquita acted with the purpose or intent to

assist in that violation, and (3) Chiquita's assistance substantially contributed to the AUC's

67

commission of the violation.[65]  *See Talisman*, 582 F.3d at 258; *Khulumani*, 504 F.3d at 277

(Katzmann, J., concurring); *Doe v. Nestle, S.A.*, 748 F. Supp. 2d 1057, 1087–88 (C.D. Cal.

2010); *Talisman*, 453 F. Supp. 2d at 668;  *Drummond II*, No. 09-1041, DE 43, Slip op. at 20–21.

To plead conspiracy liability, Plaintiffs must allege that (1) Chiquita and the AUC agreed to

commit a recognized international-law violation, (2) Chiquita joined the agreement with the

purpose or intent to facilitate the commission of the violation, and (3) the AUC committed the

violation.  *Cabello*, 402 F.3d at 1159; *Drummond II*, No. 09-1041, DE 43, Slip op. at 29.

Having determined the proper standards to apply to Plaintiffs' secondary-liability claims,

the Court now considers whether Plaintiffs have alleged sufficient facts to support the elements

of their remaining ATS claims.

### c.    Aiding and Abetting Liability

With respect to the first element of aiding and abetting liability, as discussed above

Plaintiffs have sufficiently alleged that the AUC committed primary international-law violations

for torture, extrajudicial killing, war crimes, and crimes against humanity.

With respect to the second element, the *mens rea*, Chiquita attacks the sufficiency of

Plaintiffs' allegations of its intent to assist the AUC.  Chiquita contends that Plaintiffs' do not

---

[65] The district courts in *Talisman* and *Drummond II* adopted this same purpose standard, but included the additional requirement that "the defendant knew of the specific violation." Because this Court believes that acting with purpose to assist in the specific violation encompasses knowledge of that violation, the Court does not include a knowledge element in the aiding and abetting standard employed here.  Moreover, the purpose standard recognized by the Second Circuit in *Talisman* and in Judge Katzmann's opinion in *Khulumani* does not incorporate a knowledge element.  *See Talisman*, 582 F.3d at 258 ("'[A] defendant may be held liable under international law for aiding and abetting the violation of that law by another when the defendant (1) provides practical assistance to the principal which has a substantial effect on the perpetration of the crime, and (2) does so with the purpose of facilitating the commission of that crime.'") (quoting *Khulumani*, 504 F.3d at 277 (Katzmann, J., concurring)).

allege that it acted with the specific purpose to facilitate the AUC's commission of torture, extrajudicial killing, war crimes, and crimes against humanity.  To allege the *mens rea* element for aiding and abetting liability, Plaintiffs need not allege that Chiquita specifically intended that the AUC torture or kill the specific individuals alleged in the complaint, i.e., Plaintiffs' relatives specifically.  *See Drummond II*, No. 09-1041, DE 43, Slip op. at 22 n.24 ("The court can find no authority for Defendants' contention that Drummond must have known of specific *identities* of those murdered, and have ordered the deaths of those specific individuals in order to potentially be held liable for aiding and abetting extrajudicial killings. . . . Without such authority, this court must conclude that, at this time, Plaintiffs have done enough to sufficiently allege aiding and abetting based upon their factual contention that Drummond purposefully participated in murders along its rail lines.") (emphasis in original).  But Plaintiffs must allege more than the mere fact that Chiquita had knowledge that the AUC would commit such offenses.  Plaintiffs must allege that Chiquita paid the AUC with the specific purpose that the AUC commit the international-law offenses alleged in the complaints.  This requires that the complaints allege that Chiquita intended for the AUC to torture and kill civilians in Colombia's banana-growing regions, which is the conduct that allegedly harmed or killed Plaintiffs' relatives.

The Court finds that, with one exception,[66] Plaintiffs' detailed and voluminous factual allegations meet this demanding pleading standard.  For instance, the complaints allege:

- Chiquita supported terrorist groups in Colombia by paying them and assisting them to obtain arms and smuggle drugs.  Chiquita knew that these groups used illegal violence against civilians and intended that they employ this strategy to quell social and labor unrest in the Northeast Colombian region of Uraba and safeguard the stability and profitability of Chiquita's enterprises in Colombia.[67]

- From on or about September 10, 2001, through on or about February 4, 2004, Chiquita made 50 payments to the AUC totaling over $825,000. . . . Chiquita's acts of assistance to the AUC were made with the intent that the AUC continue carrying out acts of killing, torture, and other illegal violence against the civilian population of Uraba in accordance with the AUC's strategy for suppressing the FARC and deterring its sympathizers.  In exchange for its financial support to the AUC, Chiquita was able to operate in an environment in which labor and community opposition was suppressed.  Chiquita's assistance was not given out of duress; rather it was part and parcel of the company's proactive strategy to increase profitability and suppress labor unrest by exterminating the FARC in the Uraba region.[68]

- The arrangement between Chiquita and the AUC was not one of duress; in fact, it was the banana companies that approached the AUC to initiate their relationship.  Mario Iguaran, the former Attorney-General of Colombia, has charged that there was a criminal relationship

---

[66] The Carrizosa Plaintiffs' First Amended Complaint, No. 07-60821, DE 84, (filed Feb. 26, 2010) ("FAC") fails to allege sufficient facts regarding Chiquita's purpose for assisting the AUC.  The complaint's only allegations relating to Chiquita's *mens rea* refer to its knowledge, not purpose, *e.g.*, FAC ¶ 88, or are entirely conclusory, *e.g.*, FAC ¶¶ 93, 96.  Accordingly, the Carrizosa Plaintiffs' complaint fails to plead that Chiquita is secondarily liable for the AUC's international-law violations, and therefore fails to plead an ATS claim against Chiquita.

Because this ruling based on a pleading deficiency, the Court will permit the Carrizosa Plaintiffs leave to amend to allege sufficient facts, if they can do so in good faith, supporting their claim that Chiquita is secondarily liable for the AUC's violations of international law.  The Carrizosa Plaintiffs may file a second amended complaint, if they choose, within thirty (30) days from the date of entry of this order.

[67] *Does 1-11 v. Chiquita Brands Int'l, Inc.*, No. 08-80421, DE 63, First Am. Compl. ¶ 21 (filed Feb. 26, 2010).

[68] *Id.* ¶¶ 107, 111.

between Chiquita and the AUC in which Chiquita supplied money and arms to the AUC in return for the "bloody pacification of Uraba."[69]

- As part of its deal with Chiquita, the AUC provided protection services to banana plantations, dealing out reprisals against real or suspected thieves, as well as against social undesirables, suspected guerrilla sympathizers or supporters, and anyone who was suspected of opposing the AUC's activities or social program. By arming and financing the AUC, Chiquita intended to benefit from the AUC's systematic killings of civilians. After its agreement with Chiquita, the AUC understood that one goal of its campaign of terror was to prevent work stoppages in the banana plantations. . . . For example, one individual who worked in Chiquita's offices at a plantation in Uraba was present when paramilitaries arrived at the plantation and summarily executed a banana worker who had been seen as a troublemaker because his slow work held up the production line.[70]

- Chiquita joined the conspiracy knowing that the AUC intended to fight the FARC by means of illegal violence against particular classes of civilians, and intending to help accomplish that goal. . . . Chiquita sought a meeting with the paramilitaries in late 1996 or early 1997 and concluded an agreement with the AUC whereby Chiquita paid the paramilitaries for their services supporting the banana plantations. These services consisted of threatening or killing civilians, including workers who attempted to strike, union leaders, alleged criminals, and small banana farmers who refused to sell or abandon their land.[71]

- Chiquita intended that the AUC continue carrying out acts of killing, torture, and other illegal violence against the civilian population of Uraba in accordance with the AUC's strategy for suppressing the FARC and deterring its sympathizers. In providing the AUC with money and assistance with their arms and drug trafficking, Defendants intended that the AUC obtain arms and continue their practice of killing civilians, especially those civilians who were perceived as threats to the profitability of the banana industry. The leadership of the AUC did, in fact, carry out killings of union members, social organizers and other undesirable groups, as well as civilians with no known or suspected ties to the guerrillas, knowing that Chiquita expected and intended that they do so using the arms and money provided by Chiquita.[72]

- Chiquita authorized the AUC's strategy of killing, torture, and other illegal violence against civilians in Uraba. The AUC's agreement with Chiquita involved forcing people to work

---

[69] *Id.* ¶ 114.

[70] *Id.* ¶¶ 115–16.

[71] *Id.* ¶ 124.

[72] *Id.* ¶¶ 129–30.

using threats and illegal violence, as well as the quelling of labor and social unrest through the systematic terrorization of the population of Uraba.[73]

• In late 1996 or early 1997, the Banadex general manager, and another Chiquita employee from Colombia, participated in a meeting of banana growers to discuss security issues arising from leftist guerilla activity in the Santa Marta and Uraba regions. The meeting was also attended by Carlos Castano, the leader of the AUC. . . . Castano asked Chiquita to support the AUC in its War effort against the leftist guerilas in two ways. First, Castano asked Chiquita to stop making payments to the leftist guerilas. Second, Castano asked Chiquita to begin paying the AUC. Castano informed Chiquita's executives that the AUC would use money it received from Chiquita to finance Paramilitary Terrorism Tactics that would be used to drive the leftist guerilas out of the Santa Marta and Uraba banana-growing regions; protect the company, its executives, employees, and infrastructure from future attacks by leftist guerilas; and create a business and work environment that would enable Chiquita's Colombian banana-growing operations to thrive. . . . Following the Castano Meeting, Chiquita knowingly and intentionally provided practical assistance and material support to enable the AUC to use Paramilitary Terrorism Tactics for the purpose of [1] driving leftist guerilas out of the Santa Marta and Uraba banana regions; [2] maintaining control over the banana-growing regions; and [3] creating an environment where the company's banana-growing operations could prosper. According to information developed by the Attorney General for the Republic of Colombia, the agreement between Chiquita and the AUC constituted a "criminal relationship" to bring about the "bloody pacification" of the banana-growing regions.[74]

• According to Mangones [an AUC leader in the banana-growing region], during the period of time Chiquita made payments to the AUC, the AUC killed many civilians in the Santa Marta region as part of what the AUC "had to do in order to win" the War against the leftist guerilas. Among those killed by the AUC were some individuals targeted for assassination by Chiquita executives in Colombia.[75]

• Chiquita made the payments to the AUC for the purpose of facilitating the AUC's ability to combat the leftist guerilas and employ the Paramilitary Terrorism Tactics for which it had become notorious, including massacres, extra-judicial killings, forced disappearances,

---

[73] *Id.* ¶ 132.

[74] *Montes v. Chiquita Brands Int'l, Inc.*, No. 10-60573, DE 1, Compl. ¶¶ 388, 391–92, 395–96 (filed Apr. 14, 2010).

[75] *Id.* ¶ 423.

torture, and forced displacements of civilians accused of being leftist guerillas and their sympathizers or supporters.[76]

• Chiquita also used the AUC to resolve complaints and problems with banana workers and labor unions. Among other things, when individual banana workers became "security problems," Chiquita notified the AUC, which responded to the company's instructions by executing the individual. According to AUC leaders, a large number of people were executed on Chiquita's instructions in the Santa Marta region.[77]

These detailed factual allegations are neither "vague" nor "conclusory." *Sinaltrainal*, 578 F.3d at 1268. This factual content—including allegations of specific instances of assistance, tied to a specific purpose to further the AUC's "killing, torture, and other illegal violence against the civilian population of Uraba"[78]—distinguishes this case from *Sinaltrainal*, where the Eleventh Circuit rejected as "vague and conclusory" the plaintiffs' allegations of conspiracy liability, which were "based on information and belief" and "fail[ed] to provide any factual content" supporting an inference of the defendant's liability for the alleged conspiracy. *Id.* The complaints here contain sufficient "'factual content that allows the court to draw the reasonable inference'" that Chiquita assisted the AUC with the intent that the AUC commit torture and killing in the banana-growing regions. *Id.* (quoting *Iqbal*, 129 S. Ct. at 1949).

The Court finds that these detailed allegations sufficiently plead that Chiquita provided assistance to the AUC for the purpose of furthering the AUC's torture and extrajudicial killing in the banana-growing regions. *See Drummond II*, No. 09-1041, DE 43, Slip op. at 23 ("Plaintiffs' allegations go beyond merely asserting that Drummond had 'knowledge that such attacks had

---

[76] *Id.* ¶ 424.

[77] *Id.* ¶ 448.

[78] *Does 1-11 v. Chiquita Brands Int'l, Inc.*, No. 08-80421, DE 63, First Am. Compl. ¶ 129 (filed Feb. 26, 2010).

occurred and would likely occur again.'  Now they have alleged that Drummond 'urged that such attacks be made.'  Accordingly, the [extrajudicial-killings claims] survive the pending motion to dismiss.") (quoting *Talisman*, 453 F. Supp. 2d at 676).[79]

Chiquita argues that even if the allegations suffice to plead torture and extrajudicial killing, Plaintiffs' claims for aiding and abetting war crimes and crimes against humanity require additional allegations of Chiquita's intent.  The Court agrees, but finds that the complaints sufficiently allege the required facts regarding Chiquita's purpose.  Because a primary claim for war crimes under the ATS requires that the alleged offenses be carried out in furtherance of a conflict, an aiding and abetting theory of war crimes must allege that Chiquita shared the principal's same purpose, i.e., to torture and kill as a means to defeat militarily its enemy.  Based on similar allegations, the court in *Drummond II* characterized this pleading element as requiring allegations that the defendant assisted the AUC for the purpose of advancing the AUC's interests over the FARC's in the conflict.  *Drummond II*, No. 09-1041, DE 43, Slip op. at 24.  That is, Plaintiffs must allege that the defendant "took a side" in the conflict.  *Id.* at 28.  The complaints adequately allege that Chiquita assisted the AUC not only with the intent that the AUC commit torture and killings, but for the specific purpose that the AUC commit such acts in the course of its efforts to defeat the FARC:

•    Chiquita's acts of assistance to the AUC were made with the intent that the AUC continue carrying out acts of killing, torture, and other illegal violence against the civilian population of Uraba in accordance with the AUC's strategy for suppressing the FARC and deterring its

---

[79] Although all Plaintiffs allege that their relatives were killed by the AUC (either expressly or implicitly by forced disappearances), only some allege torture. *Compare Does 1-144 v. Chiquita Brands Int'l, Inc.*, No. 08-cv-80465, DE 58, First Am. Compl. ¶ 304 (filed Mar. 1, 2010), *with id.* ¶¶ 220–21.  The Court's holding that Plaintiffs sufficiently allege torture claims applies only to those Plaintiffs who allege torture.

sympathizers. . . . Chiquita's assistance was not given out of duress; rather it was part and parcel of the company's proactive strategy to increase profitability and suppress labor unrest by exterminating the FARC in the Uraba region.[80]

• Chiquita intended that the AUC continue carrying out acts of killing, torture, and other illegal violence against the civilian population of Uraba in accordance with the AUC's strategy for suppressing the FARC and deterring its sympathizers.[81]

• Chiquita joined the conspiracy knowing that the AUC intended to fight the FARC by means of illegal violence against particular classes of civilians, and intending to help accomplish that goal.[82]

• The manager of Chiquita's Colombia operations, Charles Kaiser, worked with the AUC to set up the *convivir* system to get funds to the AUC to defeat the FARC.[83]

• At the Castano Meeting, and at all relevant times thereafter, Chiquita took sides with the AUC in the War against the leftist guerrillas and helped to finance and assist the AUC's efforts in that War.[84]

• Chiquita made the payments to the AUC for the purpose of facilitating the AUC's ability to combat the leftist guerrillas and employ the Paramilitary Terrorism Tactics for which it had become notorious, including massacres, extra-judicial killings, forced disappearances, torture, and forced displacements of civilians accused of being leftist guerrillas and their sympathizers or supporters.[85]

The fact that Chiquita may not have had a military objective of its own, or that it was

motivated by financial gain, is not dispositive. A "lack of motive does not negate intent to assist

---

[80] *Does 1-11 v. Chiquita Brands Int'l, Inc.*, No. 08-80421, DE 63, First Am. Compl. ¶ 111 (filed Feb. 26, 2010).

[81] *Id.* ¶ 129.

[82] *Id.* ¶ 124.

[83] *Does 1-144 v. Chiquita Brands Int'l, Inc.*, No. 08-cv-80465, DE 58, First Am. Compl. ¶ 534 (filed Mar. 1, 2010).

[84] *Montes v. Chiquita Brands Int'l, Inc.*, No. 10-60573, DE 1, Compl. ¶ 393 (filed Apr. 14, 2010).

[85] *Id.* ¶ 424.

the underlying acts that may be war crimes." *Drummond II*, No. 09-1041, DE 43, Slip op. at 25;

*see also In re XE Servs.*, 665 F. Supp. 2d at 587 ("Defendants would require that the conduct

allegedly constituting a war crime be committed in direct furtherance of a 'military objective.'

Under this standard, an ATS action would not lie where defendants were motivated by ideology

or the prospect of financial gain, as plaintiffs allege here.  Indeed under defendants' proposed

rule, it is arguable that nobody who receives a paycheck would ever be liable for war crimes.").

The complaints' allegations that Chiquita assisted the AUC with the intent that the AUC's

interests were furthered over the FARCs in the Colombian civil war sufficiently allege the *mens*

*rea* for aiding and abetting the AUC's war crimes, irrespective of the fact that the company may

have chosen the AUC's side for financial, as opposed to military, reasons.

　　　　　With respect to Chiquita's secondary liability for the AUC's crimes against humanity,

Plaintiffs must allege that Chiquita not only intended for the AUC to torture and kill, but that

Chiquita intended for the AUC to torture and kill *civilians*.  The complaints contain such

allegations:

• 　　Chiquita knew that these groups used illegal violence against civilians and intended that they employ this strategy to quell social and labor unrest in the Northeast Colombian region of Uraba and safeguard the stability and profitability of Chiquita's enterprises in Colombia.[86]

• 　　Chiquita intended that the AUC continue carrying out acts of killing, torture, and other illegal violence against the civilian population of Uraba in accordance with the AUC's strategy for suppressing the FARC and deterring its sympathizers.  In providing the AUC with money . . . Defendants intended that the AUC obtain arms and continue their practice of killing civilians, especially those civilians who were perceived as threats to the profitability of the banana industry.[87]

---

　　[86] *Does 1-11 v. Chiquita Brands Int'l, Inc.*, No. 08-80421, DE 63, First Am. Compl. ¶ 21 (filed Feb. 26, 2010).

　　[87] *Id.* ¶ 129.

In sum, the Court finds that Plaintiffs' allegations of Chiquita's intent to further the AUC's torture and killing of civilians in the banana-growing regions of Colombia adequately plead the *mens rea* for aiding and abetting liability, particularly in light of the fact that questions of intent are factual inquiries not appropriate for resolution on a motion to dismiss. *See, e.g.*, *Chanel, Inc. v. Italian Activewear of Fla. Inc.*, 931 F.2d 1472, 1476 (11th Cir. 1991) ("As a general rule, a party's state of mind (such as knowledge or intent) is a question of fact for the factfinder, to be determined after trial.").[88]

Turning to the third and final element of aiding and abetting liability, Chiquita argues that the allegations do not establish that it provided "substantial assistance" to the AUC. This argument is unavailing. "[M]erely 'supplying a violator of the law of nations with funds' as part of a commercial transaction, without more, cannot constitute aiding and abetting a violation of international law." *Nestle*, 748 F. Supp. 2d at 1099 (quoting *In re South African Apartheid Litig.*, 617 F. Supp. 2d at 269. However, if the defendant "engages in additional assistance beyond financing, or engages in financing that is gratuitous or unrelated to any commercial purpose, the *actus reus* element has been satisfied." *Id.* Here, Plaintiffs allege that Chiquita facilitated arms

---

[88] Chiquita's second motion argues briefly that Chiquita's intent cannot be inferred from any actions taken by Banadex, its wholly owned Colombian subsidiary. Second Mot. at 29 (DE 295). Chiquita relies on *Talisman*—a decision based on summary judgment, not the bare pleadings—which noted, without ruling on the issue, that the "attenuation between the plaintiffs' allegations and the named defendant . . . raises knotty issues concerning control, imputation, and veil piercing . . . ." 582 F.3d at 261. *Talisman* is inapposite. There, the defendant corporation owned an "indirect subsidiary" which in turn owned a 25% share in a third entity, which allegedly assisted the Sudanese government in ATS violations. *Id.* The remaining 75% of the third entity was further divided among three more corporate entities from China, Malaysia, and Sudan. *Id.* It was upon this chain of indirect and shared ownership that the Second Circuit noted concerns regarding attenuation between the allegations and the named defendant. Such attenuation is not a concern here, where Plaintiffs allege that Banadex is Chiquita's wholly owned subsidiary.

shipments for the AUC, including AK-47 rifles and ammunition used by AUC units carrying out attacks in Uraba.[89]  Morever, Plaintiffs allege that Chiquita paid the AUC nearly every month for approximately seven years.[90]  Plaintiffs allege that these payments totaled over $1.7 million.[91]  According to the allegations, these payments were not for ordinary commercial purposes, but were specifically intended to assist the AUC's military campaign against the FARC.[92]  The Court finds that, at the motion-to-dismiss stage, these allegations of arms shipments and large and numerous payments to the AUC for use in its war against the FARC adequately allege that

---

[89] *E.g.*, *Does 1-144 v. Chiquita Brands Int'l, Inc.*, No. 08-80465, DE 58, First Am. Compl. ¶¶ 478–86 (filed Mar. 1, 2010).

Chiquita contends that two public reports—one from the Organization of American States and another from the Colombian Prosecutor's Office—assign responsibility for this arms shipment to persons unrelated to Chiquita and therefore contradict these gun-shipment allegations.  Without addressing whether it is appropriate to consider these foreign documents in ruling on a motion to dismiss, the Court finds that the reports are not inconsistent with Plaintiffs' allegations that Chiquita was involved in facilitating arms shipments.  *See, e.g.*, Permanent Council, Organization of American States, *Report of the General Secretariat of the Organization of American States on the Diversion of Nicaraguan Arms to the United Defense Forces of Colombia*, at 17 (Jan. 29, 2003) (DE 93, Ex. B) ("What actually occurred at Turbo remains a mystery. . . . [A]ll that is known is that the guns somehow found their way to the AUC.  This would have meant that someone in Colombia . . . was ultimately responsible for the illegal importation of the arms onto Colombian soil.").  Moreover, the fact that investigations by a non-governmental organization and a foreign prosecutor may have attributed responsibility to others does not preclude Plaintiffs from proving in these U.S. court proceedings that Chiquita or Banadex also played a role.  Plaintiffs' allegations of gun-running are quite serious and they will need to prove these facts as this case proceeds, but at the motion-to-dismiss stage, the Court must accept these allegations as true.

[90] *E.g.*, *Montes v. Chiquita Brands Int'l, Inc.*, No. 10-60573, DE 1, Compl. ¶ 76 (filed Apr. 14, 2010).

[91] *Id.*

[92] *E.g.*, *Does 1-11 v. Chiquita Brands Int'l, Inc.*, No. 08-80421, DE 63, First Am. Compl. ¶¶ 107–11 (filed Feb. 26, 2010).

Chiquita substantially assisted the AUC's international-law violations committed in the course of its conflict with the FARC.

Plaintiffs' have thus sufficiently alleged aiding and abetting liability for their torture, extrajudicial-killing, war-crimes, and crimes-against-humanity ATS claims.

### d.     Conspiracy Liability

To plead conspiracy liability against Chiquita, Plaintiffs must allege that (1) Chiquita and the AUC agreed to commit a recognized international-law violation, (2) Chiquita joined the agreement with the purpose or intent to facilitate the commission of the violation, and (3) the AUC committed the violation. *Cabello*, 402 F.3d at 1159; *Drummond II*, No. 09-1041, DE 43, Slip op. at 29.  As discussed above, the third element is satisfied here because the AUC committed primary violations of international law.  With respect to the first element, Chiquita argues that Plaintiffs' factual allegations of an agreement are insufficient under *Iqbal* and *Sinaltrainal*'s pleading standards.  Specifically, Chiquita cites the district court opinion in *Sinaltrainal*, 474 F. Supp. 2d at 1293–96, for its position that allegations of names, dates, locations and terms of a conspiracy are required to be pled with particularity to survive a motion to dismiss.  Chiquita then contends that the complaints fail to plead facts supporting these conspiracy elements.  While the Eleventh Circuit's opinion in *Sinaltrainal* affirmed the district court's ruling that the plaintiffs' conspiracy allegations were insufficient, the Eleventh Circuit's decision was not premised on the lack of specificity in the allegations regarding these items.  Rather, the court's holding was based upon the failure of the "plaintiffs' attenuated chain of conspiracy . . . to nudge their claims across the line from conceivable to plausible." *Sinaltrainal*, 578 F.3d at 1268.  The court there found the conspiracy allegations insufficient because they

79

rested on "unwarranted deductions of fact," failed to "provide any factual content," were "vague and conclusory," and failed to define "the scope of the conspiracy and its participants." *Id.*; *see also In re Chiquita Brands Int'l*, 690 F. Supp. 1296, 1311 (S.D. Fla. 2010). The Eleventh Circuit's opinion does not analyze the elements of a civil conspiracy claim, and there is no indication that it was retreating from or adding to *Cabello*'s articulation of the elements required to plead conspiracy under the ATS. In any event, as discussed in detail above, the allegations here are not "vague and conclusory," but instead provide facts regarding dates, attendees, and discussions of meetings between Chiquita and the AUC, as well as facts regarding the terms of the agreements reached.[93] The Court thus finds that Plaintiffs sufficiently allege an agreement between Chiquita and the AUC to commit the ATS claims alleged in the complaints.

Next, with respect to the intent element, Chiquita argues that the complaints fail to allege that Chiquita joined the agreement with the purpose or intent to facilitate the AUC's offenses. A conspiracy claim under the ATS requires the same *mens rea* allegations as aiding and abetting claims, i.e., a showing of purpose or intent, not merely knowledge. *Talisman*, 582 F.3d at 260; *Cabello*, 402 F.3d at 1159. Because the same standards govern both conspiracy and aiding and abetting theories of liability, and because the allegations here sufficiently allege that Chiquita acted with the purpose and intent to aid and abet the AUC's international-law violations, the Court concludes that the complaints also sufficiently allege that Chiquita conspired with the AUC with the requisite purpose and intent. *See Drummond II*, No. 09-1041, DE 43, Slip op. at 30 ("[B]ecause the same standards control on the issue of intent in the conspiracy context as

---

[93] *See, e.g.*, *Does 1-11 v. Chiquita Brands Int'l, Inc.*, No. 08-80421, DE 63, First Am. Compl. ¶ 124 (filed Feb. 26, 2010); *Montes v. Chiquita Brands Int'l, Inc.*, No. 10-60573, DE 1, Compl. ¶¶ 388–96 (filed Apr. 14, 2010).

apply in the area of aiding and abetting, and because Defendants have argued only that they did not have the requisite intent to meet those particular standards, the court concludes that the [ATS claims] may proceed on theories of conspiracy.").  Plaintiffs have therefore adequately alleged conspiracy liability for their torture, extrajudicial-killing, war-crimes, and crimes-against-humanity ATS claims.

e.      *Agency Liability*

Plaintiffs also assert an agency theory for Chiquita's secondary liability.  The Court rejects this ground for indirect liability under the ATS.  First, Plaintiffs point to no authority recognizing agency liability under international law.[94]  This alone suggests that there is no well-established international consensus for imposing secondary liability on entities whose agents violate international law.  Without any authority recognizing this theory under international law, the Court cannot conclude that agency liability is sufficiently established or recognized to satisfy *Sosa*'s requirements for recognizing ATS liability.

---

[94] Plaintiffs' reliance on *Aldana* and *Cabello* is misplaced.  Neither decision held that plaintiffs may plead an ATS case under an agency-liability theory.  While the plaintiffs in *Aldana* alleged an agency relationship, the Eleventh Circuit did not address that issue and instead held only that accomplice and conspiracy were recognized theories of secondary liability.  416 F.3d at 1247–48.  The *Cabello* opinion is also limited to accomplice and conspiracy liability, and in fact does not mention agency liability at all.  402 F.3d at 1157.

Plaintiffs' selective quotation from *Flores*, 414 F.3d at 251, is similarly misplaced. *Flores* quotes Article 38 of the International Court of Justice ("ICJ") Statute, which provides that the ICJ shall decide issues "in accordance with international law" and "shall apply . . . the general principles of law recognized by civilized nations" and "judicial decisions."  *Id.* at 251.  Plaintiffs seem to argue that this statement establishes that agency liability—a "general principle of law recognized by civilized nations," e.g., U.S. domestic law—is a recognized principle under international law.  The Court disagrees.  The ICJ Statute's general statement regarding the law to which that court looks cannot satisfy *Sosa*'s requirement that ATS standards be well-defined and universally accepted.  Additionally, the issue of agency liability is entirely absent from the ICJ Statute, as well as from the *Flores* opinion.

81

Second, even assuming agency liability is recognized under international law, Plaintiffs'

allegations do not satisfy the requisite elements of an agency relationship between Chiquita and

the AUC concerning the AUC's alleged offenses.  The parties agree that such a theory requires

allegations that Chiquita exercised control over the AUC.  *See* Pls.' Second Resp. at 13 (DE 321)

("Agency requires '(1) consent to the agency by both principal and agency; and (2) the control of

the agent by the principal.'") (quoting *CFTC v. Gibraltar Monetary Corp.*, 575 F.3d 1180, 1189

(11th Cir. 2009)).  The complaints, however, fail to allege that the AUC acted under Chiquita's

control when carrying out its campaign of torture and killing.  The Court finds unavailing

Plaintiffs' argument that "by trading payment for performance" Chiquita "exercised control over

the AUC like any employer."  Pls.' Second Resp. at 13 (DE 321).  The mere fact that Chiquita

paid the AUC, and allegedly shared the same goals as the AUC, falls short of alleging that

Chiquita, an American corporation, controlled the military campaign of the AUC, a violent

Colombian paramilitary group.  There are no allegations that Chiquita directed the AUC's

military strategy or tactics, directed any of the AUC's actions in the banana-growing region, or

exercised any other direction over the AUC's decisions or conduct.  Plaintiffs merely allege that

Chiquita provided substantial support to the paramilitary group, support that the AUC seems to

have used as it deemed fit in its war with the FARC.  The complaints thus fail to plead facts

supporting the conclusion that Chiquita, as principal, "controlled" the AUC's violence, and

Plaintiffs cannot survive a motion to dismiss based on vague and conclusory legal assertions that

the AUC acted as Chiquita's "agent" or that the AUC acted under Chiquita's "control."  *See*

*Sinaltrainal*, 578 F.3d at 1268.

Last, the Court rejects Plaintiffs' alternative theory that Chiquita may be liable under agency principles for its after-the-fact ratification of the AUC's violence.  Plaintiffs contend that Chiquita may be secondarily liable under this ratification theory if it "(1) knows of the unauthorized act carried out on [its] behalf and (2) affirms the act, including by failure to repudiate it."  Pls.' Second Resp. at 13–14 (DE 321) (citing Restatement (Second) of Agency (1958) §§ 91 & 94).  Regardless of whether Plaintiffs may plead this theory of secondary liability under domestic agency principles, the Court finds that such a theory is not cognizable under international law.  Plaintiffs' proposed ratification standard requires a *mens rea* of mere knowledge and potentially no *actus reus*, as failure to act suffices.  To hold that aiding and abetting and conspiracy liability under the ATS require allegations of purpose or intent and affirmative acts, but that agency liability may be established by a less-demanding knowledge-based ratification theory and no *actus reus* is inconsistent.  More importantly, to permit Plaintiffs to plead an ATS claim so easily is at odds with *Sosa*'s directive that court's exercise "great caution" before adding to the "narrow class" of recognized international-law norms.  542 U.S. at 728, 729; *see also Amergi*, 611 F.3d at 1364 ("[T]he ATS does not broadly provide for causes of action.  The federal courts are empowered to open the door only 'to a narrow class' of claims.") (quoting *Aldana*, 416 F.3d at 1246–47); *id.* ("[T]he ATS cases have consistently emphasized the need for federal courts to guard carefully against the overexpansion of federal subject matter jurisdiction.").  Accordingly, the Court finds that Plaintiffs cannot plead an agency theory of indirect liability under the ATS.

## II.     Torture Victim Protection Act

The Torture Victim Protection Act of 1991 ("TVPA") provides a cause of action for

official torture and extrajudicial killing.  In relevant part, the TVPA provides:

> An individual who, under actual or apparent authority, or color of law, of any foreign
> nation—
>
>> (1) subjects an individual to torture shall, in a civil action, be liable for
>> damages to that individual; or
>>
>> (2) subjects an individual to extrajudicial killing shall, in a civil action, be
>> liable for damages to the individual's legal representative, or to any person
>> who may be a claimant in an action for wrongful death.

Torture Victim Protection Act of 1991 § 2(a), Pub. L. No. 102-256, 106 Stat. 73 (codified at 28

U.S.C. § 1350 note).  The TVPA defines torture as any act (1) "directed against an individual in

the offender's custody or physical control," (2) that inflicts "severe pain or suffering[,] . . .

whether physical or mental," (3) for the purpose of obtaining information or a confession,

inflicting punishment, intimidation or coercion, or any reason based on discrimination of any

kind.  *Id.* § 3(b).  Extrajudicial killing is defined as "a deliberated killing not authorized by a

previous judgment pronounced by a regularly constituted court affording all the judicial

guarantees which are recognized as indispensable by civilized peoples."  *Id.* § 3(a)

Plaintiffs assert two causes of action under the TVPA, torture and extrajudicial killing.

Plaintiffs' allegations of TVPA violations are based on the same operative facts underlying their

ATS claims.  *See Sinaltrainal*, 578 F.3d at 1269 ("It is not uncommon for plaintiffs to assert ATS

and TVPA claims together," based on "the same operative facts").  Whereas a complaint that

fails to sufficiently plead the elements of an ATS claim is analyzed under Rule 12(b)(1) for lack

of subject-matter jurisdiction, a motion to dismiss a TVPA claim requires an inquiry under Rule

12(b)(6) for failure to state a claim upon which relief can be granted.  *Sinaltrainal*, 578 F.3d at 1269.  To survive a motion to dismiss for failure to state a TVPA claim, "Plaintiffs must sufficiently allege (1) the paramilitaries were state actors or were sufficiently connected to the Colombian government so they were acting under color of law and (2) the Defendants, or their agents, conspired with [or aided and abetted] the state actors, or those acting under color of law, in carrying out the state-sponsored torture [or extrajudicial killing]."  *Id.* at 1270.

Chiquita first argues that the "'plain reading of the TVPA strongly suggests that it only covers human beings, and not corporations.'"  First Mot. at 68 (DE 93) (quoting *Exxon Mobil*, 393 F. Supp. 2d at 28).  This limitation to individuals, Chiquita contends, bars Plaintiffs' TVPA claims against it, a corporation.  Recent Eleventh Circuit precedents, however, hold that "'an individual' to whom liability may attach under the TVPA also includes a corporate defendant."  *Sinaltrainal*, 578 F.3d at 1264 n.13; *see also Romero*, 552 F.3d at 1315 ("Under the law of this Circuit, the Torture Act allows suits against corporate defendants.").  Thus, under the precedent of this Circuit, the Court rejects Chiquita's first basis for dismissal.

Chiquita's asserts two additional arguments: first, that Plaintiffs do not sufficiently allege that the AUC acted under color of law in committing torture and extrajudicial killing, and second, that Plaintiffs fail to plead aiding and abetting liability (i.e., *mens rea* and substantial assistance).  In support of these arguments, which are identical to those advanced against Plaintiffs' torture and extrajudicial-killing claims under the ATS, Chiquita incorporates by reference its ATS arguments on these two points.  For the same reasons that the Court rejected these same arguments in the ATS context, discussed in detail above, these arguments fail against

85

Plaintiffs' TVPA claims.[95]  The Court thus finds that Plaintiffs' TVPA claims survive Chiquita's

motion to dismiss.

## III.    State-Law Claims

Plaintiffs assert various common-law claims under the laws of Florida, New Jersey, Ohio,

the District of Columbia, and in some cases the law of "any other applicable jurisdiction."[96]

These claims include assault and battery, wrongful death, intentional infliction of emotional

distress, negligent infliction of emotional distress, negligence, negligent hiring, negligence per se,

and loss of consortium.  The Court will dismiss these claims because the civil tort laws of

Florida, New Jersey, Ohio, and the District of Columbia do not apply to the extraterritorial

conduct alleged here.

Under recognized principles of international law, a nation state "has jurisdiction to

prescribe law with respect to . . . conduct outside its territory that has or is intended to have

substantial effect within its territory."  Restatement (Third) of Foreign Relations Law of the

United States § 402 (1987) ("Restatement of Foreign Relations Law").  Additionally, a nation

---

[95] The Court recognizes that the "TVPA differs from the ATS in certain crucial ways," *Baloco v. Drummond Co.*, No. 09-16216, Slip op. at 12 (11th Cir. May 20, 2011), and that ruling on ATS claims does not necessarily dispose of similar claims under the TVPA.  Here, however, Chiquita's state-action and indirect-liability arguments are the same arguments, based on the same factual allegations and under the same legal standards, asserted against Plaintiffs' ATS claims.  The Court rejected those arguments in the ATS context, finding that, with respect to state action, Plaintiffs alleged a "symbiotic relationship" between the AUC and Colombian government and that, with respect to aiding and abetting liability, Plaintiffs alleged that Chiquita possessed a purpose *mens rea* and provided substantial assistance to the AUC.  These rulings, based on the same allegations and same legal standards, therefore dispose of Chiquita's identical arguments against Plaintiffs' TVPA claims.

[96] *E.g.*, *Carrizosa v. Chiquita Brands Int'l, Inc.*, No. 07-60821, DE 84, First. Am. Compl. ¶ 121 (filed Feb. 26, 2010).

state has jurisdiction to define and prescribe punishment for offenses "recognized by the community of nations as of universal concern . . . , even where none of the bases of jurisdiction indicated in § 402 is present." *Id.* § 404; *see also Basulto v. Cuba*, No. 02-21500, DE 39, Slip op. at 14 (S.D. Fla. Jan. 20, 2005). Similarly, the right of the several States of the United States to prescribe laws relative to such extraterritorial conduct is recognized under the same principles of international law, so long as the exercise of such jurisdiction does not violate constitutional limitations. Restatement of Foreign Relations Law § 402, Reporters' Note 5; cmt. k; *Basulto*, No. 02-21500, Slip op. at 15.

Plaintiffs' state-law claims are premised on acts by Colombian paramilitaries against Colombian civilians that occurred inside Colombia as part of Colombia's civil war. There are no allegations that this conduct had or was intended to have a substantial effect within the states of Florida, New Jersey, Ohio, or the District of Columbia. Nor are the state-law claims alleged here—e.g., ordinary tort claims for assault and battery, negligence, wrongful death, etc.—matters of universal concern recognized by the community of nations. Accordingly, the Court holds that the civil tort laws of Florida, Ohio, New Jersey and the District of Columbia do not apply to the AUC's alleged torts against Plaintiffs' relatives. *See, e.g.*, *Roe I v. Bridgestone Corp.*, 492 F. Supp. 2d 988, 1024 (S.D. Ind. 2007) (dismissing state-law claims because "[p]laintiffs have not yet articulated a viable basis for applying California law or Indiana law to the management of a Plantation in Liberia."); *Romero v. Drummond Co.*, No. 03-0575, DE 329, Slip op. at 2 (N.D. Ala. Mar. 5, 2007) ("[I]n view of Alabama's traditional refusal to apply its common law to torts where the injury occurred outside of the state, [the Court will] not apply Alabama common

87

law to the tort claims alleged here, which occurred extraterritorially in Colombia."); *Basulto*, No. 02-21500, Slip op. at 15 (permitting a Florida citizen to assert a claim under Florida tort law where the alleged conduct had a "detrimental effect on its citizens after their return to the State").

The Montes Plaintiffs (Case No. 10-60573), who assert common-law claims under Ohio law, argue that the Ohio Revised Code expressly authorizes suits in Ohio courts by nonresident aliens. The Montes Plaintiffs point to Ohio's wrongful-death statute, which provides in relevant part:

> When death is caused by a wrongful act, neglect, or default in another state or foreign country, for which a right to maintain an action and recover damages is given by a statute of such other state or foreign country, such right of action may be enforced in this state. Every such action shall be commenced within the time prescribed for the commencement of such actions by the statute of such other state or foreign country.

Ohio Rev. Code. Ann. § 2125.01 (West 2011). The Montes Plaintiffs contend that under Section 2125.01 they can maintain their wrongful-death claim because "Colombia provides a right to maintain an action and recover damages for torts, including wrongful death" and "the relevant statutes of limitations have not yet expired under Colombian law." Montes Pls.' Second Resp. at 5 (DE 322). Recognizing the Montes Plaintiffs' wrongful-death claims, via Ohio's wrongful-death statute, would involve interpreting and ruling on complex and novel issues of Colombian common law—such as the elements of a Colombian wrongful-death claim and the applicable statutes of limitation—which, for the reasons discussed in the next section, this Court declines to do. That is, because the Court declines to exercise jurisdiction over Plaintiffs' Colombian-law claims, the Court will not hear those same claims under the guise of Ohio's wrongful-death statute.

88

Plaintiffs also contend that even if they cannot directly assert these state-law claims, this Court can exercise supplemental jurisdiction over them based on the Court's jurisdiction under the ATS and TVPA.  First, the previously stated basis for refusing to hear Plaintiffs' state-law claims is not based on a lack of subject-matter jurisdiction, but because those state laws do not cover Plaintiffs' claims.  Thus, supplemental jurisdiction cannot save Plaintiffs' state-law claims.

In any event, the Court would decline to exercise supplemental jurisdiction.  The "application of supplemental jurisdiction is statutorily controlled by 28 U.S.C. § 1367."  *Amergi*, 611 F.3d at 1366.  The statute permits the district courts to decline to exercise supplemental jurisdiction if, for example, "the claim raises a novel or complex issue of State law" or "in exceptional circumstances, there are other compelling reasons for declining jurisdiction."  28 U.S.C. § 1367(c).  This section "describes the occasions on which a federal court may exercise its *discretion* not to hear a supplemental claim or admit a supplemental party, despite the *power* of the court to hear such a claim."  *Amergi*, 611 F.3d at 1366 (emphasis in original) (internal quotation marks omitted).  The Court is unaware of any of these states' civil tort laws ever being applied to foreign conduct against foreign citizens in the course of a foreign war.  Given the novelty and complexity of adjudicating claims under the laws of four U.S. states, and potentially *every* state,[97] based on wholly foreign conduct by foreign tortfeasors against foreign victims, even if the Court could hear these claims it would exercise its discretion under 28 U.S.C. § 1367 to decline to supplemental jurisdiction.

---

[97] *E.g.*, *Carrizosa v. Chiquita Brands Int'l, Inc.*, No. 07-60821, DE 84, First. Am. Compl. ¶ 121 (filed Feb. 26, 2010) (alleging common-law claims "under the laws of the United States, Colombia or the common law of Ohio, New Jersey, Florida or any other applicable jurisdiction.").

IV.     **Colombia-Law Claims**

Some Plaintiffs also assert claims under the laws of Colombia.  These are the same common-law claims that these Plaintiffs assert under state laws, e.g., wrongful death, but the complaints assert that these claims also are actionable under Colombian law.  Even if the Court were competent to interpret and rule upon a foreign nation's common law, the novel and complex issues inherent in such in endeavor balance against exercising supplemental jurisdiction. Accordingly, under 28 U.S.C. § 1367(a) the Court will decline to exercise supplemental jurisdiction over Plaintiffs' Colombian-law claims.  *See Amergi*, 611 F.3d at 1366 (affirming district court's decision not to exercise supplemental jurisdiction over foreign-law claim based on "extraordinary inconvenience and expenditure of judicial resources involved in hearing the Israeli law wrongful death claim"); *Romero*, 552 F.3d at 1318 ("The conclusion of the district court that the claim [for wrongful death under Colombian law] raised complex issues is supported by the record, and the court was well within its discretion to decline jurisdiction over that claim."); *Drummond I*, No. 09-1041, Slip op. at 35 (declining to exercise supplemental jurisdiction over Colombian-law claim, reasoning that the "wrongful death claim raises a novel and complex issue under the law of Colombia.  Those issues are sufficiently complex that it would be impossible for this court to navigate the Colombian law requisites for a wrongful death claim.") (citing 28 U.S.C. § 1367(c)(1).

V.      **FARC Claims**

The Perez Plaintiffs (Case No. 08-80465) assert claims based on Chiquita's alleged payments to *both* the AUC and the FARC.[98]  Of Plaintiffs' remaining claims—torture and extrajudicial killing under the TVPA and torture, extrajudicial killing, war crimes, and crimes against humanity under the ATS—the Perez Plaintiffs concede that they cannot state a claim for torture or extrajudicial killings under either the TVPA or ATS because they do not allege that the FARC, a guerrilla group that opposes the Colombian government, acted under color of law. Perez Pls.' First Resp. at 32 (DE 119, Ex. 1).  The Perez Plaintiffs further concede that they cannot state a claim under a conspiracy theory of secondary liability because they do not allege any meetings or agreements between the FARC and Chiquita.  Perez Pls.' First Resp. at 32 (DE 119, Ex. 1).  The Court therefore addresses only whether the Perez Plaintiffs' complaint sufficiently alleges ATS claims against Chiquita for war crimes and crimes against humanity under an aiding and abetting theory of liability.

 To plead aiding and abetting liability under the applicable international standard, Plaintiffs must allege that (1) the FARC committed an international-law violation, (2) Chiquita acted with the purpose or intent to assist in that violation, and (3) Chiquita's assistance substantially contributed to the FARC's commission of the violation.  *See Talisman*, 582 F.3d at 258; *Khulumani*, 504 F.3d at 277 (Katzmann, J., concurring); *Drummond II*, No. 09-1041, DE 43, Slip op. at 20-21.  The Court concludes that this complaint fails to allege sufficient facts supporting the second and third elements for aiding and abetting liability.

_____

[98] *Perezes (1-95) v. Chiquita Brands Int'l, Inc.*, No. 08-cv-80465, DE 58, First Am. Compl. ¶ 5 (filed Mar. 1, 2010).

First, the Perez Plaintiffs fail to allege that Chiquita paid the FARC with the purpose or intent to further the FARC's violence.  Plaintiffs conclusorily allege that Chiquita supported the FARC, but fail to allege Chiquita's intent, if any, in doing so.[99]  The complaint thus lacks facts supporting the conclusion that Chiquita acted with the purpose, as opposed to mere knowledge, to further the FARC's violence in the banana-growing regions.  Indeed, the complaint itself argues that the FARC allegations meet the lesser knowledge standard, and argues only that the AUC allegations meet the purpose standard.[100]

Second, the Perez Plaintiffs' allegations regarding Chiquita's assistance to the FARC are conclusory and devoid of any factual support.  Plaintiffs assert that Chiquita made payments to the FARC, but they fail to allege any facts supporting this allegation, such as when these payments were made, the size, frequency, or form of the payments, how the FARC used the funds or whether the payments were related in any way to the offenses alleged in the complaint.[101]  Without any facts regarding the amount of payments or how the FARC used that

_____

[99] The allegations regarding the FARC's victims repeat the same language throughout: "[W]hen Pablo Perez 83 was murdered, the FARC guerrillas were receiving substantial from Chiquita.  Pablo Perez 83 was one of the innocent victims of the violence that ensued when Chiquita brought and provided support to the guerrillas in the banana zone and surrounding areas of Magdalena." *Id.* ¶ 367.

[100] *See id.* ¶ 513 ("T]his Court held in the related case under the ATA [that] Chiquita's payments to the FARC with knowledge of the group's record of terrorism were 'well within the mainstream of aiding and abetting liability.'  In this case, Plaintiffs who allege they were killed by the FARC when it was supported by Chiquita have the exact same claim as was found sufficient in the ATA case.  And those alleging Chiquita aided and abetted the AUC have an even more compelling case as Chiquita not only provided knowing and substantial assistance to the AUC, but it did so with the shared purpose of defeating the FARC in the civil conflict and pacifying the local populations with terror.").

[101] *See, e.g., id.* ¶ 5 ("Some of the Plaintiffs allege herein that their decedents were killed by the FARC during the time Chiquita was providing substantial support to that terrorist

support, this Court cannot conclude that Chiquita's alleged assistance substantially contributed to the FARC's international-law violations.   The Perez Plaintiffs' conclusory allegations therefore fail to state a claim against Chiquita for aiding and abetting the FARC.  *See Iqbal*, 129 S. Ct. at 1951 (explaining that conclusory allegations, devoid of factual support, are not entitled to the presumption of truth on a motion to dismiss); *Sinaltrainal*, 578 F.3d at 1268 (holding that the plaintiff "must plead factual content," not "vague and conclusory" assertions, to state a claim).

The Court rejects the Perez Plaintiffs' suggestion that this Court's February 4, 2010 order in a related case—finding that the plaintiffs sufficiently alleged that Chiquita aided and abetted the FARC (DE 278)—is controlling here.[102]  The Court's February 4, 2010 order applied the *domestic* aiding and abetting standard (i.e., knowledge) to the plaintiffs' claims that arose under a different statute, the Antiterrorism Act, 18 U.S.C. § 2331 *et seq*. ("ATA").  That this Court found that a different complaint sufficiently alleged, under a less-demanding standard, that Chiquita knew of the FARC's violent aims when allegedly assisting it is not relevant to whether the Perez Plaintiffs sufficiently allege, under the international purpose standard, that Chiquita assisted the FARC with the purpose to further the FARC's violence.  Similarly, the Court's finding that the ATA plaintiffs sufficiently alleged that Chiquita substantially assisted the FARC is not dispositive here.  The complaints at issue there alleged detailed facts regarding the specific

---

organization."); *id.* ¶ 367 ("[W]hen Pablo Perez 83 was murdered, the FARC guerrillas were receiving substantial [assistance] from Chiquita.  Pablo Perez 83 was one of the innocent victims of the violence that ensued when Chiquita brought and provided support to the guerrillas in the banana zone and surrounding areas of Magdalena."); *id.* ¶ 516 ("As Chiquita admitted in its criminal case, it provided substantial funding to the FARC until Chiquita switched sides and funded the AUC to drive the FARC out of the banana areas of Colombia.").

[102] *Id.* ¶¶ 5, 513.

amounts, frequency, and duration of Chiquita's payments, the terms of Chiquita and the FARC's agreements surrounding the payments, and included the additional allegations that Chiquita supplied the FARC with weapons, ammunition, and other non-monetary supplies. The Perez Plaintiffs do not allege such facts.

Thus, because the Perez Plaintiffs' complaint fails to allege that Chiquita's payments to the FARC substantially contributed to the FARC's violence or were intended to further that violence, the Perez Plaintiffs fail to sufficiently allege, under the applicable international-law standard, that Chiquita is secondarily liable for the FARC's alleged offenses. The Perez Plaintiffs' claims based on Chiquita's alleged payments to the FARC are dismissed.[103]

## CONCLUSION

For the foregoing reasons, it is hereby ORDERED AND ADJUDGED that Chiquita's Motions to Dismiss Amended Complaints (DEs 92, 295) are GRANTED IN PART AND DENIED IN PART. Specifically, Chiquita's motions to dismiss are GRANTED with respect to Plaintiffs' ATS claims for terrorism and material support to terrorist organizations. Chiquita's motions to dismiss are GRANTED with respect to Plaintiffs' ATS claims for cruel, inhuman, or degrading treatment; violation of the rights to life, liberty and security of person and peaceful assembly and association; and consistent pattern of gross violations of human rights. Chiquita's motions to dismiss are GRANTED with respect to Plaintiffs' state-law claims. Chiquita's

---

[103] Because this ruling in based on a pleading deficiency, the Court will permit the Perez Plaintiffs leave to amend to allege sufficient facts, if they can do so in good faith, supporting their claim that Chiquita aided and abetted the FARC's violations of international law. The Perez Plaintiffs may file a second amended complaint, if they choose, within thirty (30) days from the date of entry of this order.

motions to dismiss are GRANTED with respect to Plaintiffs' Colombia-law claims.  Chiquita's

motions to dismiss are GRANTED with respect to the Perez Plaintiffs' FARC-based claims.

Chiquita's motions to dismiss are DENIED with respect to Plaintiffs' ATS claims for

torture, extrajudicial killing, war crimes, and crimes against humanity.  Chiquita's motions to

dismiss are DENIED with respect to Plaintiffs' TVPA claims for torture and extrajudicial killing.

The Carrizosa and Perez Plaintiffs are hereby granted leave to amend their complaints,

consistent with the directives of this order.  They may file their amended complaints, if they

choose, within thirty (30) days from the date of entry of this order.

DONE AND ORDERED in Chambers at West Palm Beach, Palm Beach County, Florida,

this 3rd day of June, 2011.

_____
KENNETH A. MARRA
United States District Judge